John Persell (Utah Bar # 17298)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
Tele: (503) 896-6472

Attorney for Plaintiff
Western Watersheds Project

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT,<br><br>  Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE,<br><br>  Defendant. | **COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

## I.    INTRODUCTION

1.    Monroe Mountain, located in Sevier and Piute counties in south-central Utah, provides important and world-renowned habitat for a variety of special plant and wildlife species. These traditional lands of the Southern Paiute Tribe are now located within the Richfield Ranger District of the Fishlake National Forest. The Monroe Mountain area contains important habitat for the imperiled greater sage-grouse and valuable forage for deer and elk herds. Monroe Mountain's streams and wetlands contain populations of sensitive aquatic species such as the boreal toad and Bonneville cutthroat trout. Monroe Mountain is also home to some of the world's largest living organisms, aspen clone colonies that share common root systems and have expanded over thousands of years.

2.    However, the remarkable qualities of Monroe Mountain are being damaged. Wildlife populations must coexist with overstocked livestock on the national forest, and are suffering as a result. Recent forest plan amendments to protect sage-grouse have not been implemented into relevant livestock grazing permits. Sensitive aquatic species' habitat is degraded by livestock trampling and bank alteration. Aspen regeneration has been inhibited by excessive livestock browsing.

3.    Yet despite awareness that cattle numbers on Monroe Mountain are too high relative to available forage, and despite grazing permittees' on-going non-compliance with permit terms and conditions, the U.S. Forest Service (USFS) continues to authorize grazing at levels that repeatedly lead to over-utilization of forage vegetation and degradation of other forest resources. Rather than directly address the anthropogenic causes of aspen decline, the agency has been using prescribed burns in an effort to stimulate regrowth.

4.     It appears that USFS's failures to remedy damaging livestock use have been influenced by threats made by a handful of scofflaw grazing permittees on Monroe Mountain who refuse to acknowledge the agency's role as trustee of the national forests for all Americans, and who refuse to abide by the most basic of permit terms and conditions. These men have made overtly clear they have guns to back up their threats, and they call for the arrest of USFS employees who attempt to exercise basic management and oversight on federal grazing allotments as required by law. Stoked by the anti-government rhetoric of Cliven Bundy and other fringe extremists, these particular ranchers do not accept federal authority over the national forests, the clear language of statutes enacted by Congress, or the validity of the judicial system. More than once, the ominous hint of "another Bunkerville situation"[1] has been laid at local USFS employees' feet.

5.     Additionally, regional and Washington Office agency leaders, state and local officials, and Utah's Congressional delegation constantly pressure local USFS staff to plug their ears and look the other way when these permittees clearly demonstrate through their words and actions they have no plan to abide by federal grazing laws and regulations. Local USFS staff are directed to make outrageous and unlawful concessions that other ranchers across the West do not receive. To placate this handful of bad actors, USFS has bent and broken its own laws and regulations, and continues to authorize livestock grazing without any reasonable expectation of

---

[1] The Bunkerville standoff occurred on April 12, 2014, near Bunkerville Nevada. The Bureau of Land Management tried to remove cattle Cliven Bundy allowed to illegally graze public land. In response, armed militiamen came to the rancher's defense, and the federal government ceased its removal operation. *See Tensions still high in 'Nevada Land' over cattle dispute*, Kirk Siegler, NPR (June 17, 2014), available at https://www.npr.org/2014/06/17/321705941/tensions-still-high-in-nevada-land-over-cattle-dispute (last visited Nov. 20, 2019).

permit compliance. After years of documented permit violations, USFS has failed to hold these ranchers accountable and failed to implement effective management to protect and restore Monroe Mountain's ecosystem integrity.

6.     The specter of violence is not a valid excuse for USFS to abdicate its role as trustee of the National Forest System on behalf of all Americans. These lands must be managed for the full suite of multiple uses identified in the National Forest Management Act (NFMA), not solely to meet the illegal and unreasonable demands of private livestock interests. Social intimidation and political pressure must not dictate the management of grazing allotments on Monroe Mountain, or anti-government extremists will be further emboldened to menace the stewards of our public lands elsewhere.

7.     This lawsuit challenges USFS decisions to issue temporary grazing permits and annual operating instructions (AOIs) for the Kingston, Forshea, and Manning Creek grazing allotments on Monroe Mountain. The temporary permits were not issued in accordance with USFS regulations. The agency relied on its authority to issue these temporary permits "in the event of drought or other emergency of National or Regional scope." Yet no drought or emergency of such scope existed at the time of its decisions. No other USFS regulations present any lawful justification for issuing temporary permits and AOIs on these allotments. Further, USFS issued permits to individuals with long histories of blatant, willful permit non-compliance. The agency has not rationally based its decisions to issue these temporary permits and accompanying AOIs on the facts before it. Thus, the agency has violated the Federal Land Policy and Management Act (FLPMA) and the Administrative Procedure Act (APA).

8.      This lawsuit also challenges the issuance of both ten-year term and temporary permits and AOIs by USFS for the Kingston and Forshea allotments that allow different management strategies and livestock numbers on each allotment than USFS analyzed under the most recent National Environmental Policy Act (NEPA) analysis in 2007. The agency admits the relevant Decision Memos did not authorize the type of grazing currently occurring on the allotments. The agency also admits that the manner of grazing currently allowed in the allotments is not consistent with the relevant allotment management plans (AMPs). Thus, USFS has violated NEPA, FLPMA, and the APA.

9.      This lawsuit also challenges the failure of term permits and AOIs issued by USFS for the Kingston and Forshea allotments to incorporate any protections for the greater sage-grouse as required by recent forest plan amendments. Both the Kingston and Forshea allotments contain Priority Habitat Management Areas (PHMAs) for sage-grouse. The Forest Service admits that it has thus far failed to address sage-grouse in permits for these allotments. Accordingly, the USFS has violated NFMA and the APA.

10.     This lawsuit challenges USFS's decision to issue temporary permits and ten-year term permits and AOIs for the Manning Creek Allotment, despite years of documented non-compliance by the permittees that culminated in suspension and cancellation actions issued by the District Ranger in 2013. The permittees appealed the cancellation action in November of 2013, but the Forest Service failed to abide by its own regulations to resolve or decide the appeal. Nearly six years later, in June of 2019, the current Forest Supervisor reversed the District Ranger's 2013 actions. This lawsuit also challenges the Forest Supervisor's reversal, because his appeal decision completely failed to adhere to agency regulations specifying the manner in

which appeals may be resolved, and no lacked any rational connection between the facts in the

appeal record and the decision made, and, in fact, appears to be fear-based capitulation to the

intimidation tactics of the permittees. Thus, the agency violated the Organic Act of 1897, the

Forest Transfer Act of 1905, FLPMA, and the APA.

## II.     JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action

arises under the laws of the United States, including the NFMA, NEPA, FLPMA, the APA, and

the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.* WWP seeks judicial review of final

administrative actions of the U.S. Forest Service. *See* 5 U.S.C. § 704) (actions reviewable). An

actual, justiciable controversy exists between the parties, and the requested relief is therefore

proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. § 701-06.

12.     Venue is proper in the United States District Court for the District of Utah

pursuant to 28 U.S.C. § 1391(e)(1) because the statutory violations alleged herein occurred

within the state of Utah, defendant U.S. Forest Service resides in this district, and the public

lands and resources and agency records in question are located in this district.

13.     The federal government has waived sovereign immunity in this action pursuant to

5 U.S.C. § 702.

## III.     PARTIES

14.     Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is a non-profit

organization dedicated to protecting and restoring watersheds and wildlife, and conserving the

public lands and natural resources in Utah and throughout the West. Since its inception, WWP

has advocated to curb ecological abuses of public lands from domestic livestock throughout the

West, including in Utah. WWP undertakes a wide range of activities including education, advocacy, scientific study, and litigation in order to protect and restore natural ecosystems, often through reducing the effects of harmful livestock use, and to communicate to the public and policy-makers about the values of native biodiversity and associated landscapes in Utah. WWP and many of its members and supporters have long-standing interests in preserving and conserving native ecosystems, including native plants and animals and their habitats on the Fishlake National Forest and across Utah.

15.     WWP is headquartered in Hailey, Idaho, and has 9,500 members and supporters across the United States. WWP's members use and enjoy public lands in and throughout Utah, including on the Fishlake National Forest, for a variety of purposes, including scientific study, recreation, wildlife viewing, and aesthetic appreciation.

16.     Ms. Laura Welp, an employee and member of WWP, visited the areas where livestock grazing takes place on the Kingston, Forshea, and Manning Creek allotments on October 22 and 23, 2019. Ms. Welp intends to return to the areas in May or June of 2020. While on the allotments, Ms. Welp engaged in habitat surveys, plant and wildlife observation, scientific study, and enjoyment of the natural qualities of the areas. Ms. Welp intends to engage in these activities again in the future. During her recent visit, Ms. Welp observed trespassing cattle on the allotments more than a week after the permitted off-dates. *See* Attached Declaration of Laura Welp ¶¶ 14, 18, and 19. She also observed other AOI and permit violations and environmental damage including over-utilization of forage, poorly maintained and unmaintained fences, and degraded natural water features on the Kingston, Forshea, and Manning Creek allotments. *Id.* at ¶¶ 14-20.

17.     WWP brings this action on its own behalf and on behalf of its members.

18.     WWP and its members' recreational, scientific, inspirational, educational, aesthetic, and other interests have been directly and irreparably harmed, and continue to be affected and harmed, by USFS's issuance of permits for livestock grazing on the Kingston, Forshea, and Manning Creek allotments on the Fishlake National Forest, as well as by the agency's failure to incorporate protections for sage-grouse, its failure to prevent repeated over-utilization of forage, and its failure to prevent repeated allotment use outside the times allowed by permit. These are actual, concrete injuries to WWP and its members that would be redressed by the relief sought herein. WWP has no other adequate remedy at law.

19.     Defendant UNITED STATES FOREST SERVICE is an agency of the United States within the Department of Agriculture charged with managing the Fishlake National Forest and other units of the National Forest System according to federal statutes and regulations. USFS oversees livestock grazing on the Fishlake National Forest as well as the management of other Forest uses and resources.

20.     Plaintiff WWP has Article III standing to bring this action because it is directly injured by the procedural and substantive violations of federal laws alleged herein, which are redressable by this Court. WWP is directly injured by USFS's failure to manage livestock grazing according to applicable laws and regulations and in a manner that will protect the resources of the Fishlake National Forest. WWP is directly injured by USFS's issuance of permits and AOIs to individuals and groups with documented histories of permit non-compliance, including extensive and repeated over-utilization of vegetation, unauthorized use

outside permitted times, failure to rest and rotate pastures, and failure to maintain fencing and water developments.

21.     In this action, WWP challenges USFS's issuance of ten-year term and temporary permits, as well as Annual Operating Instructions, for the Manning Creek, Kingston, and Forshea allotments. Temporary permits and Annual Operating Instructions by their nature expire either within one calendar year or at the end of the permitted grazing season. As such, "the duration of the challenged conduct is too short to be fully litigated prior to its cessation or expiration." *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1255-56 (10th Cir. 2010) (citing *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005)). Further, because USFS has issued such temporary permits in the years directly preceding the 2019 grazing season, along with accompanying AOIs across the three allotments, and because USFS is likely to continue to issue temporary permits and AOIs for the upcoming grazing season, "there is a reasonable expectation that the same complaining party [WWP] will be subject to the same action again" without the agency addressing WWP's concerns about the permits' and AOIs' lawfulness. *Id.* As such, WWP's claims regarding temporary permits and AOIs are "capable of repetition, yet evading review." *Id.*

22.     WWP's injuries would be redressed if this Court (1) reversed and vacated USFS's issuance of temporary and ten-year term permits and AOIs for the Kingston, Forshea, and Manning Creek allotments; (2) declared the USFS's issuance of such permits and AOIs to be unlawful; (3) set aside the Forest Supervisor's reversal of the District Ranger's cancellation actions for the Manning Creek Allotment and ordered the agency to dismiss or resolve any appeals of the cancellation actions according to its own regulations; (4) ordered USFS to

complete legally adequate NEPA analysis for the allotments; (5) ordered USFS to incorporate sage-grouse protections into current and future permits for these allotments; and (6) enjoined USFS from issuing further permits or AOIs for the allotments or otherwise allowing livestock on the allotments unless and until USFS has fully complied with NEPA, NFMA, FLPMA, the Organic Act of 1897, the Forest Transfer Act of 1905, and associated regulations. Unless judicial relief is granted, WWP and its members will continue to suffer irreparable harm to their interests from unlawful livestock grazing under the permits and AOIs issued by USFS.

## IV.   LEGAL BACKGROUND

### A.   Laws Governing the Management of National Forests

23.    Congress originally established the modern National Forest System to "improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of the citizens of the United States." Organic Act, 16 U.S.C. § 475 (1897).

24.    In 1905, Congress transferred authority of the National Forest System from the Department of the Interior to the Department of Agriculture. Forest Transfer Act, 16 U.S.C. § 472 (1905).

25.    Congress later established a policy of multiple use and sustained yield on all units of the National Forest System, managing forests for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." Multiple Use and Sustained Yield Act, 16 U.S.C. §§ 528 and 529 (1960).

26.    Congress affirmed this mandate in the National Forest Management Act (NFMA) of 1976, requiring all units of the National Forest System to provide for multiple use, adding

wilderness to the list of values enumerated in the Multiple Use and Sustained Yield Act. 16

U.S.C. § 1604(e)(1).

> ### i.    Forest Plans and Amendments

27.    NFMA also requires each National Forest System unit to develop a land resource

management plan, more commonly referred to as a forest plan. 16 U.S.C. § 1604(a). Permits for

the use and occupancy of National Forest System lands, including grazing permits, must be

consistent with the relevant forest plan. *Id*. § 1604(i). Any permits "currently in existence must

be revised as soon as practicable to be made consistent with such plans," including after revision

of a forest plan. *Id.*

28.    In order to avoid a listing under the Endangered Species Act for the greater sage-

grouse, USFS amended its Utah forest plans in 2015 to address the need for stronger protections

across the species' range. *See* Greater Sage-grouse Record of Decision and Land Management

Plan Amendments (USDA Forest Service, Sept. 2015), available at

https://www.fs.fed.us/sites/default/files/sage-grouse-great-basin-rod.pdf (last visited Nov. 20,

2019).

29.    For Utah, these amendments included new Desired Conditions, Standards, and

Guidelines for livestock grazing in sage-grouse habitat. *Id.*, p. 146-47. These new protections

included restrictions on trailing livestock, fences, water developments, and other livestock

facilities, as well as perennial grass and forb height retention requirements for vegetation. *Id.*

30.    The amendments identified Priority Habitat Management Areas (PHMAs) on the

Richfield Ranger District, including the Kingston and Forshea allotments. Greater Sage-Grouse

Habitat on and in the Vicinity of the Richfield Ranger District, Fishlake National Forest (Sept.

2015), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3856017.pdf (last visited

Nov. 20, 2019).

31.     The amendments required USFS to incorporate the new sage-grouse protections

into term grazing permits no later than 2018. *Id.*, p. 71-72.

32.     On November 27, 2017, USFS approved an "administrative change" to the

timeframe specified in the 2015 Record of Decision for implementation of sage-grouse

protections into term grazing permits. *See* Grazing Permits and Greater Sage-grouse Timeframe

Change (USFS Nov. 27, 2017). Instead of the original 2018 deadline, USFS reverted to the "as

soon as practicable" language found in NFMA. *Id.*

33.     In August of 2019, USFS released a draft record of decision for yet another sage-

grouse plan amendment for national forests in Utah, rolling back some of the 2015 amendment's

protections. *See* Greater Sage-grouse Draft Record of Decision and Land Management Plan

Amendment for National Forest System Land in Utah (USDA Forest Service, Aug. 2019),

available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd645841.pdf (last visited

Nov. 20, 2019). That draft decision is currently still under consideration in a pre-decisional

administrative review process while USFS responds to objections filed by the public, including

by WWP.

     **ii.     Federal Land Policy and Management Act and Associated Regulations**

34.     The Federal Land Policy and Management Act of 1976 provides direction for

USFS on the management of livestock grazing across the National Forest System. All grazing on

the national forests must be authorized by a grazing permit. 43 U.S.C. § 1752(a); 36 C.F.R. §

222.3(a).

35.     Grazing permits "convey no right, title or interest held by the United States in any

lands or resources." *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1247 (10th Cir. 2010); 36

C.F.R. § 222.3(b). Instead, grazing permits "merely grant a license and establish the number,

kind, and class of livestock, the allotment to be grazed, and the period of use." *McKeen*, 615 F.3d

at 1247 (internal marks omitted) (citing *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d

977, 980 (9th Cir. 2006)).

36.     Under FLPMA, all grazing permits "shall be for a term of ten years" unless USFS

> determines that (1) the land is pending disposal; or (2) the land will be devoted to
> a public purpose prior to the end of ten years; or (3) it will be in the best interest
> of sound land management to specify a shorter term . . . .

43 U.S.C. § 1752(a) and (b).

37.     USFS prescribes itself even more specific direction for when a grazing permit for

no more than one year may be issued:

(i)     Temporary grazing permits for periods not to exceed one year, and on a charge
basis, may be issued:
(A)     To allow for use of range while a term grazing permit is held in
suspension.
(B)     To use forage created by unusually favorable climatic conditions.
(C)     To use the forage available when the permit of the normal user's livestock
is in nonuse status for reasons of personal convenience.
(D)     To allow a person to continue to graze livestock for the remainder of the
grazing season where base property has been sold, the permit waived, and
a new term permit issued.
(E)     To allow grazing use in the event of drought or other emergency of
National or Regional scope where such use would not result in permanent
resource damage.

36 C.F.R. § 222.3(c)(2)(i).

38.     After the expiration of a grazing permit, if USFS issues subsequent permits for the

same allotment, it must continue the expired permit's terms and conditions "until the date on

which the Secretary concerned completes any environmental analysis and documentation for the permit or lease required under the National Environmental Policy Act." 43 U.S.C. § 1752(c)(2).

39.     Additionally, FLPMA allows USFS to "categorically exclude" a permit from the requirement to prepare an environmental assessment or an environmental impact statement under NEPA if "the issued permit or lease continues the current grazing management of the allotment" and USFS determines the allotments "meet[] objectives in the applicable land and resource management plan" or "factors other than livestock grazing" are causing the allotment not to meet those objectives. 43 U.S.C. § 1752(h)(1)(A) and (B).

40.     Under FLPMA, an "allotment management plan . . . prescribes the manner in, and extent to, which livestock operations will be conducted in order to meet the multiple-use, sustained yield, economic and other needs and objectives as determined for the lands . . . ." 42 U.S.C. § 1702(k)(1).

41.     Under its statutory authority, USFS now authorizes livestock grazing on the national forests

> by issuing (1) Forest Plans, *see generally* 16 U.S.C. § 1604; 36 C.F.R.§ 219.1-.16; (2) Allotment Management Plans ("AMPs"), *see* 43 U.S.C. § 1752(d); 36 C.F.R. §§ 222.1(b)(2), 222.2; (3) term grazing permits, *see* 43 U.S.C. § 1752(a); 36 C.F.R. §§ 222.1(b)(5), 222.3; and (4) Annual Operating Instructions ("AOIs").

*McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1246-47 (10th Cir. 2010).

42.     Grazing pursuant to a permit on National Forest lands must be "'in accordance with provisions of the . . . [relevant] Forest Service policies,' including the relevant Forest Plan and any relevant AMPs." *Id.*, 615 F.3d at 1247.

43.     Annual operating instructions "are signed agreements between the Forest Service and grazing permit recipients which set forth the parameters of the permit holder's license for the upcoming year." *Id.*

44.     Issuance of an AOI is a final agency action; "[i]t is the consummation of a process that sets the parameters for the upcoming grazing season and it imposes legal consequences on the permit holder." *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 983 (9th Cir. 2006).

45.     Under FLPMA, only if the holder of an expired permit has been "in compliance with the rules and regulations issued and the terms and conditions in the permit," and the permittee accepts the terms and conditions of a new permit, shall the holder of the expired permit be given first priority for a new permit. 43 U.S.C. § 1752(c)(1).

46.     USFS regulations restate this compliance threshold for prioritizing new term permits: only if a permit holder "fully complied" with an expired term permit's terms and conditions should that permittee be given first priority for a new permit. 36 C.F.R. § 222.3(c)(1)(ii).

47.     USFS may cancel or suspend a livestock grazing permit "if the permittee does not comply with provisions and requirements in the grazing permit or the regulations of the Secretary of Agriculture on which the permit is based." 36 C.F.R. § 222.4(a)(4). Under the APA, such action by USFS must be preceded by "notice by the agency in writing of the facts or conduct which may warrant the action" and an "opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c)(1) and (2); *see also Anchustegui v. U.S. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001).

### iii.     Regulations Governing Appeals of Livestock Grazing Permit Decisions

48.     Through authority granted by the Organic Act of 1897, 16 U.S.C. § 551, and the

Forest Transfer Act of 1905, 16 U.S.C. § 472, USFS promulgated regulations governing the

manner in which livestock grazing permit decisions may be appealed, and the procedures to be

followed in the event of such an appeal. 36 C.F.R. § 214 *et seq.*

49.     Certain parties may appeal livestock grazing decisions regarding term permits. 36

C.F.R. § 214.4(a). Parties to an appeal may include permit holders, operators, solicited

applicants, intervenors, and the Responsible Official (decision-maker). *Id.* § 214.3. Intervenors

must request intervention and be granted intervention by the Appeal Deciding Officer. *Id.* §

214.2. However, eligibility to intervene is limited to holders, operators, and solicited applicants.

*Id.* § 214.11.

50.     If an appeal meeting content requirements is filed, the Responsible Official must

prepare and provide a responsive statement addressing the appeal's factual and legal allegations

to the Appeal Deciding Officer within 20 days, unless mediation is underway. 36 C.F.R. §

214.12(a).

51.     The Appeal Deciding Officer may authorize a stay of the appealed decision if the

appellant requests such a stay in writing. 36 C.F.R. §§ 214.8(b)(2) and 214.13(b)(1). If mediation

is requested pursuant to 36 C.F.R. § 222.20, a stay is automatic. 36 C.F.R. § 214.13(d).

52.     The Appeal Deciding Officer must determine an appeal is timely and meets

content requirements, otherwise the appeal must be dismissed. 36 C.F.R. §§ 214.8(a) and (b),

214.10(a), and 214.14(a). Aside from the time period to file an appeal and the time periods

related to discretionary review, the Appeal Deciding Officer may grant extensions of time during

the appeal process "upon the written request of a party to an appeal and a finding of good cause

for the extension." 36 C.F.R. § 214.14(c)(2) and (3). Any decisions granting extensions of time

must be in writing and explain their bases. *Id.* § 214.14(c)(4). USFS's regulations state that

"[o]rdinarily, extensions that add more than 60 days to the appeal period should not be granted."

*Id.* § 214.14(c)(5).

53.     USFS's appeal regulations also specify when an appeal may be resolved without

an appeal decision 36 C.F.R. § 214.15. This includes where the parties "agree on facts, and

explore opportunities to resolve one or more of the issues in dispute by means other than

issuance of an appeal decision." *Id.* § 214.15(a). The Responsible Official may also withdraw the

decision under appeal. *Id.* § 214.15(b).

54.     An appeal decision issued by the Appeal Deciding Officer must be based solely

on the appeal record and any oral presentation by the appellant. 36 C.F.R. § 214.18(b). The

"appeal record" refers to [d]ocumentation and other information filed with the Appeal Deciding

Officer within the relevant time period by parties to an appeal and upon which review of an

appeal is conducted." *Id.* § 214.2. An appeal decision must "conform to all applicable laws,

regulations, policies, and procedures." *Id.* § 214.18(c).

**B.     National Environmental Policy Act**

55.     The National Environmental Policy Act is the "basic national charter for

protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted NEPA with the

objectives of "encouraging productive and enjoyable harmony between man and his

environment" while "promoting efforts which will prevent or eliminate damage to the

environment and biosphere stimulating the health and welfare of man; and enriching the

understanding of the ecological systems and natural resources important to the Nation . . . ." 42
U.S.C. § 4321.

56.    To achieve these goals, NEPA contains "action-forcing" procedures, including the
mandate that all federal agencies must prepare an environmental impact statement (EIS) to
analyze and disclose the environmental consequences of major federal actions "significantly
affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*,
490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C).

57.    Congress created the Council on Environmental Quality (CEQ) to assist with the
implementation of NEPA. 42 U.S.C. §§ 4342 and 4344. CEQ has promulgated NEPA
regulations that are binding on all federal agencies. *See id.*; *see also* 40 C.F.R. §§ 1500-1508.

58.    The CEQ regulations allow certain federal actions to be categorically excluded
from NEPA analysis through an environmental assessment (EA) or environmental impact
statement (EIS) if they "do not individually or cumulatively have a significant effect on the
human environment and which have been found to have no such effect in procedures adopted by
a Federal agency in implementation of [CEQ] regulations." 40 C.F.R. § 1508.4. However,
federal agencies must "provide for extraordinary circumstances in which a normally excluded
action may have a significant environmental effect." *Id.* In that case, an EA or EIS is still
required. *See* 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. 1501.4.

59.    To implement the CEQ regulations, USFS promulgated its own NEPA
regulations, including an enumerated list of "resource conditions" that must be considered for
"extraordinary circumstances related to a proposed action warrant[ing] further analysis and
documentation in an EA or EIS," including "species proposed for Federal listing" under the

Endangered Species Act (ESA), and "Forest Service sensitive species." 36 C.F.R. §

220.6(b)(1)(i).

60.     The greater sage-grouse was proposed for Federal listing as threatened under the

Endangered Species Act, receiving a "warranted but precluded" finding by the U.S. Fish and

Wildlife Service (FWS) in 2010. 75 Fed. Reg. 13910 (Mar. 23, 2010). Following amendments in

2015 to land use plans across the West, including to the Fishlake National Forest plan, and under

the assumption the protections for sage-grouse contained in the amendments would be fully

implemented, FWS found the greater sage-grouse no longer warranted listing under the ESA. 80

Fed. Reg. 59858 (Oct. 2, 2015).

61.     The greater sage-grouse remains a Region 4 Forest Service sensitive species and

occurs within the Fishlake National Forest. *See* Intermountain Region (R4) Endangered,

Threatened, Proposed, and Sensitive Species, p. 5 (June 2016),

https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5370041.pdf (last visited Nov.

20, 2019); *see also* https://www.fs.usda.gov/main/r4/home (last visited Nov. 20, 2019).

**C.     Administrative Procedure Act**

62.     The Administrative Procedure Act provides for judicial review of final agency

action for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702. Final

agency action exists that is subject to this Court's review under the APA, 5 U.S.C. § 702, NEPA,

NFMA, the Organic Act of 1897, and FLPMA.

63.     The APA requires a reviewing court to "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." *Id.* § 706(2)(A). An agency must "articulate[] a rational

connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Under this standard,

> [a]n agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

*Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1100-01 (D. Colo. 2012) (citing *New Mexico ex. rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (internal citations omitted)).

64.     Further, under the APA, agency action in excess of statutory authority must be set aside. 5 U.S.C. § 706(2)(C).

## V.     FACTUAL BACKGROUND GIVING RISE TO WWP'S CAUSES OF ACTION

### A.     Kingston and Forshea Allotments

#### i.     Permittees for the Kingston and Forshea Allotments

65.     Gary Allen currently holds a ten-year term grazing permit for 118 cow/calf pairs on the Kingston Allotment issued on May 20, 2013, with an expiration date of December 31, 2022. Developing Issue, Fishlake National Forest, Richfield Ranger District, p. 1 (USDA Forest Service, Feb. 14, 2019).

66.     Ryan Brindley currently holds a ten-year term grazing permit for 42 cow/calf pairs on the Kingston Allotment issued on December 31, 2015, with an expiration date of December 31, 2024.  *Id.*

67.     Glen, Karl, and Scott Allen (collectively, "the Allen Boys") have been operating under temporary grazing permits since the 2017 grazing season. *Id.*, pp. 5-8. The Allen Boys' permits authorized 83 cow/calf pairs on the Kingston Allotment and 40 cow/calf pairs on the Forshea Allotment. *Id.*, p. 1.

68.     Garrett Gleave has been operating under temporary grazing permits since the 2017 grazing season. *Id.*, pp. 5-8. Garrett Gleave's permits authorized 83 cow/calf pairs on the Kingston Allotment and 40 cow/calf pairs on the Forshea Allotment. *Id.*, p. 1.

69.     Stanton Gleave has been operating under temporary grazing permits since the 2018 grazing season. *Id.*, pp. 5-8. Stanton Gleave's permits authorized 74 cow/calf pairs on the Kingston Allotment. *Id.*

70.     All grazing permits for the Kingston and Forshea Allotments authorize cattle on the allotments between June 6 and October 15. *Id.*

**ii.     Recent Management History of the Kingston and Forshea Allotments**

71.     On September 28, 2007, pursuant to Section 339 of the 2005 Consolidated Appropriations Act, Pub. L. 108-447 (Dec. 8, 2004), USFS issued Decision Memos for the allotments at issue in the present suit. For the Forshea Allotment, the Decision Memo authorized 80 cow/calf pairs from June 6 through October 15, deferred-rotation. Decision Memo, Forshea Allotment (USDA Forest Service Sept. 28, 2007). For the Kingston Allotment, the Decision Memo authorized 400 cow/calf pairs from June 6 through October 15, rest-rotation. Decision Memo, Kingston Allotment (USDA Forest Service Sept. 28, 2007).

72.     In 2008, without additional public process, USFS decided to manage both of the allotments together with 480 cow/calf pairs authorized on <u>each</u> allotment for a portion of the

grazing season, exceeding the number of animals previously authorized on either allotment. Developing Issue, Fishlake National Forest, Richfield Ranger District, p. 2 (USDA Forest Service, Feb. 14, 2019).

73.     In 2013, all the Gleaves and all the Allens were given Notice of Non-Compliance (NONC) letters for livestock on the combined allotments prior to and after the permitted on and off-dates, as well as livestock use in a pasture meant to be rested and fences not maintained to standard. *Id.*, p. 3. The District Ranger drafted 50% suspension letters for the Gleaves and Allens in response to continued non-compliance, including forage over-utilization, further livestock use after the permitted off-date, pasture rotation schedules not followed, and pastures scheduled for rest not being rested. *Id.* Citing "safety concerns and verbal threats," the Forest Supervisor directed the District Ranger not to finalize or mail the suspension letters. *Id.*

74.     Also citing "safety concerns," beginning in 2013 USFS directed the Richfield Ranger District's Range Management Specialist to cease day-to-day involvement with the Manning Creek, Kingston, and Forshea allotments. Briefing Paper, Fishlake National Forest, Richfield Ranger District, p. 3 (USDA Forest Service, May 16, 2016).

75.     In 2014, the Gleaves and Allens requested the Kingston Allotment's five pastures no longer be managed through rest-rotation, and instead be managed through deferred-rotation on reconfigured pastures within the Kingston and Forshea allotments.[2] Developing Issue, Fishlake National Forest, Richfield Ranger District, p. 3 (USDA Forest Service Feb. 14, 2019).

---

[2] Rest-rotation grazing refers to the practice of resting certain pastures an entire year while other pastures are seasonally grazed by livestock. Deferred-rotation grazing refers to the practice of deferring livestock grazing on each pasture periodically until forage species' seeds are set. *See* Grazing Systems, available at https://globalrangelands.org/topics/uses-range-and-pasture-lands/grazing-systems (last visited Nov. 20, 2019).

USFS allowed the Gleaves and Allens to combine four of the Kingston Allotment's pastures, and

to combine a fifth Kingston Allotment pasture with the entire Forshea Allotment. *Id.* USFS then

allowed the Gleaves and Allens to use these combinations as two separate large pastures. *Id.*

76.     USFS incorporated these changes into AOIs for the allotments beginning in 2014

and, to the best of WWP's knowledge, continued to incorporate these changes into AOIs for

2015, 2016, 2017, and 2018. *See*, *e.g.*, Annual Operating Instructions, Kingston/Forshea Cattle

Allotments (USDA Forest Service, May 2018), available at

https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5158779.pdf (last visited Nov.

20, 2019).

77.     USFS admits these changes in grazing management for the Kingston and Forshea

allotments are not consistent with the relevant AMPs. USFS Response to WWP Letter (July 15,

2019). USFS also admits the 2008 and 2014 changes to grazing management on the allotments

were neither analyzed under NEPA nor authorized in the 2007 Decision Memos. *Id.*

78.     During the 2014 grazing season, the Gleaves and Allens failed to follow the

rotation schedule outlined in the AOIs. Developing Issue, Fishlake National Forest, Richfield

Ranger District, p. 3 (USDA Forest Service, Feb. 14, 2019). Cattle used both allotments

throughout the grazing season, cattle were on the allotments earlier and after the on- and off-

dates specified in the grazing permits, and range improvements were not maintained to standard.

*Id.*, pp. 3-4. Despite these clear permit violations, USFS did not send non-compliance letters to

the permittees in 2014 "[d]ue to safety concerns and tensions being high." Instead, USFS

communicated the permit and AOI violations verbally.[3] *Id.*, p. 4.

79.     In 2015, USFS documented unauthorized use and other violations on both the

Kingston and Forshea allotments, including livestock on both allotments throughout the grazing

season, livestock on the allotments after the October 15 off-date stated in the permits, and range

improvements not maintained to standard. *Id.*, p. 4.

80.     In 2016, USFS documented violations on the allotments, including range

improvements not maintained to standard and forage utilization over the allowable use of 60%.

*Id.*, p. 5.

81.     The ten-year term grazing permits for Garrett Gleave and the Allen Boys expired

on December 31, 2016. *Id.*, p. 1.

82.     Rather than approve new term permits for the Allen Boys and Garrett Gleave,

USFS approved temporary grazing permits for them on June 12, 2017. *Id.*, p. 6.

83.     In 2017, Garrett Gleave and the Allen Boys each verbally requested an increase

from 40 cow/calf pairs to 100 cow/calf pairs on the Forshea Allotment, for a total of 200

cow/calf pairs. *Id.* USFS did not approve the requests. *Id.* Garrett Gleave and the Allen Boys

requested USFS do NEPA analysis to increase their permit numbers on the Forshea Allotment.

*Id.*

---

[3] The APA requires USFS to first provide written notice and an "opportunity to demonstrate or achieve compliance with all lawful requirements" before the agency may suspend or cancel term permits. 5 U.S.C. § 558(c)(1) and (2); *see also Anchustegui v. U.S. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001). WWP notes this here because USFS's choice not to address permittees' violations in writing could hinder its ability to quickly take decisive action in response to documented and on-going non-compliance in some circumstances.

84.     On June 2, 2017, USFS sent a letter to Stanton Gleave, Garrett Gleave, Gary Allen, and the Allen Boys committing to complete a "NEPA Sufficiency Review."

85.     In 2017, USFS documented unauthorized use and other violations on both allotments including livestock on the allotments prior to and after the on- and off-dates stated in the permits, livestock on both allotments simultaneously, livestock without ear tags, livestock on a separate allotment without a permit, failure to complete fence maintenance, and forage utilization over the allowable use of 60%. Developing Issue, Fishlake National Forest, Richfield Ranger District, p. 6 (USDA Forest Service, Feb. 14, 2019).

86.     The ten-year grazing permit for Stanton Gleave expired on December 31, 2017. *Id.*, p. 1.

87.     USFS approved all applications for temporary grazing permits for Garrett Gleave, Stanton Gleave, and the Allen Boys on May 22, 2018. *Id.*, p. 7.

88.     In 2018, documented non-compliance included livestock on the Kingston Allotment over a week before the on-date stated in the permits, livestock without ear tags, livestock on a separate allotment without a permit, livestock on both the Kingston and Forshea allotments simultaneously, and forage utilization well over the allowable use of 60% stated in the permits – as high as 98%. *Id.*

89.     USFS did not send non-compliance letters in 2015, 2016, 2017, and 2018, and instead verbally communicated on-going permit and AOI violations to the permittees. *See* Developing Issue, Fishlake National Forest, Richfield Ranger District, pp. 4-7 (USDA Forest Service, Feb. 14, 2019).

90.    On March 3, 2019, USFS completed its NEPA Sufficiency Review under its June 2, 2017, commitment to the Kingston and Forshea allotment permittees. NEPA Sufficiency Review (USDA Forest Service, March 3, 2019). In that review, USFS noted its 2008 change increasing cow/calf pairs from 80 to 480 on the Forshea Allotment, and from 400 to 480 on the Kingston Allotment beginning the season immediately following the 2007 Decision Memos. *Id.*

91.    USFS stated in its review that priority sage-grouse habitat occurs on both allotments, yet no sage-grouse standards and guidelines were added to the relevant grazing permits. *Id.*

92.    In the review, USFS found excessive forage utilization on the allotments and concluded "under current management, the 480 cow/calf pairs currently permitted on the Kingston and Forshea Allotments may be too high." *Id.* Further, "the Kingston and Forshea Allotments don't appear to be able to sustainably support an increase in cow/calf pairs." *Id.*

93.    No new environmental analysis under NEPA has occurred for the Kingston and Forshea allotments since the 2007 Decision Memos, since the expiration of term permits, nor since the reissuance of term and temporary permits, despite the increase in permitted animals on the allotments, the elimination of rest-rotation of pastures, and the reconfiguration of allotments and pastures.

### iii.    Events Leading up to the Issuance of 2019 Permits and AOIs

94.    Despite the accumulated of permit and AOI violations by most of the Kingston and Forshea allotment permittees documented since at least 2013, USFS opted to invite all permittees for the Kingston and Forshea allotments to an April 12, 2019, meeting at the USFS office in Richfield, Utah, to discuss 2019 permits and AOIs.

95.     The permittees refused to travel to Richfield and instead demanded a meeting on the same date in Junction, Utah, at the Piute County Courthouse. Email from Glen Allen to Mike Elson and Jason Kling (April 11, 2019). USFS did not travel to Junction on April 12, 2019.

96.     During a phone call on April 8, 2019, according to USFS records, Stanton Gleave told Forest Supervisor Mike Elson that he would put his cattle out on the Kingston and Manning Creek allotments regardless of permit status, and that he had a gun and the sheriff to back him up. Email from Mike Elson to Steven Beverlin *et al.* (April 8, 2019). During the call, Stanton Gleave also stated he is not interested in USFS's "silly rules" regarding fence maintenance or rotation schedules. *Id.* He indicated he would work with USFS if the agency helps the permittees or leaves them alone. *Id.* He claimed he did not need a permit from USFS, because the land was previously disposed of and he owns the right to graze there. *Id.*

97.     Both a local county commissioner and a representative of the state Public Lands Policy Coordinating Office expressed concern to local USFS about another "Bunkerville" situation if USFS did not authorize grazing on Monroe Mountain for the 2019 grazing season. *See* Email from Mike Elson to Steven Beverlin, *et al.* (April 10, 2019); *see also* Email from Mike Elson to Mary Farnsworth *et al.* (April 23, 2019).

98.     USFS is aware that certain permittees of the allotments at issue in this lawsuit traveled to Bunkerville to support Cliven Bundy in 2014. *See* Email from Mike Elson to Steven Beverlin *et al.* (April 24, 2019); *see also* Email from Mike Elson to Steven Beverlin *et al.* (May 30, 2019); *see also Nevada cattle issue stalled*, The Richfield Reaper (April 17, 2014), available at http://www.richfieldreaper.com/news/local/article_a5aa3416-c4e3-11e3-9404-001a4bcf887a.html (last visited Nov. 20, 2019).

99.     On April 18, 2019, USFS sent the permittees temporary permits for the relevant allotments and in accompanying letters stated: "If you agree to the terms and conditions described below and listed on the permit please sign and return the permit to the Richfield Ranger District by May 8." *See*, *e.g.*, Letter from Mike Elson to Allen Boys (April 18, 2019).

100.    USFS included the following paragraph it the letters to the permittees:

As I explained in my email response to the permit holders on April 12, I have no desire to dictate to any of you, however, agency regulations and policy-as well as good range management-require some basic expectations in order to authorize grazing on the National Forests. These expectations have been developed over the course of many decades working in partnership with ranchers. It is part of our mission to provide access to forage on National Forests, while also protecting watersheds, wildlife habitat, recreational opportunities, and the whole range of uses the public can enjoy on their National Forests. With many thousands of permittees across the country, it is important for the Forest Service to be fair and consistent in the way we apply the terms and conditions. We must ensure that we are managing grazing at appropriate levels that are sustainable and compatible with other uses.

*Id.*

101.    In the letters, USFS identified specific expectations and requirements of the permittees, including that livestock would not occur on the allotments before or after the permitted dates, rotation schedules would be followed, forage utilization standards would not be exceeded, and "[a]ll permitted livestock will be tagged with Forest Service issued tags." *Id.*

102.    On May 2, 2019, Supervisor Elson met with all Kingston and Forshea allotment permittees in Junction, Utah (except Ryan Brindley), along with a Piute County commissioner and a representative from the state Public Lands Policy Coordinating Office (PLPCO). Email from Mike Elson to Henrie Walton (May 3, 2019). During the meeting, according to USFS records, the permittees cursed at the Forest Supervisor, disputed federal ownership of the public lands, and expressed frustration with District Ranger Jason Kling. *Id.* When told the District

Ranger served as the main point of contact due to the permittees' threats to other USFS employees, the permittees became angry and claimed they had never threatened anyone. *Id.* The permittees then proceeded to make additional threatening statements about how anyone they threatened would be missing teeth and that they could show "what a real threat looks like." *Id.*

103.    On May 14 and May 18, 2019, respectively, the Gleaves and the Allen Boys returned signed temporary permits with the content and terms and conditions significantly altered. *See*, *e.g.*, Temporary Permit returned to USFS by Garrett Gleave (May 14, 2019); *see also* Temporary Permit returned to USFS by the Allen Boys (May 18, 2019).

104.    Garrett Gleave, Stanton Gleave, and the Allen Boys coordinated the alteration of the temporary permits they returned to USFS so that each had the words "permittee" and "permit" crossed out throughout, with "allottee" and "allotment" hand-written in their place. *See*, *e.g.*, Temporary Permit returned to USFS by the Allen Boys (May 18, 2019). Many sections of the temporary permits, including sections specifying "Maximum Allowable Use Forage Critieria" and provisions allowing USFS to cancel permits for failure to comply with terms and conditions, were crossed out. *Id.*, Part 3 and p. 2.

105.    In hand-writing, the permittees added the following text:

All permits, contracts, and other instruments are subject to valid existing rights. NFMA section 6. All actions by the secretary are subject to valid existing rights. Do [sic] to the elk numbers that you allow on our allotments, we can not [sic] agree to your terms. Its [sic] impossible.

*Id.*, p. 2.

106.    In several locations on the temporary permits, the permittees crossed out references to USFS's obligations to protect Forest resources and defer placement of livestock on the allotments if "the forage is not ready to be grazed." *Id.* Instead, the permittees wrote "[if] it

can be shown that grazing will harm timber or mining operations and cannot be mitigated." *Id.*, p. 3.

107.    The permittees also crossed out the temporary permit's language that USFS "may require the permittee to place or fasten appropriate marks or tags that will identify them as permitted to graze under this permit" and wrote "Livestock will be identified in accordance with State law." *Id.*, p. 4. The permittees repeated the latter statement after crossing out another provision of the temporary permit: "All permitted cows must be tagged prior to entry on the Kingston and Forshea Allotments, with Forest Service provided ear-tags." *Id.*, Part 3.

108.    Throughout the altered temporary permits returned by the permittees, they indicated their belief that the only resources they had any obligation to protect are "commercial timber and stone." *Id.*, pp. 3 and 4. They also asserted their belief they are the "allotment owner[s]." *Id.*, p. 4. The permittees crossed out the following statement in the temporary permit: "You are responsible to monitor your livestock and to comply with the listed utilization standards and to move livestock prior to any of the above standards being exceeded." *Id.*, Part 3. In their place, the permittees wrote "Cattle will be to [sic] avoid damages to the timber species or interference with mineral operations." *Id.*

109.    Regarding maintenance standards for range improvements, the permittees crossed out the words "included in your annual operating instructions" and wrote "in accordance with Grazing Advisory Board standards." *Id.*

110.    On May 28, 2019, Garrett Gleave and Stanton Gleave applied for ten-year term grazing permits, each using nearly identical language. *See*, *e.g.*, Letter and Application from Garrett Gleave to USFS (May 28, 2019).

111.    In the letters of application, the Gleaves stated:

My right as the surface owner, owner of water rights and improvements, and right to the full use of "grass and trees" by "occupation and cultivation" do not depend on your issuance of a permit, and cannot be taken through onerous restrictions or your failure to issue a permit (Curtis v Benson, 1911) [sic].

*Id.*

112.    Garrett and Stanton Gleave each went on to list a long series of statutes and court decisions, most over a century old, to support their asserted rights and claims of surface ownership. *Id.*

113.    They each concluded their letters with the following sentence: "I would be more than happy to work with you, if you can show me the actual court case overturning (Curtis vs. Benson, 1911.) Along with these other outlined cases showing me my rights [sic]." *Id.*

114.    On June 3, 2019, District Ranger Kling spoke with permittee Gary Allen in the parking lot of the Richfield USFS office. Email from Jason Kling to Terry Padilla *et al.* (June 3, 2019). Gary Allen told the District Ranger he would not put Forest Service ear tags on his cows. *Id.* Gary Allen also told the District Ranger that regardless of whether his boys (the Allen Boys) are issued a permit, they all plan to put cattle on the allotments on June 6. *Id.* When the District Ranger mentioned that due to weather, the range might not be ready for turn-out, Gary Allen told the District Ranger that elk are already using the allotments, so they will be putting cows on the allotments. *Id.*

115.    USFS expected Garrett Gleave, Stanton Gleave, and the Allen Boys to illegally run cattle on the Kingston and Forshea allotments in 2019. Email to Mike Elson (June 5, 2019).

116.    On June 5, 2019, USFS sent letters to Garrett Gleave, Stanton Gleave, and the Allen Boys informing them the agency did not authorize them to graze livestock on the Kingston

and Forshea allotments for the 2019 season because the permittees had not signed clean, unaltered, or unedited permits. *See*, *e.g.*, Letter from Mike Elson to Allen Boys (June 5, 2019).

117.    On June 5, 2019, Supervisor Elson and District Ranger Kling spoke by telephone with Stanton Gleave about the agency's decision not to authorize livestock grazing. Email from Mike Elson to Steven Beverlin *et al.* (June 5, 2019). According to USFS records, Stanton Gleave told the Forest Supervisor that if USFS actions hurt anyone in Mr. Gleave's family, the Forest Supervisor had better remember that his own family can get hurt, too. *Id.*

118.    On June 5, 2019, Supervisor Elson and District Ranger Kling also spoke by telephone with Gary Allen to reiterate the ear-tagging requirement for all grazed cattle. *Id.* Gary Allen stated USFS had no authority to require ear-tagging, while also acknowledging he had tagged his cattle's ears in the past. [4] *Id.* When told USFS can require ear-tagging as part of a permit, Mr. Allen cursed at the Forest Supervisor and District Ranger. *Id.* Mr. Allen told the Forest Supervisor and the District Ranger he planned to put his cattle on the allotment just to prove a point, even though there was not yet enough grass. *Id.*

119.    The Forest Supervisor and the District Ranger also tried to reach Garrett Gleave, Scott Allen, Glen Allen, and Karl Allen by telephone on June 5, 2019. *Id.* They were able to leave voicemails for Garrett Gleave and Scott Allen indicating that grazing was not authorized without valid permits. *Id.*

---

[4] Although the Allens, the Gleaves, and Keith Anderton complained to USFS that ear-tagging their cattle posed too great a burden, Kingston Allotment permittee Ryan Brindley promptly made good faith efforts to complete ear-tagging requirements for his cattle. *See* Responsive Documents Fishlake 1, p. 28 (provided by USFS on July 31, 2019, in response to WWP FOIA request).

120.    On June 6, 2019, after being alerted by the Utah Department of Agriculture and Food that USFS letters denying grazing authorization for the season were on the way, Garrett Gleave, Stanton Gleave, and the Allen Boys sent USFS signed temporary permits without any alterations to the content or terms and conditions. *See* Email from Nora Rasure to Mike Elson (June 7, 2019); *see also*, *e.g.*, Temporary Permit for Allen Boys (June 6, 2019).

121.    The USFS Washington Office, rarely involved in such site-specific decisions, called Deputy Regional Forester David Rosenkrance to tell him that ear-tagging requirements for the Monroe Mountain permittees were excessive, and Rosenkrance then informed Regional Forester Rasure of this direction. Email from David Rosenkrance to Nora Rasure (June 7, 2019).

122.    Despite the Gleaves and the Allen Boys directly telling USFS they did not plan to abide by agency management direction, on June 11, 2019, USFS sent Garrett Gleave, Stanton Gleave, and the Allen Boys temporary grazing permits for the 2019 grazing season with District Ranger Kling's signature. *See*, *e.g.*, Letter from Mike Elson to Allen Boys (June 11, 2019). USFS rescinded ear-tagging requirements for the season. *Id.*

123.    The 2019 Annual Operating Instructions posted publicly online by USFS for the Kingston and Forshea allotments do not indicate a signature date by permittees, unlike the 2018 Annual Operating Instructions for these allotments. *See* 2019 Annual Operating Instructions, Kingston/Forshea Allotments, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5302350.pdf (last visited Nov. 20, 2019); *see also* 2018 Annual Operating Instructions, Kingston/Forshea Allotments, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5158779.pdf (last visited Nov. 20, 2019).

124.     The AOIs for 2019 for the Kingston and Forshea allotments indicate an average

forage utilization of over 75% across 11 monitoring locations during the 2018 grazing season.

Annual Operating Instructions, Kingston/Forshea Cattle Allotments (June 2019), available at

https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5302350.pdf (last visited Nov.

20, 2019). Yet USFS authorized the same number of livestock for 2019 without explanation and

despite the agency's acknowledgement of forage over-utilization under these numbers. *See id.*;

*see also* NEPA Sufficiency Review (USDA Forest Service March 3, 2019).

125.     In 2019, all five pastures in the Kingston Allotment are being managed as one

large pasture, and the entire Forshea Allotment is being managed as one large pasture. Email

from Jason Kling (Sept. 9, 2019). No rest-rotation is planned for the 2019 grazing season,

according to USFS, despite years of excessive utilization in all the pastures. *Id.*; *see also* NEPA

Sufficiency Review (USDA Forest Service March 3, 2019).

### iv.     Recent Observations of Continued Unauthorized Use and Permit and AOI Violations on the Kingston and Forshea Allotments

126.     On October 23, 2019, WWP employee and member Laura Welp observed a total

of 40 cattle and seven calves trespassing on the Kingston Allotment, and 21 cattle and two calves

trespassing on the Forshea Allotment over a week after the permitted off-date of October 15.

Attached Declaration of Laura Welp ¶¶ 18-19.

127.     Ms. Welp also observed excessive utilization of forage on the Kingston Allotment

based on the difference between forage species in utilization cages and adjacent forage species

outside the cages. *Id.* ¶¶ 16-17. In the Middle Pasture, Ms. Welp observed over 75% utilization.

*Id.* ¶ 16. In the South Pasture, Ms. Welp observed over 80% utilization. *Id.* ¶ 17. In the Pole

Canyon Pasture, Ms. Welp observed over 60% utilization. *Id.*

128.     Ms. Welp also observed over 75% utilization of forage on the Forshea Allotment, again based on the difference between forage species in utilization cages and adjacent forage species but outside the cages. *Id.* ¶ 20.

129.     Ms. Welp noticed much of the fence along the boundary between the Kingston and Forshea allotments has not been maintained, with many sections down or damaged. *Id.* ¶ 22.

**B.     Manning Creek Allotment**

   **i.     Permittees for the Manning Creek Allotment**

130.     Waylon Gleave currently holds a ten-year grazing permit for 42 cow/calf pairs on the Manning Creek Allotment issued on June 1, 2018. Letter from Mike Elson to Waylon Gleave (June 10, 2019).

131.     Keith and Pamala Anderton currently hold a ten-year grazing permit for 115 cow/calf pairs on the Manning Creek Allotment issued on June 18, 2019. Letter from Jason Kling to Keith Anderton (June 18, 2019); *see also* Letter from Mike Elson to Keith Anderton (June 10, 2019).

132.     Stanton Gleave has been operating under temporary grazing permits since the 2018 grazing season. Developing Issue, Fishlake National Forest, Richfield Ranger District, p. 1 (USDA Forest Service, Feb. 14, 2019). Stanton Gleave's permits authorized 100 cow/calf pairs on the Manning Creek Allotment. Letter from Mike Elson to Stanton Gleave (June 10, 2019).

133.     For all Manning Creek Allotment permittees, cattle are authorized to graze between June 15 and September 30. *Id.*

ii.      **Recent Management History of the Manning Creek Allotment**

134.    On September 28, 2007, pursuant to Section 339 of the 2005 Consolidated Appropriations Act, Pub. L. 108-447 (Dec. 8, 2004), USFS issued Decision Memos for the Manning Creek Allotment. The Decision Memo continued current grazing management. Decision Memo, Manning Creek Allotment (USDA Forest Service, Sept. 28, 2007).

135.    In 2013, USFS began attempting to resolve management issues on the Manning Creek allotment. On June 7, 2013, USFS sent the Manning Creek permittees a Notice of Non-Compliance letter regarding unauthorized sheep on the allotment and livestock on the allotment prior to their authorized on-date. Briefing Paper, Fishlake National Forest, Richfield Ranger District, p. 1 (USDA Forest Service, May 16, 2016).

136.    On July 3, 2013, USFS sent the Manning Creek permittees a second NONC letter regarding fences not being maintained to standard, water developments not being maintained to standard, livestock use occurring in the wrong pastures at the wrong time of year, and riparian utilization being exceeded. *Id.*

137.    On September 26, 2013, USFS issued the Manning Creek permittees a 50% permit suspension letter. *Id.* The suspension affected the number of days that livestock would be authorized during the 2014 and 2015 grazing seasons. *Id.* USFS based the suspension on continued non-compliances throughout July, August, and September of 2013, including the unauthorized use of allotments, placement of salt blocks in unauthorized areas, not maintaining fences to standard, not maintaining water developments to standard, over-utilization of forage, not following set rotation schedules, and not resting pastures according to schedule. *Id.*

138.    Non-compliances continued after September 26, 2013. *Id.*

139.    On November 1, 2013, USFS issued the Manning Creek permittees a 50% cancellation letter. *Id.* The cancellation also affected the number of days of livestock use. *Id.*

140.    According to USFS, the Manning Creek permittees appealed the 50% suspension and 50% cancellation decisions on or near November 7, 2013. *Id.* Two handwritten letters were sent to USFS dated November 4 and November 8, 2013, respectively. Responsive Documents Fishlake 1, pp. 407-08 (provided by USFS on July 31, 2019, in response to WWP FOIA request).

141.    The November 4, 2013, letter references the September 2013 suspension decision by District Ranger Kling, while the November 8, 2013, letter does not reference any particular decision. *Id.* That November 8, 2013, letter states succinctly, "We want the decision pulled." *Id.*, p. 407. It is not clear which permittee sent which letter.

142.    By November 26, 2013, USFS apparently lost its resolve to address the violations on Manning Creek allotment. The Appeal Deciding Officer at the time, Forest Supervisor Allen Rowley, set aside the appeal timelines indefinitely, ignoring the applicable regulations specifying a limit of 60-day for appeal extensions. Briefing Paper, Fishlake National Forest, Richfield Ranger District, p. 1 (USDA Forest Service, May 16, 2016). The Appeal Deciding Officer also directed the District Ranger not to implement the suspensions or cancellations. *See*, *e.g.*, Letter from Mike Elson to Keith Anderton (June 10, 2019).

143.    In letters sent to the permittees on November 26, 2013, the Appeal Deciding Officer only acknowledges the permittees' appeal of District Ranger Kling's 50% suspension actions dated September 25, 2013, not the November 1, 2013, cancellation actions. *See*, *e.g.*, Letter from Allen Rowley to Stanton Gleave (Nov. 26, 2013).

144.    The Appeal Deciding Officer's letters also mention possible future mediation discussions, but it is unclear whether the permittees actually requested mediation under the applicable regulations. *Id.*

145.    The next year, in 2014, the permittees again failed to maintain all fences to standard. Briefing Paper, Fishlake National Forest, Richfield Ranger District, p. 2 (USDA Forest Service, May 16, 2016). Livestock remained in the Little Table Pasture ten days longer than authorized. *Id.* The permittees exceeded forage utilization and riparian stubble height standards for this pasture. *Id.* Livestock remained in the Manning Meadows Pasture too long, and exceeded forage utilization. *Id.* The permittees did not follow set rotation schedules. *Id.* USFS observed Manning Creek livestock on two separate unauthorized allotments. *Id.* USFS also observed livestock on the Manning Creek Allotment nearly three weeks after the permitted off-date. *Id.*

146.    USFS did not mail NONC letters in 2014; all communications occurred verbally. *Id.*

147.    In 2015, livestock remained in the Manning Meadows Pasture longer than authorized in the AOIs. *Id.* USFS observed livestock on the Manning Creek Allotment during the first week of December, months past the permitted off-date of September 30. *Id.* Permittees did not follow set rotation schedules, and exceeded forage utilization on most of the allotment. *Id.*, p. 3.

148.    In November of 2015, USFS received a tip that Manning Creek Allotment permittee Keith Anderton was "calling in the militia" regarding range management issues in Piute County. Email from Mel Bolling to Jason Kling *et al.* (Nov. 16, 2015). USFS believe the militia in question to be the Oath Keepers, who had previously been involved in conflicts with

federal land managers regarding Cliven Bundy's illegal livestock grazing in Nevada. Email from

Mel Bolling to Nora Rasure *et al.* (Nov. 16, 2015).

149.    On January 11, 2016, the Piute County Sheriff Marty Gleave told Richfield

District Ranger Kling at a Piute County Commission meeting in Junction, Utah, that if cuts to

any of the Manning Creek Allotment permits occur, the sheriff would arrest the District Ranger.

Briefing Paper, Fishlake National Forest, Richfield Ranger District, p. 3 (USDA Forest Service

May 16, 2016). Marty Gleave is the second cousin of Manning Creek Allotment permittee

Stanton Gleave. *See Fearing another Bunkerville or Malheur, Utah tries to mediate disputes*

*between ranchers, feds*, Trent Nelson, Salt Lake Tribune (May 2, 2016), available at

https://archive.sltrib.com/article.php?id=3817819&itype=CMSID (last visited Nov. 20, 2019).

150.    Upon information and belief, USFS has documented recurring non-compliance on

the Manning Creek Allotment in 2016, 2017, and 2018.

151.    Despite this long history of recurring non-compliance, USFS issued Waylon

Gleave a new ten-year term permit for the Manning Creek Allotment on June 1, 2018. Letter

from Mike Elson to Waylon Gleave (June 10, 2019).

### iii.    Events Leading up to the Issuance of 2019 Permits and AOIs

152.    Stanton Gleave's term permit for both the Kingston and Manning Creek

allotments expired on December 31, 2017. Developing Issue, Fishlake National Forest, Richfield

Ranger District, p. 8 (USDA Forest Service, Feb. 14, 2019).

153.    USFS issued a temporary permit to Stanton Gleave on June 11, 2019. *See* Letter

from Mike Elson to Stanton Gleave (June 11, 2019); *see also supra* Part V.A.iii.

154.    Keith Anderton also attended the May 2, 2019, meeting between USFS and permittees in Junction, Utah. Permittee Meeting Notes (USDA Forest Service May 2, 2019). Anderton indicated he wished to sign a new ten-year term permit if he could cross out certain requirements in the permit such as ear tagging and range improvement maintenance. *Id.* Forest Supervisor Elson explained to Anderton those were requirements of all Forest Service permittees, and deleting items in the permit would make it invalid. *Id.*

155.    On May 9, 2019, USFS received an application for a term grazing permit for the Manning Creek Allotment from Keith and Pamala Anderton. Email from Jason Kling to Terry Padilla *et al.* (May 20, 2019).

156.    On May 13, 2019, District Ranger Kling spoke with Keith Anderton by telephone to explain errors in Mr. Anderton's permit application, and what was needed to correct the errors. *Id.*

157.    On June 3, 2019, USFS sent Keith Anderton a letter with a term grazing permit requiring Anderton's signature for the Manning Creek Allotment. The letter included the following paragraph:

> Agency regulations and policy—as well as good range management—require some basic expectations in order to authorize grazing on the National Forests. These expectations have been developed over the course of many decades working in partnership with ranchers. It is part of our mission to provide access to forage on National Forests, while also protecting watersheds, wildlife habitat, recreational opportunities, and the whole range of uses the public can enjoy on their National Forests. With many thousands of permittees across the country, it is important for the Forest Service to be fair and consistent in the way we apply the terms and conditions. We must ensure that we are managing grazing at appropriate levels that are sustainable and compatible with other uses.

Letter from Jason Kling to Keith and Pamala Anderton (June 3, 2019).

158.    USFS's letter also expressly stated that "[f]ull compliance with the terms and conditions of the permit and AOIs is expected," including that "[a]ll permitted livestock will be tagged with Forest Service issued tags." *Id.*

159.    Mr. Anderton signed the term grazing permit on June 6, 2019. On the same day, the Andertons sent a letter to USFS complaining that it was too difficult to ear-tag his cattle at that time, but they could have if he had received the tags in February or March. Letter from Andertons to Jason Kling (June 6, 2019).

160.    On June 18, 2019, USFS sent a term grazing permit signed by District Ranger Kling to the Andertons. USFS also rescinded its ear-tagging requirements for the 2019 grazing season. Letter from Jason Kling to Keith and Pamala Anderton (June 18, 2019).

    **iv.    Resolution of Appeals**

161.    For many years, WWP and others have repeatedly asked USFS why the agency had not resolved the Manning Creek Allotment 2013 appeals in accordance with the timeframes specified in the agency's own appeal regulations. *See* Briefing Paper, Fishlake National Forest, Richfield Ranger District, p. 3 (USDA Forest Service, May 16, 2016).

162.    When pressed again by WWP for an explanation of why the agency had not resolved the appeals, USFS belatedly prepared and sent "Reversal of Decision" letters on June 10, 2019, to Keith Anderton, Stanton Gleave, and Waylon Gleave. *See* WWP Letter to USFS (May 30, 2019); *see also*, *e.g.*, Letter from Mike Elson to Keith Anderton (June 10, 2019).

163.    In the letters to Manning Creek allotment permittees, Forest Supervisor Elson, now acting as the Appeal Deciding Officer, stated he based his decision to reverse District Ranger Kling's 2013 suspension and cancellation actions "on the length of time that has passed

and changes in circumstances since the Ranger's decisions and the filing of the appeal;

additionally, the decisions were not implemented, permits have expired, and new permits have

been issued." *See*, *e.g.*, Letter from Mike Elson to Keith Anderton (June 10, 2019).

164.    USFS cited nothing from the appeal record to justify the decision to reverse the

2013 suspension and cancellation actions, nor did it provide any explanation as to why it took the

agency nearly six years to resolve the appeals.

> **v.    Recent Observations of Continued Unauthorized Use and Permit and AOI Violations on the Manning Creek Allotment**

165.    On October 22, 2019, WWP employee and member Laura Welp observed a

trespassing bull in the Manning Creek Allotment over three weeks after the permitted off-date of

September 30. Attached Declaration of Laura Welp ¶ 14.

166.    Ms. Welp also observed riparian damage and aspen overuse in the Windy Ridge

Pasture near White Ledge Spring. *Id.* at ¶¶ 14-15.

**C.    WWP's Letter to USFS Regarding the Allotments**

167.    On May 30, 2019, WWP sent a letter by certified mail to USFS asking the

following questions:

> 1)    Why has the Appeal Deciding Officer not issued an appeal decision on the Manning Creek Allotment appeals, and when does the Appeal Deciding Officer intend to do so?
>
> 2)    Under what authority has USFS issued temporary one-year permits on the Manning Creek, Kingston, and Forshea allotments since 2017? (WWP listed the enumerated options for temporary permits specified in 36 C.F.R. § 222.3(c)(2).)
>
> 3)    Has anyone applied for permits to graze livestock on the Manning Creek, Kingston, and Forshea allotments for the 2019 grazing season? How does USFS intend to respond if an applicant has a documented pattern of non-compliance?

4)      Was the manner of pasture combination and elimination of rest-rotation in the Kingston and Forshea allotments analyzed under NEPA or authorized under the 2007 Decision Memos?

5)      Does the manner of pasture combination and elimination of rest-rotation in the Kingston and Forshea allotments comply with the applicable Allotment Management Plans?

Letter from WWP to USFS (May 30, 2019).

168.    After several emails and phone calls requesting a response to our letter, the

District Ranger finally replied on July 15, 2019, with the following statements:

1)      On June 10, 2019, the Appeal Deciding Officer made the decision to rescind cancellation and suspension actions issued by Jason Kling, Richfield District Ranger, in 2013.

2)      "Temporary permits have been issued based on authority outlined in sub-part (E) of the CFR regulation relative to issuance of temporary grazing permits. Additional considerations from the authorized official include the following: (1) agency flexibility to provide for continued grazing use on a restricted annual basis pending resolution of permitted grazing issues; (2) issuance of temporary grazing permits was in the public interest to provide for employee safety while administering grazing use and collecting grazing management data; and (3) issuance of temporary grazing permits was in the public interest to address and resolve long-term grazing use and occupancy on the affected grazing allotments and such use would not result in permanent resource damage during proper implementation per the appurtenant Annual Operating Instructions incorporated with the temporary grazing permits.

3)      An application for a term grazing permit for the Manning Creek Allotment was received and a term grazing permit was issued.

4)      This manner of grazing management was not analyzed under NEPA or authorized in the Decision Memos signed on September 28, 2007, for these two allotments.

5)      The combination of pastures and elimination of rest-rotation for the Kingston and Forshea Allotments is not consistent with the applicable Allotment Management Plans. The Forshea Allotment Management Plan was last approved in 1978, and the Kingston Allotment Management Plan

was last approved in 1963. Both of these Allotment Management Plans
need to be updated.

USFS Response to WWP's Letter (July 15, 2019).

169.     Through documents obtained through the Freedom of Information Act, it is clear

the District Ranger had not previously contemplated Questions 2, 4, and 5, posed by WWP,

despite signing the relevant grazing permits and AOIs each of the past several seasons. The

District Ranger told the Forest Supervisor, the Forest Range Program Manager, and the Regional

Rangeland Staff Management Officer by email on June 26, 2019, "Questions 1 and 3 seemed

straight forward. Questions 2, 4, and 5 were more difficult to answer." Email from Jason Kling to

USFS Colleagues (June 26, 2019).

170.     District Ranger Kling's draft response to WWP's Question 2 stated:

Temporary permits have been issued based on authority outlined in (E) – To
allow grazing for use in the event of drought or other emergency of National or
Regional scope where such use would not result in permanent resource damage.

Draft Response to WWP Letter (June 26, 2019).

171.     The final response from USFS to WWP's Question 2 included the "additional

considerations" language, an indication District Ranger Kling's colleagues added justifications

for the issuance of temporary permits not found in 36 C.F.R. § 222.3(c)(2), the governing

regulation.

172.     USFS identified no "drought or emergency of National or Regional scope"

affecting the allotments in question.

**FIRST CAUSE OF ACTION**
**Violation of FLPMA and APA**
*(Unlawful Issuance of Livestock Grazing Permits and AOIs*
*outside of Regulatory and Statutory Authority)*

173.    WWP incorporates by reference all preceding paragraphs.

**A.    USFS Violated FLPMA and the APA by Issuing Temporary Permits for Reasons Not Properly Determined to Apply**

174.    USFS regulations promulgated pursuant to FLPMA authorize the agency to issue temporary grazing permits in five enumerated circumstances. 36 C.F.R. § 222.3(c)(2)(i). These regulations state the agency "may" issue permits under the five specified circumstances, not that it "must." *Id.*

175.    For the temporary permits issued to Stanton Gleave, Garrett Gleave, and the Allen Boys, USFS relied on 36 C.F.R. § 222.3(c)(2)(i)(E): "[t]o allow grazing use in the event of drought or other emergency of National or Regional scope where such use would not result in permanent resource damage." *See* USFS Response to WWP Letter (July 15, 2019).

176.    USFS also considered "agency flexibility to provide for continued grazing use on a restricted annual basis pending resolution of permitted grazing issues." *Id.* Further, USFS contended "issuance of temporary grazing permits was in the public interest to provide for employee safety while administering grazing use and collecting grazing management data." *Id.*

177.    USFS identified no drought or other emergency of National or Regional scope affecting the allotments in question at the time it issued temporary permits, including the most recent permits issued in June of 2019. In fact, Monroe Mountain had a very heavy snowpack leading into the grazing season, and the U.S. Drought Monitor showed no drought concerns in late May or early June of 2019. *See Utah's snowpack gives water managers a reason to*

*celebrate*, Amy Joi O'Donoghue, Deseret News (April 9, 2019), available at

https://www.deseret.com/2019/4/9/20670439/utah-s-snowpack-gives-water-managers-a-reason-to-celebrate (last visited Nov. 20, 2019); *see also* U.S. Drought Monitor, Map Archive, Utah

(June 4, 2019), available at https://droughtmonitor.unl.edu/Maps/MapArchive.aspx (last visited

Nov. 20, 2019).

178.    USFS cited additional considerations that unlawfully expand the agency's

authority to issue temporary permits. "Agency flexibility," "pending resolution of permitted

grazing issues," and "employee safety" may well be concerns of USFS, but they do not have a

basis in the plain language of the regulations governing the use of temporary permits.

179.    Nor can the agency's additional justifications make up for the lack of an identified

drought or other emergency affecting the allotments, despite USFS's assertion that sub-part E of

the regulations provides authority for the permits in question.

180.    USFS ignored a mountain of factual evidence indicating these particular parties

could in no way be trusted or expected to follow the terms and conditions of permits or

accompanying Annual Operating Instructions. *See supra* Part V.A.iii. The permittees in question

repeatedly demonstrated their unwillingness to comply with USFS management direction, yet the

agency issued temporary permits to these parties anyway. *Id.*

181.    Because USFS cannot identify a lawful basis for its issuance of temporary permits

that fits within the enumerated reasons of the agency's own regulations, the agency did not act in

accordance with the law, and exceeded the bounds of the agency's statutory authority. Further,

the USFS's issuance of temporary permits and Annual Operating Instructions to Stanton Gleave,

Garrett Gleave, and the Allen Boys was arbitrary and capricious and lacks a rational connection to the facts before the agency. USFS violated FLPMA and the APA.

**B.    USFS Violated FLPMA and the APA by Ignoring Past and On-Going Non-Compliance by Term Permittees**

182.    FLPMA states that only holders of expired permits who were "in compliance with the rules and regulations issued and the terms and conditions in the permit" shall be given first priority for new permits. 42 U.S.C. § 1752(c)(1).

183.    Here, USFS documented and communicated a long list of non-compliance by Gary Allen on the Kingston Allotment and Waylon Gleave and Keith Anderton on the Manning Creek Allotment, yet chose to proceed with issuance of new ten-year term permits for these parties.

184.    USFS issued non-compliance notices regarding the Kingston Allotment to Gary Allen, along with other allotment permittees, once in 2010 and twice in 2013. Developing Issue, Fishlake National Forest, Richfield Ranger District, pp. 2-3 (USDA Forest Service, Feb. 14, 2019). USFS drafted but ultimately did not send a 50% suspension letter for Mr. Allen and other permittees in 2013. *Id.*, p. 3. USFS verbally communicated continued non-compliance documentation to Mr. Allen and the other allotment permittees from 2014 through 2018. *Id.*, pp. 4-7.

185.    On the Manning Creek Allotment, Keith Anderton and Waylon Gleave each faced 50% suspension and cancellation actions from USFS in 2013 following written Notices of Non-Compliance. Briefing Paper, Fishlake National Forest, Richfield Ranger District, p. 1 (USDA Forest Service, May 16, 2016). USFS chose not to resolve appeals of those actions until 2019

despite continued documentation of permit and AOI violations. *See id.*; *see also*, *e.g.*, Letter from Mike Elson to Keith Anderton (June 10, 2019).

186.    For years leading up to the expiration of their term permits, Gary Allen, Waylon Gleave, and Keith Anderton were not "in compliance with the rules and regulations issued and the terms and conditions" of those permits, and thus should not have received any priority consideration for the issuance of new permits. USFS has not shown that it allowed other eligible parties to apply for permits on the allotments following these individuals' previous permits, nor has it articulated a rational connection between the extensive record of non-compliance by these permittees with the agency's decisions to issue them new ten-year term permits.

187.    As such, by issuing new ten-year permits and Annual Operating Instructions to Gary Allen for the Kingston Allotment, and Waylon Gleave and Keith and Pamala Anderton for the Manning Creek Allotment, USFS acted arbitrarily and capriciously and has not acted in accordance with the law, in violation of FLPMA and the APA.

## SECOND CAUSE OF ACTION
### Violation of NEPA, FLPMA, and APA
*Unlawful Issuance of Permits and AOIs Inconsistent with Decision Memos and Allotment Management Plans and without Required NEPA Analysis*

188.    WWP incorporates by reference all preceding paragraphs.

189.    USFS admits that the increased number of cattle, the reconfiguration of pastures and allotments, and the elimination of rest-rotation allowed on the Kingston and Forshea allotments were neither analyzed under NEPA nor authorized by the 2007 Decision Memos for the allotments. USFS Response to WWP Letter (July 15, 2019).

190.     The number of livestock and the specific allotment to be grazed are basic

components of a grazing permit. *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1247 (10th Cir.

2010).

191.     Here, less than a year after signing the 2007 Decision Memo authorizing 80

cow/calf pairs on the Forshea Allotment and 400 cow/calf pairs on the Kingston Allotment,

USFS agreed to manage the two allotments as one large allotment, and changed the authorized

number of cow/calf pairs to 480 without any subsequent NEPA analysis. Developing Issue,

Fishlake National Forest, Richfield Ranger District, p. 2 (USDA Forest Service, Feb. 14, 2019).

192.     Further, in 2014, at the request of permittees, USFS agreed to eliminate rest-

rotation of pastures in the allotments, another major change in on-the-ground management. *See*

Developing Issue, p. 3 (USDA Forest Service, Feb. 14, 2019). USFS admits this type of

management was neither analyzed under NEPA nor authorized in the 2007 Decision Memos.

USFS Response to WWP Letter (July 15, 2019). A combination of pastures without rest-rotation

continued to be authorized in AOIs from 2014 through 2019. *See*, *e.g.*, Annual Operating

Instructions, Kingston/Forshea Cattle Allotments (USDA Forest Service, May 2018), available at

https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5158779.pdf (last visited Nov.

20, 2019).

193.     Under FLPMA, USFS may delay thorough NEPA analysis prior to issuing a new

term permit only if previous permit terms and conditions are maintained. 43 U.S.C. § 1752(c)(2).

194.     Further, USFS may categorically exclude the issuance of a new permit from

detailed analysis through and EA or EIS only if previous permit terms and conditions are

continued, <u>and</u> if USFS determines the allotments meet forest plan objectives (or determines

non-livestock grazing factors are causing the allotments not to meet those objectives). 43 U.S.C.

§ 1752(h)(1)(A) and (B).

195.    USFS has not complied with the FLPMA requirement to complete an EA or EIS

under NEPA prior to issuance of new permits for these allotments because USFS has changed

the number of permitted livestock and other key aspects of grazing management on both the

Kingston and Forshea allotments dramatically since the 2007 Decision Memos.

196.    Grazing pursuant to a permit must be "in accordance with provisions of . . . any

relevant AMPs." *McKeen v. U.S. Forest Serv.*, 615 F.3d 1244, 1247 (10th Cir. 2010).

197.    USFS admits the current manner of grazing it has authorized on the Kingston and

Forshea allotments is not consistent with the relevant AMPs for those allotments. Letter from

USFS to WWP (July 15, 2019).

198.    Because USFS admits the agency did not analyze or authorize the current

management of these allotments (cow/calf pair number, combination of allotments, combination

of pastures, and elimination of rest-rotation) under NEPA, and because USFS admits current

management is not consistent with either the relevant AMPs or the 2007 Decision Memos,

continued authorization of grazing on the Kingston and Forshea allotments through permits and

Annual Operating Instructions is arbitrary, capricious, or otherwise not in accordance with the

law, and USFS has violated NEPA, FLPMA, and the APA.

**THIRD CAUSE OF ACTION**
**Violation of Organic Act of 1897, Forest Transfer Act of 1905, and APA**
*(Unlawful Failure to Follow Agency Appeal Regulations)*

199.    WWP incorporates by reference all preceding paragraphs.

200.    Regulations promulgated by USFS under its statutory authority lay out specific procedures the agency must follow in order to resolve appeals of livestock grazing permit decisions. *See* 16 U.S.C. §§ 472 and 551; *see also* 36 C.F.R. § 214 *et seq.*

201.    USFS contends Manning Creek Allotment permittees appealed decisions by Richfield District Ranger Kling to suspend and then cancel grazing permits in September and November of 2013, respectively. Briefing Paper, Fishlake National Forest, Richfield Ranger District, p. 1 (USDA Forest Service, May 16, 2016).

202.    Upon information and belief formed through review of documents WWP received through FOIA requests, USFS has not demonstrated the permittees' appeals met content requirements specified in the agency's regulations. 36 C.F.R. § 214.8. Appeals that do not meet these content requirements must be dismissed. *Id.* § 214.10(a)(4).

203.    The appeal regulations state that an extension may be granted during the appeal process only "upon the written request of a party to an appeal and a finding of good cause." 36 C.F.R. § 214.14(c)(3). In any case, "[o]rdinarily, extensions that add more than 60 days to the appeal period should not be granted." *Id.* § 214.14(c)(5).

204.    Upon information and belief formed through review of documents WWP received through FOIA requests, no appealing party filed a written request for an extension, yet the Appeal Deciding Officer chose to set aside normal appeal timelines. Briefing Paper, Fishlake National Forest, Richfield Ranger District, p. 1 (USDA Forest Service, May 16, 2016). USFS

extended the appeal period for nearly six years, far outside the bounds laid out by the agency's

own appeal regulations. *See*, *e.g.*, Letter from Mike Elson to Keith Anderton (June 10, 2019).

205.    The Appeal Deciding Officer must base an appeal decision solely on the appeal

record and any oral presentation by the appellant. 36 C.F.R § 214.18(b). The "appeal record"

refers to "[d]ocumentation and other information filed with the Appeal Deciding Officer within

the relevant time period by parties to an appeal and upon which review of an appeal is

concluded." *Id.* § 214.2.

206.    An appeal decision must "conform to all applicable laws, regulations, policies,

and procedures." *Id.* § 214.18(c).

207.    At numerous points throughout the appeal process, Appeal Deciding Officers

failed to follow the agency's own regulations prescribing mandatory procedural steps for

resolving livestock grazing permit decision appeals. These deviations include the failure to

determine whether the Manning Creek Allotment permittees' appeals met content requirements;

the failure to dismiss appeals that did not meet such content requirements; the failure to complete

requested mediation, if such mediation was requested; the failure to limit extensions of time only

to those requested in writing by parties and upon good cause shown; the grant of an extension of

time of nearly six years, well beyond the duration of 60 days identified as an ordinary temporal

limit in the regulations; the failure to issue a decision based solely upon oral presentation by

appellants and documentation and information in the appeal record; and an overall failure by the

agency to conform its appeal process and decision to all applicable laws, regulations, policies,

and procedures.

208.    Supervisor Elson's letter reversing District Ranger Kling's suspension and cancellation actions fails to address any "[d]ocumentation or other information filed with the Appeal Deciding Officer within the relevant time period by parties to [the] appeal," as required for a lawful appeal decision under the agency's regulations. 36 C.F.R. § 214.2.

209.    Because USFS failed to follow its own prescriptive procedures for the resolution of livestock grazing permit decision appeals, the agency violated its own regulations promulgated pursuant to the Organic Act of 1897 and the Forest Transfer Act of 1905. Further, the agency has failed to articulate a rational connection between facts found in the appeal record and the 2019 decision made by Supervisor Elson.

210.    Supervisor Elson's 2019 reversal of District Ranger Kling's suspension and cancellation actions is arbitrary, capricious, or otherwise not in accordance with the law, and must be set aside under the APA.

## FOURTH CAUSE OF ACTION
### Violation of NFMA and APA
*(Failure to Incorporate Sage-Grouse Protections in Permits or AOIs)*

211.    WWP incorporates by reference all preceding paragraphs.

212.    NFMA requires grazing permits to be consistent with the relevant National Forest System unit's forest plan. 16 U.S.C. § 1601(i).

213.    In 2015, USFS amended all forest plans in Utah in order to provide greater protections for sage-grouse on National Forest System units with the goal of avoiding an Endangered Species Act listing for the bird. Greater Sage-grouse Record of Decision and Land Management Plan Amendments, (USDA Forest Service, Sept. 2015), available at

https://www.fs.fed.us/sites/default/files/sage-grouse-great-basin-rod.pdf (last visited Nov. 20, 2019).

214.   In Utah, this amendment required USFS to implement pertinent restrictions on trailing livestock, fences, water developments, and other livestock facilities, as well as stubble height retention requirements for vegetation. *Id.*, pp. 146-47.

215.   Under NFMA, and under USFS's "administrative change" to the 2015 amendment, protections for sage-grouse must be incorporated into relevant livestock grazing term permits "as soon as practicable." 16 U.S.C. § 1604(i); Grazing Permits and Greater Sage-grouse Timeframe Change (USDA Forest Service, Nov. 27, 2017).

216.   The Kingston and Forshea allotments contain Priority Habitat Management Areas for sage-grouse. Greater Sage-Grouse Habitat on and in the Vicinity of the Richfield Ranger District, Fishlake National Forest (Sept. 2015), available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprd3856017.pdf (last visited Nov. 20, 2019).

217.   USFS has not incorporated any relevant sage-grouse protections into the recurring temporary permits nor into the current ten-year term permits, despite repeated opportunities to do so. The agency itself has flagged this failure as recently as February and March of 2019. Developing Issue, Fishlake National Forest, Richfield Ranger District, p. 2 (USDA Forest Service, Feb. 14, 2019); NEPA Sufficiency Review, Fishlake National Forest, Richfield Ranger District, p. 2 (USDA Forest Service, March 3, 2019).

218.   Because USFS has not availed itself of repeated practicable opportunities to incorporate sage-grouse protections into permits or Annual Operating Instructions for the

Kingston and Forshea allotments, and thus has not incorporated the 2015 amendment requirements into the permits "as soon as practicable," USFS has acted arbitrarily and capriciously and violated NFMA and the APA.

### PRAYER FOR RELIEF

Wherefore, WWP respectfully prays that this Court enter judgment in its favor and against Defendant United States Forest Service, and that the Court:

1.     Declare that Defendant USFS's issuance of temporary permits and AOIs for the Kingston, Forshea, and Manning Creek allotments without genuine bases found in relevant agency regulations is in violation of FLPMA and the APA;

2.     Declare that Defendant USFS's issuance of ten-year permits and AOIs for the Kingston, Forshea, and Manning Creek allotments despite permittees' deep histories of non-compliance with permit terms and conditions is in violation of FLPMA and the APA;

3.     Declare that Defendant USFS's issuance of permits and AOIs allowing grazing on the Kingston and Forshea allotments inconsistent with its 2007 Decision Memos and relevant AMPs is in violation of NEPA, FLPMA, and the APA;

4.     Declare that Defendant USFS's failure to follow its own appeal procedures is in violation of the Organic Act of 1897, the Forest Transfer Act of 1905, and the APA;

5.     Declare that Defendant USFS's failure to incorporate protections for sage-grouse in permits and AOIs for the Kingston and Forshea allotments is in violation of NFMA and the APA;

6.     Award injunctive relief directing Defendant USFS to rescind the issuance of on-going term permits and AOIs for the Kingston, Forshea, and Manning Creek allotments issued to Gary Allen, Waylon Gleave, or Keith and Pamala Anderton;

7.     Award injunctive relief requiring Defendant USFS to undertake legally valid NEPA, FLPMA, and NFMA analyses prior to issuing any permits or AOIs for the allotments going forward, including review for "extraordinary circumstances" (i.e.,  habitat for sensitive species identified for the Intermountain Region of USFS such as the greater sage-grouse), allotment management plan consistency, and incorporation of sage-grouse standards and guidelines into permit terms and conditions and AOIs as required by relevant forest plan amendments;

8.     Award injunctive relief prohibiting Defendant USFS from issuing temporary permits under 36 C.F.R. § 222.3(c)(2)(i)(E) where no genuine, identified drought or other emergency of National or Regional scope exist, or for any set of circumstances outside those specified in 36 C.F.R. § 222.3(c)(2)(i);

9.     Award injunctive relief setting aside Supervisor Elson's June 10, 2019, letter reversing District Ranger Kling's November 2013 cancellation actions, and requiring Defendant USFS to properly dismiss or resolve according to its own regulations any appeals of those cancellation actions;

10.     Retain jurisdiction of this action to ensure compliance with the Court's decree;

11.     Award WWP the costs it has incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable provisions; and

12.     Grant such other and further relief as is proper.

Dated this 20th day of November, 2019.

Respectfully submitted,

s/John Persell

John Persell (Utah Bar #17298)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
Tele: (503) 896-6472
jpersell@westernwatersheds.org

Attorney for Plaintiff

COMPLAINT - 57