

**United States Department of Agriculture**

**Forest Service**

**Intermountain Region**

**August 2019**



# Greater Sage-grouse Draft Record of Decision and Land Management Plan Amendment for National Forest System Land in Utah

## Ashley, Dixie, Fishlake, Manti-La Sal, Uinta-Wasatch-Cache, and Sawtooth National Forests



In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by:

    (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410;

    (2) fax: (202) 690-7442; or

    (3) email: program.intake@usda.gov

USDA is an equal opportunity provider, employer and lender.

## FOREWORD

The landscape and culture of the Interior West are characterized by the iconic sagebrush steppe ecosystems that are valued and used by people with a long and deep connection to the land. The United States Department of Agriculture, Forest Service has identified a need and desire to create a new balance between the use and protection of this landscape to conserve its important attributes, including greater sage-grouse.

In 2010, the Forest Service began a journey that involved a multi-faceted effort that included both programmatic planning and on-the-ground projects across multiple states. The Forest Service has come together through working groups, task forces, councils, and meetings with the public, Tribes, state and federal agencies, counties, and associations. This landscape includes multiple jurisdictions with a diversity of authorities, responsibilities, geography, resources and needs that lead to similar but different plans and actions. Our efforts have not and could not be expected to result in one overall plan agreed to by everyone across the entire landscape. However, we've achieved an unprecedented level of collaboration to achieve a significant set of accomplishments that will benefit greater sage-grouse and the sagebrush steppe ecosystem across the landscape.

On September 16, 2015, the Forest Service signed two decisions the *Greater Sage-grouse Record of Decision and Land Management Plan Amendments for Idaho, Southwest Montana, Nevada, and Utah* and the *Greater Sage-grouse Record of Decision and Land Management Plan Amendments for Northwest Colorado and Wyoming*. On October 2, 2015, the U.S. Fish and Wildlife Service (USFWS) found that listing the greater sage-grouse under the Endangered Species Act (ESA) of 1973 was not warranted (80 FR 59858). The USFWS based its finding on regulatory certainty from the conservation measures in the Forest Service and Bureau of Land Management (BLM) greater sage-grouse land management plan amendments (LMPAs) and revisions, as well as on other private, state, and federal conservation efforts.

In 2017, the Secretary of the Interior issued Secretarial Order (SO) 3353 with a purpose of enhancing cooperation among 11 western states and the BLM in managing and conserving greater sage-grouse. It also directed an Interior Review Team, consisting of the BLM, the USFWS, and the US Geological Survey (USGS), to coordinate with the Sage-Grouse Task Force.  A June 14, 2017 letter from the Forest Service Chief directed the Forest Service in Regions 1, 2, and 4 to cooperate in the review. On August 4, 2017, the Interior Review Team submitted its Report which recommended modifying the greater sage-grouse plans and associated policies to better align with individual state plans. On August 4, 2017, the Secretary of the Interior issued a memo to the Deputy Secretary directing the BLM to implement the recommendations found in the report and the BLM initiated their environmental analysis process.

After two years of implementation and monitoring, the Forest Service believed new information could be incorporated to improve the clarity, efficiency, and implementation of the 2015 Greater Sage-Grouse Plan Amendments, including better alignment with BLM and state plans, in order to benefit greater sage-grouse conservation at the landscape scale. In November 2017, the Forest Service initiated the environmental analysis process with the publication of a Notice of Intent to Prepare an Environmental Impact Statement (EIS) in the Federal Register. On June 20, 2018 a Supplemental NOI was published to continue the scoping effort by seeking comments for a proposed action to make amendments to the plans. Comments from both NOIs were considered and on October 5, 2018, the Forest Service published a Draft EIS (DEIS) for public comment.  The Forest Service considered input from cooperating agencies, as well as comments and meetings with the public, Tribes, state and federal agencies, counties, and associations.

This Record of Decision (ROD) represents our contribution and commitment to the conservation of greater sage-grouse and the sagebrush steppe ecosystem that is vital to the survival of greater sage-grouse. Our decision was made after carefully listening and considering concerns raised by the state and federal agencies, Tribes, cooperating agencies (including the BLM), grazing permittees, industry, counties, groups, and public. The states involved in this effort have taken approaches appropriate to their situation towards this common goal; and the Forest Service has developed plans that provide a level of consistency across the federal lands that they manage, while incorporating aspects of each state's plan. The Forest Service worked closely with state partners to develop direction that will provide the habitat necessary to maintain a viable population of greater sage-grouse on the plan area while taking state plan direction into consideration.

The LMPA, as outlined in this decision, provides overall direction and guidance for land management activities on National Forest System lands. The actual changes on the ground, however, will occur as project-level environmental analysis and decisions occur and the resulting actions are implemented.

The Forest Service fully recognizes that this decision will result in changes to how National Forest System lands and uses are managed and, as actions are being implemented, they will have impacts on some users. It is incumbent upon us to continue working at the local level to find ways to achieve the goals outlined in this ROD and associated LMPA. the Forest Service understands that to be successful implementation must proceed in a thoughtful way that is collaborative and transparent with our federal, state, and local partners.

The LMPA establishes a solid foundation to work from that provides a level of certainty about management of National Forest System lands. Through our experiences implementing the plan amendments, completing additional project analysis, conducting monitoring and additional research, the Forest Service will continue to learn more about these landscapes, and the wildlife and uses they support. It will be incumbent upon us to embrace an attitude of continual learning and adaptation.

The large landscape that the Forest Service is working on, and the associated diverse group of stakeholders affected and interested in this effort, provides an opportunity to take advantage of each other's knowledge and capacity and, using our varied strengths, work in partnership to conserve greater sage-grouse while continuing the important uses on our National Forest System lands.

To date through this effort, we've established new ways of working together that have resulted in significant accomplishments. We're committed to building on these successes and exploring additional ways to strengthen our efforts to work together.


**Nora Rasure**
Regional Forester
Intermountain Region

# Table of Contents

FOREWORD ..................................................................................................................................... 1

INTRODUCTION .............................................................................................................................. 7

BACKGROUND ................................................................................................................................ 7

PLANNING AREA ............................................................................................................................. 9
    Table 1-1. Forest Service LMPs proposed to be amended by GRSG planning strategy in the entire
    planning area. ........................................................................................................................... 10

DECISION AREA ............................................................................................................................ 11

*HABITAT MANAGEMENT AREAS* .................................................................................................. 11
    Table 1-2. Comparative summary of acres of greater sage-grouse habitat in entire planning area by
    alternative. ............................................................................................................................... 12

DECISION ..................................................................................................................................... 13
    Table 1-3. Land management plans in Utah amended by this decision. ................................................ 13
    Table 1-4. Summary of habitat management areas in acres located in Utah in the Proposed Action
    Alternative, with Modifications. .................................................................................................... 14

DECISION RATIONALE .................................................................................................................. 15

*HOW THE SELECTED ALTERNATIVE RESPONDS TO THE PURPOSE AND NEED* ........................................ 15

*HOW ISSUES WERE ADDRESSED AND CONSIDERED* .......................................................................... 17
    Habitat Management Area Designations .......................................................................................... 17
    Sagebrush Focal Area Designations/Withdrawals .............................................................................. 19
    Changing Net Conservation Gain and Adjustment of Compensatory Mitigation Frameworks ............. 19
    Including Waivers, Exceptions, and Modifications on NSO Stipulations ................................................ 20
    Modifying Desired Conditions ....................................................................................................... 21
    Changing Livestock Grazing Guidelines ........................................................................................... 21
    Adaptive Management Review Process ............................................................................................ 22
    Treatment of Invasive Plant Species ............................................................................................... 23
    Consistency with the 2012 Planning Rule ........................................................................................ 23
    Noise Standards ......................................................................................................................... 24

OTHER ELEMENTS OF MY DECISION ............................................................................................. 24

*MONITORING (See Attachment F)* ............................................................................................... 24

*MITIGATION (See Attachment G)* ................................................................................................. 25

*ADAPTIVE MANAGEMENT (See Attachment H)* .......................................................................................25

**ALTERNATIVES CONSIDERED** .............................................................................................................26

*ALTERNATIVE 1 – NO ACTION ALTERNATIVE* ...........................................................................................26

*ALTERNATIVE 2 – PROPOSED ACTION ALTERNATIVE*.................................................................................27

*ALTERNATIVE 3 – STATE OF UTAH ALTERNATIVE* ....................................................................................28

*ENVIRONMENTALLY PREFERRED ALTERNATIVE* .......................................................................................28

*ALTERNATIVES CONSIDERED BUT NOT ANALYZED IN DETAIL* .......................................................................29

**PUBLIC INVOLVEMENT**....................................................................................................................29

**INTERAGENCY COORDINATION** .........................................................................................................31
   Table 1-5. Public open houses and interagency and cooperating agency meetings held....................31

*BUREAU OF LAND MANAGEMENT*........................................................................................................33

*STATE GOVERNMENTS*......................................................................................................................33

*CONSULTATION WITH AMERICAN INDIAN TRIBES* ....................................................................................33

*ENDANGERED SPECIES ACT SECTION 7 CONSULTATION* ............................................................................33

**FINDINGS REQUIRED BY LAWS AND REGULATIONS**................................................................................34

*NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)*...................................................................................34

*CIVIL RIGHTS AND ENVIRONMENTAL JUSTICE*.........................................................................................35

*NATIONAL HISTORIC PRESERVATION ACT*..............................................................................................35

*NATIONAL FOREST MANAGEMENT ACT (NFMA) AND THE PLANNING RULE*..................................................36

*COMPLIANCE WITH THE PROCEDURAL REQUIREMENTS OF THE PLANNING RULE*....................................36
   Using the best available scientific information to inform the planning process (§ 219.3)....................36
   Amend the plan consistent with NEPA procedures (§219.13 (b)(3))....................................................36
   Applying the planning rule's format requirements for plan components (§ 219.13 (b)(4))..................36
   Base the amendment on the preliminary identification of the need to change the plan (§219.13
   (b)(1)) ...............................................................................................................................................36
   Providing opportunities for public participation (§ 219.4) and providing public notice (§ 219.16; §
   219.13(b)(2)) ....................................................................................................................................36

*COMPLIANCE WITH THE PLANNING RULE'S APPLICABLE SUBSTANTIVE PROVISIONS* .............................37
   Scope and Scale of the Amendment....................................................................................................37

Planning rule provisions that are directly related to the amendment .................................................37

Table 1-6. Topics and associated specific subsections of 219.8(b) and 219.10(a) that are directly related provisions. ............................................................................................................................38

Table 1-7.  Resources and uses with beneficial effects from the amendment and the associated directly related rule provision..........................................................................................................40

In applying 36 CFR 219.8(a)(1), the Forest Service took into account the relevant aspects of the list at 36 CFR 219.8(a)(1)..............................................................................................................................40

In applying 36 CFR 219.8(b), the Forest Service took into account the relevant aspects of the list at 36 CFR 219.8(b)..........................................................................................................................................41

36 CFR 219.9 ............................................................................................................................................42

36 CFR 219.10 ..........................................................................................................................................43

*VIABLE POPULATION DETERMINATION* ....................................................................................................45

*ENDANGERED SPECIES ACT* .....................................................................................................................45

*CLEAN AIR ACT* .......................................................................................................................................46

*CLEAN WATER ACT* .................................................................................................................................46

**TRANSITION TO AMENDED PLAN DIRECTION** ..........................................................................................46

*LANDS AND REALTY TRANSITION*.............................................................................................................46

*GREATER SAGE-GROUSE PLAN AMENDMENT DIRECTION*..........................................................................47

**EFFECTIVE DATE OF THE AMENDMENT** ..................................................................................................47

**PRE-DECISIONAL ADMINISTRATIVE REVIEW PROCESS (OBJECTION PROCESS)** .......................................47

**CONTACT PERSON** ...............................................................................................................................48

**ATTACHMENT A – LAND MANAGEMENT PLAN AMENDMENT FOR NFS LANDS IN UTAH ON THE ASHLEY, DIXIE, FISHLAKE, MANTI-LA SAL, UINTA-WASATCH-CACHE, AND SAWTOOTH NATIONAL FORESTS** ...............................................................................................................................................50

Greater Sage-grouse General...............................................................................................................52

Adaptive Management ........................................................................................................................53

Lands and Realty .................................................................................................................................53

Special-use Authorizations (Non-recreation)........................................................................................53

Land Ownership Adjustments..............................................................................................................54

Wind and Solar....................................................................................................................................54

Greater Sage-grouse Habitat ..............................................................................................................54

Livestock Grazing ................................................................................................................................55

Fire Management ................................................................................................................ 56
Recreation ........................................................................................................................... 58
Roads/Transportation ......................................................................................................... 58
Minerals ............................................................................................................................... 59
Fluid-Unleased .................................................................................................................... 59
Fluid-Leased ........................................................................................................................ 59
Fluid- Operations ................................................................................................................ 60
Coal Mines- Unleased ......................................................................................................... 60
Coal Mines- Leased ............................................................................................................. 61
Locatable Minerals .............................................................................................................. 61
Non-energy Leasable Minerals ........................................................................................... 61
Mineral Materials................................................................................................................ 62

**ATTACHMENT B - HMA MAPS OF ALTERNATIVE 2, WITH MODIFICATIONS** .......................................... 64

**ATTACHMENT C - GLOSSARY OF TERMS USED IN THE FEIS AND THIS ROD AND LMPA** ....................... 71

**ATTACHMENT D – MANAGEMENT APPROACH FOR FLUID MINERALS: STIPULATIONS** ........................ 84

**ATTACHMENT E - DESIRED CONDITIONS AND HABITAT OBJECTIVES**...................................................... 90
Table E-1. Utah - Seasonal habitat desired conditions for greater sage-grouse at the ........................ 90
landscape scale. ................................................................................................................... 90
Table E-2. Utah - Treatment acres per decade.[1] ............................................................... 92

**ATTACHMENT F - UTAH MONITORING FRAMEWORK MANAGEMENT APPROACH** .............................. 94

**ATTACHMENT G - UTAH MITIGATION STRATEGY MANAGEMENT APPROACH** ..................................... 97

**ATTACHMENT H - UTAH ADAPTIVE MANAGEMENT STRATEGY AND DISTURBANCE CAP GUIDANCE
MANAGEMENT APPROACHES**................................................................................................................. 100

**DISTURBANCE CAP GUIDANCE MANAGEMENT APPROACH**................................................................... 104

## INTRODUCTION

This Record of Decision (ROD) documents my decision and rationale for approving the land management plan amendment (LMPA) and final environmental impact statement (FEIS) for National Forest System (NFS) lands located in the state of Utah. This LMPA will provide guidance for future project and activity decisionmaking on the Ashley, Dixie, Fishlake, Manti-La Sal, Uinta-Wasatch-Cache, and Sawtooth National Forests (NFs).

The Forest Service has developed a targeted, multi-tiered, collaborative landscape-level conservation strategy. This strategy is based on the best available scientific information that offers the highest level of protection for greater sage-grouse (GRSG) in the most important habitat areas to address the specific threats identified in the 2010 U.S. Fish and Wildlife Service (USFWS) "warranted but precluded" decision, and the USFWS 2013 Conservation Objectives Team (COT) report, and the 2017 Response to SO 3353 written by the Interior Review Team.

The conservation measures presented in this ROD and the attached LMPA protect greater sage-grouse and its habitat, and more than 350 other wildlife species associated with the sagebrush steppe ecosystem, which is widely recognized as one of the most endangered ecosystems in North America. Reversing the slow degradation of this valuable ecosystem will also benefit local economies and a variety of rangeland uses including sustainable livestock grazing, recreation, and continued sustainable economic development in a manner that safeguards the long-term sustainability, diversity, and productivity of these important and iconic landscapes and the Western culture.

The management direction in the LMPA comprises forest plan components that limit or eliminate new surface disturbance in Priority Habitat Management Areas (PHMAs). The LMPA also includes a suite of other management direction, such as the establishment of disturbance limits, greater sage-grouse habitat objectives, lek buffers, mitigation requirements, monitoring protocols, adaptive management triggers and responses, and targeted restoration and habitat improvements. The cumulative effect of these measures is to conserve, enhance, and restore greater sage-grouse habitat across the remaining range of the species in the Intermountain Region and provide greater certainty that Forest Service land management plan decisions will lead to conservation of greater sage-grouse and other species associated with the sagebrush steppe ecosystem.

The greater sage-grouse conservation measures approved by this decision, in addition to other state, federal, and local partners' greater sage-grouse conservation actions, represent a collaborative, landscape-level conservation effort. Through past and future partnerships and cooperation, the Forest Service intends to manage the sagebrush steppe ecosystem to achieve our common goal to conserve greater sage-grouse and its habitat.

## BACKGROUND

Greater sage-grouse is a species dependent on sagebrush steppe ecosystems. These ecosystems are managed in partnership across the range of the greater sage-grouse by federal, state, tribal and local authorities. Efforts to conserve the species and its habitat date back to the 1950s. Over the past two decades, state wildlife agencies, federal agencies, and many others in the range of the species have been collaborating to conserve greater sage-grouse and its habitats. The United States Department of Agriculture (USDA) Forest Service (FS) and the United States Department of the Interior (USDI) Bureau of

Land Management (BLM) have broad responsibilities to manage federal lands and resources for the public benefit.

The greater sage-grouse, an iconic species of the sagebrush steppe ecosystem, currently occupies only 56% of its historic range and populations have continued to decline for the past 40 years. The Forest Service manages approximately 8% of the remaining greater sage-grouse habitat.  The National Forest Management Act of 1976 (NFMA) directs the FS to develop, maintain, and, as appropriate, revise land management plans (LMPs) which guide management of NFS lands (16 USC 1604(a)). The conservation measures in the LMPA fulfills this responsibility as well as our commitment to the Forest Service mission to sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations.

In March 2010, the USDI Fish and Wildlife Service (USFWS) issued a 12 Month Finding for Petitions to List the greater sage-grouse (*Centrocercus urophasianus*) as Threatened or Endangered (75 Federal Register 13910, March 23, 2010). In that 12-Month Finding, the USFWS concluded that listing the greater sage-grouse as a threatened or endangered species was "warranted, but precluded by higher priority listing actions." The USFWS reviewed the status and threats to the greater sage-grouse in relation to the five Listing Factors provided in Section 4(a)(1) of the ESA (16 USC 1533(a)(1)). Of the five Listing Factors reviewed, the USFWS determined that Factor A, "the present or threatened destruction, modification, or curtailment of the habitat or range," (p. 13924) and Factor D, "inadequacy of existing regulatory mechanisms" (p. 13973) posed "a significant threat to the greater sage-grouse now and in the foreseeable future" (pp. 13962 and 13982) (75 FR 13910, March 23, 2010). The USFWS identified the land and resource management plans for the FS and BLM as mechanisms through which adequate protections for greater sage-grouse could be implemented.

The 2010 USFWS listing decision prompted a joint FS and BLM planning effort to amend FS LMPs and BLM equivalents to incorporate conservation measures to support the continued existence of the greater sage-grouse. This effort culminated in the Forest Service Greater Sage-grouse Records of Decisions (2015 RODs) that were signed on September 16, 2015. On October 2, 2015, the USFWS found that listing the greater sage-grouse under the ESA was not warranted (80 FR 59858). The USFWS based its finding on regulatory certainty from the conservation measures in the FS and BLM greater sage-grouse LMPAs and revisions, as well as on other private, state, tribal, and federal conservation efforts.

On March 29, 2017, the Secretary of the Interior issued Secretarial Order (SO) 3349. It ordered agencies to reexamine practices to better balance conservation strategies and policies with the need of creating jobs. On June 7, 2017, the Secretary issued SO 3353 with a purpose of enhancing cooperation among eleven western states and the BLM in managing and conserving greater sage-grouse. SO 3353 directed an Interior Review Team, consisting of the BLM, the USFWS, and the US Geological Survey (USGS), to coordinate with the Sage-Grouse Task Force.  A June 14, 2017 letter from the Forest Service Chief directed Forest Service Regions 1, 2, and 4 to cooperate in the review. On August 4, 2017, the Interior Review Team submitted its Report in Response to SO 3353. In this report the team recommended modifying the greater sage-grouse plans and associated policies to better align with the individual state plans. On August 4, 2017, the Secretary issued a memo to the Deputy Secretary directing the BLM to implement the recommendations found in the report.  On October 11, 2017, the BLM published the Notice of Intent to Amend Land Use Plans Regarding Greater Sage-Grouse Conservation and Prepare Associated Environment Impact Statements or Environmental Assessments (82 FR 47248).

To solicit public comment on greater sage-grouse management issues that could warrant LMPAs, the FS

published a Notice of Intent (NOI) to prepare an Environmental Impact Statement (EIS) (82 FR 55346, November 21, 2017). The FS provided the public with an opportunity to identify the preliminary need for change to the 2015 amendments and encouraged the public to help identify any issues, management questions, or concerns that should be addressed. A March 2018 Executive Summary of comments can be found here: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd576258.pdf. On June 20, 2018 a Supplemental NOI was published to continue the scoping effort by seeking comments for a proposed action to make amendments to the plans (83 FR 28608).  This Supplemental NOI identified the provisions in the regulations that guide the development, amendment, and revision of land management plans for all units of the NFS (36 CFR 219, referred to as the "planning rule") likely to be directly related, and so applicable, to proposed plan amendments. On July 2, 2018, a corrected Supplemental NOI was published to clarify that the FS is not proposing to amend land management plans for NFS lands in Montana (83 FR 30909). On August 1, 2018 the comment period was extended for two weeks in response to public concerns regarding the BLM Draft Environmental Impact Statement (DEIS) comment period closing the same day as the FS (83 FR 37460). A September 2018 Executive Summary of comments is located on the project page at:
 https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd595810.pdf.

On October 5, 2018 a Notice of Availability (NOA) for the Greater Sage-grouse Proposed LMPAs and DEIS for the Intermountain and Rocky Mountain Regions was published in the Federal Register (83 FR 50362 and 83 FR 50331, October 5, 2018). The 90-day comment period per the 2018 NOA drew 33,192 comment letters, of which 622 contained unique and substantially different comments. The Forest Service received letters, emails, form letters, and public comment forms from Tribes, individuals, organizations, agencies, businesses, and groups. The Forests analyzed 2,935 comments from the 622 comment letters to identify the significant issues driving the alternatives. A February 2019 Executive Summary of comments is located on the Intermountain Region webpage at:
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd610376.pdf.  A summary of the responses to comments is included in Appendix I – Response to Comments in the FEIS. A spreadsheet containing all unique comments and response to comments is available at:
https://data.ecosystem-management.org/nepaweb/nepa_project_exp.php?project=52904.


The FS prepared the FEIS to analyze changing conservation measures for greater sage-grouse as well as to incorporate new information to improve the clarity, efficiency, and implementation of the conservation measures of the 2015 Greater Sage-Grouse Plan Amendments.  The FS was also a cooperating agency with the BLM as they undertook a similar action.

## PLANNING AREA

The planning area comprises NFS lands in greater sage-grouse habitat management areas (HMAs) located in National Forests and Grasslands in the Intermountain and Rocky Mountain Regions. The NFS lands located in the planning area are managed under 19 land management plans, shown in Table 1-1. One DEIS and one FEIS were developed for the entire planning area; however, a separate ROD has been prepared for each state. See "Decision Area" and Table 1-3 below for a list of those land management plans amended in this ROD.

Table 1-1. Forest Service LMPs proposed to be amended by GRSG planning strategy in the entire planning area.

| Managing Forest or Grassland | LMP and Year Approved[1] | State |
|---|---|---|
| **Intermountain Region, Region 4** | | |
| Ashley National Forest | Ashley National Forest Land and Resource Management Plan (1986) | Utah, Wyoming |
| Boise National Forest | Boise National Forest Land and Resource Management Plan (2003) | Idaho |
| Bridger-Teton National Forest | Bridger-Teton Land and Resource Management Plan (1990) | Wyoming |
| Caribou-Targhee National Forest | Curlew National Grassland Plan (2002) | Idaho |
| Caribou-Targhee National Forest | Revised Forest Plan for the Caribou National Forest (2003) | Idaho |
| Caribou-Targhee National Forest | 1997 Revised Forest Plan, Targhee National Forest (1997) | Idaho |
| Dixie National Forest | Land and Resource Management Plan for the Dixie National Forest (1986) | Utah |
| Fishlake National Forest | Fishlake National Forest Land and Resource Management Plan (1986) | Utah |
| Humboldt-Toiyabe National Forest | Humboldt National Forest Land and Resource Management Plan (1986) | Nevada |
| Humboldt-Toiyabe National Forest | Land and Resource Management Plan, Toiyabe National Forest (1986) | Nevada |
| Manti-La Sal National Forest | Land and Resource Management Plan, Manti-La Sal (1986) | Utah |
| Salmon-Challis National Forest | Challis National Forest Land and Resource Management Plan (1987) | Idaho |
| Salmon-Challis National Forest | Salmon National Forest Land and Resource Management Plan (1988) | Idaho |
| Sawtooth National Forest | Sawtooth National Forest Land and Resource Management Plan (2003) | Idaho, Utah |
| Uinta-Wasatch-Cache National Forest | 2003 Land and Resource Management Plan, Uinta National Forest (2003) | Utah, Wyoming |
| Uinta-Wasatch-Cache National Forest | Revised Forest Plan, Wasatch-Cache National Forest (2003) | Utah, Wyoming |
| **Rocky Mountain Region, Region 2** | | |
| Medicine Bow-Routt National Forest | Routt National Forest Revised Land and Resource Management Plan (1997) | Colorado |
| Medicine Bow-Routt National Forest | Medicine Bow National Forest Revised Land and Resource Management Plan (2003) | Wyoming |
| Thunder Basin National Grassland | Land and Resource Management Plan for the Thunder Basin National Grassland (2001) | Wyoming |

[1]As amended

## DECISION AREA

The NFS lands included in this decision are greater sage-grouse habitat management areas and lek buffers as specified in the LMPA located in Utah. All lands included in this decision are in the Intermountain Region. Maps of the decision area are included in Attachment B.

### *HABITAT MANAGEMENT AREAS*

The planning area comprises numerous areas with greater sage-grouse habitat across the local ranges of one or more greater sage-grouse populations. These habitat areas are non-contiguous, meaning they are often separated by natural geographic features/barriers or human development. In this ROD, the planning area is further divided into HMAs.  Habitat management areas are broadly mapped at a large scale and may encompass tracts of non-habitat; plan components only apply to greater sage-grouse habitat within the broad bounds of the HMAs.  The HMAs are defined as follows:

- **Priority Habitat Management Areas (PHMA):** Areas that have been identified as having the highest conservation value to maintaining sustainable greater sage-grouse populations. These areas are occupied seasonally or year-round and include breeding, late brood-rearing, and winter concentration areas. The FS and BLM have identified these areas in coordination with respective state wildlife agencies.

- **General Habitat Management Area (GHMA):** Areas that are likely to be occupied seasonally or year-round outside of PHMAs and where special management would apply to sustain the greater sage-grouse population. GHMA may include active leks, seasonal habitats, and fragmented or marginal habitat.  These areas have been identified by the FS and BLM in coordination with respective state wildlife agencies.

As new information about greater sage-grouse habitat becomes available, including seasonal habitats, in coordination with the State wildlife agency and USFWS, and based on best available scientific information, the Forest Service may revise the greater sage-grouse habitat management area maps and associated management decisions through LMPA or forest plan revision, as appropriate.

**Table 1-2. Comparative summary of acres of greater sage-grouse habitat in entire planning area by alternative.**

| Alternatives | Colorado | Acreage Change | Idaho | Acreage Change | Nevada | Acreage Change | Utah | Acreage Change | Wyoming | Acreage Change | Total Acreage Change |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **No Action Alternative** | | | | | | | | | | | |
| PHMA | 1,400 | - | 342,000 | - | 994,800 | - | 782,100 | - | 419,600 | - | - |
| IHMA | - | - | 416,300 | - | - | - | - | - | - | - | - |
| GHMA | 11,000 | - | 347,500 | - | 797,800 | - | 28,100 | - | 609,800 | - | - |
| OHMA | - | - | - | - | 625,600 | - | - | - | - | - | - |
| Anthro Mountain | - | - | - | - | - | - | 42,100 | - | - | - | - |
| SFA | - | - | 248,000 | - | 566,800 | - | 47,300 | - | 2,800 | - | - |
| **Total** | **12,400** | **-** | **1,105,800** | **-** | **2,418,100** | **-** | **852,300** | **-** | **1,029,400** | **-** | **-** |
| **Proposed Action Alternative** | | | | | | | | | | | |
| PHMA | 1,400 | - | 342,000 | - | 889,600 | -105,200 | 824,200 | 42,200 | 319,400 | -100,300 | -163,300 |
| IHMA | - | - | 416,300 | - | - | - | - | - | - | - | - |
| GHMA | 11,000 | - | 347,500 | - | 1,096,000 | 298,300 | 28,100 | - | 514,300 | -94,600 | 203,700 |
| OHMA | - | - | - | - | 426,800 | -198,800 | - | - | - | - | -198,800 |
| CHMA | - | - | - | - | - | - | - | - | 6,400 | - | - |
| Anthro Mountain | - | - | - | - | - | - | - | -42,100 | - | - | -42,100 |
| **Total** | **12,400** | **-** | **1,105,800** | **-** | **2,412,400** | **-5,700** | **852,400** | **100** | **840,100** | **-194,900** | **-200,400** |
| **State of Utah Alternative** | | | | | | | | | | | |
| PHMA | 1,400 | - | 342,000 | - | 889,600 | - | 782,100 | -42,200 | 319,400 | - | -42,200 |
| IHMA | - | - | 416,300 | - | - | - | - | - | - | - | - |
| GHMA | 11,000 | - | 347,500 | - | 1,096,000 | - | - | -28,100 | 514,300 | - | -28,100 |
| OHMA | - | - | - | - | 426,800 | - | - | - | - | - | - |
| CHMA | - | - | - | - | - | - | - | - | 6,400 | - | - |
| **Total** | **12,400** | **-** | **1,105,800** | **-** | **2,412,400** | **-** | **782,100** | **-70,300** | **840,100** | **-** | **-70,300** |

Acres rounded to the nearest hundred.
No Action Alternative - Source: FS GIS 2015; Proposed Action - Source: FS GIS 2018; State of Utah Alternative - Source: FS GIS 2018

## DECISION[1]

My decision is to approve Alternative 2, the Proposed Action Alternative from the FEIS, with Modifications. My decision approves the LMPA to amend the LMPs for NFS lands in Utah (See Table 1-3). The Ashely and Uinta-Wasatch-Cache NFs are located in both Utah and Wyoming and the Sawtooth NF is located in Idaho and Utah. This decision and LMPA only applies to the portion of the NFS lands located in Utah. The portion of NFS lands located in Wyoming will be considered in the "Greater Sage-grouse Draft ROD and LMPA for NFS Land in Wyoming". The portion of NFS lands located in Idaho will be considered in the "Greater Sage-grouse Draft ROD and LMPA for NFS Land in Idaho".

**Table 1-3. Land management plans in Utah amended by this decision.**

| Managing Forest or Grassland | LMP and Year Approved[1] | State |
|---|---|---|
| Intermountain Region, Region 4 | | |
| Ashley National Forest | Ashley National Forest Land and Resource Management Plan (1986) | Utah, Wyoming[2] |
| Dixie National Forest | Land and Resource Management Plan for the Dixie National Forest (1986) | Utah |
| Fishlake National Forest | Fishlake National Forest Land and Resource Management Plan (1986) | Utah |
| Manti-La Sal National Forest | Land and Resource Management Plan, Manti-La Sal (1986) | Utah |
| Uinta-Wasatch-Cache National Forest | 2003 Land and Resource Management Plan, Uinta National Forest (2003) Revised Forest Plan, Wasatch-Cache National Forest (2003) | Utah, Wyoming[2] |
| Sawtooth National Forest | Sawtooth National Forest Land and Resource Management Plan (2003) | Idaho[2], Utah |

[1]As amended
[2]A separate draft ROD and proposed LMPA have been published for the NFS lands in Wyoming (Ashley and Uinta-Wasatch-Cache NFs) and Idaho (Sawtooth NF) and will be considered in those draft RODs and LMPAs.

In the DEIS and FEIS, the Forest Service analyzed effects of two action alternatives and a No Action Alternative (see FEIS, Chapter 2, Sections 2.2 and 2.3 regarding alternatives). The action alternatives are Alternative 2 - Proposed Action Alternative and Alternative 3 – State of Utah Alternative.  Alternative 2 is the preferred alternative and has modifications from the DEIS.

When the State of Utah Alternative was developed, it incorporated all aspects of Alternative 2 – Proposed Action Alternative, except for two modifications, specifically, the removal of GHMA designation from NFS lands in Utah and no designation of the Anthro Mountain management area on the Ashley National Forest. The Anthro Mountain management area would be redesignated as PHMA under Alternative 2. See Chapter 2, Section 2.5 and Tables 2-8 and 2-8a.

This decision selects Alternative 2 – Proposed Action Alternative from the FEIS, with a modification. The modification is that the LMPA will remove approximately 28,100 acres of GHMA designation from NFS lands in Utah as analyzed in Alternative 3.

---

[1] If any inconsistencies exist between the language contained in this ROD and the LMPAs, the language as written in the LMPAs will prevail.

In the No Action Alternative, there were approximately 28,100 acres of GHMA in Utah. Table 1-4 shows the Proposed Action Alternative, with modifications which removes GHMA of approximately 8,800 acres on the Ashley NF, 4,700 acres on the Uinta-Wasatch-Cache NF, 7,100 acres on the Fishlake NF, and 7,600 acres on the Manti-La Sal NF. These is no GHMA located on the Dixie and Sawtooth NFs in any of the alternatives.

**Table 1-4. Summary of habitat management areas in acres located in Utah in the Proposed Action Alternative, with Modifications.**

| National Forest | GHMA | PHMA |
|---|---|---|
| Ashley NF | 0 | 78,700 |
| Dixie NF | N/A* | 185,200 |
| Fishlake NF | 0 | 173,400 |
| Manti-La Sal NF | 0 | 89,200 |
| Sawtooth NF | N/A* | 71,800 |
| Uinta-Wasatch-Cache NF | 0 | 183,900 |
| **Total Acres in Utah** | **0** | **782,200** |

N/A* – There is no designated GHMA on the Dixie or Sawtooth NF.

The proposed LMPAs in the FEIS became the LMPA located in Attachment A. The LMPA provides conservation measures to conserve, enhance, and restore greater sage-grouse and its habitat by reducing, eliminating, or minimizing threats to greater sage-grouse and its habitat. Land management plan direction is expressed as desired conditions, objectives, standards, and guidelines. These plan components are designed to provide conservation protection for greater sage-grouse and habitat sufficient for a viable population on each planning unit.

In developing the proposed LMPA for the FEIS and ROD, modifications were made to the Proposed Action Alternative in the DEIS. The clarifications and edits made between the DEIS and FEIS are shown in the FEIS, Chapter 2, Utah Tables 2-8 and 2-8a. The modifications were based on public comments, internal review, new information, best available scientific information, the need for clarification in the plans, and ongoing coordination with States and other stakeholders across the range of the greater sage-grouse.

The suite of desired conditions, objectives, standards, and guidelines in the LMPA have been developed to provide direction for the potential activities that can occur in greater sage-grouse habitat. In addition, management approaches, which are identified as optional content in the plan, are also included. Optional Content in the Plan is discussed at 36 CFR 219.7(f)(2): "A plan may include additional content, such as potential management approaches or strategies and partnership opportunities or coordination activities." Optional content in the plan is also described in Forest Service Handbook 1909.12, Sec. 22.4 "If used, management approaches would describe the principal strategies and program priorities the Responsible Official intends to employ to carry out projects and activities developed under the plan. The management approaches can convey a sense of priority and focus among objectives and the likely management emphasis. Management approaches should relate to desired conditions and may indicate the future course or direction of change, recognizing budget trends, program demands and accomplishments. Management approaches may discuss potential processes such as analysis, assessment, inventory, project planning, or monitoring."

Management approaches are intended as guidance of how to meet the purpose of the amendment for situations that are outside of the decisionmaking process.  Several plan components were identified as management approaches in the DEIS Proposed Action when it was determined that they did not meet the definition of a standard or guideline.  In the FEIS, many remained as management approaches, but some were changed back to guidelines, when it was determined that they did more closely meet the definition of a guideline; "a constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met. Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements."  I intend to employ management approaches in the FEIS to meet the purpose of the amendment. There was no effect and no reduction in protection to greater sage-grouse or its habitat as a result of identifying a plan component that had been mislabeled and was a management approach. I am making use of all the tools the 2012 Planning Rule provides to conserve greater sage-grouse and its habitat.

Implementation of the LMPA direction within the designated greater sage-grouse habitat management areas will be consistently and systematically monitored. Management decisions will be adjusted through an adaptive management process consistent and in accordance with applicable law. Monitoring, Mitigation, and Adaptive Management details are provided below in this ROD (refer to ROD, Attachments F, G, and H for additional details).

The LMPA does not commit the Forest Service to on-the-ground, site-specific projects or actions.  The LMPA provides a broad, programmatic framework that guides project-level decisions, but does not authorize, fund, or carry out any site-specific activities. Instead, the land management plan establishes limitations on what actions may be authorized and what conditions must be met during project-level decisionmaking. Upon the effective date of the LMPA, the Forests will carry out on-the-ground projects and activities designed to accomplish management objectives and move the project area toward desired conditions described in the LMPA. Projects and activities may require additional environmental analysis at the time of project- and activity-specific proposals and will be subject to the National Environmental Policy Act (NEPA) and other applicable laws and regulations. Project-level decisions must be consistent with the land management plan.

## DECISION RATIONALE

### HOW THE SELECTED ALTERNATIVE RESPONDS TO THE PURPOSE AND NEED

The LMPA that I approve by this decision meets the purpose and need to incorporate new information to improve the clarity, efficiency, and implementation of the 2015 Greater Sage-Grouse Plan Amendments, including better alignment with BLM and state plans, to benefit greater sage-grouse conservation at the landscape scale. The FS gained new information and understanding from comments received, within-agency scoping, new science and research, and coordination with cooperating agencies and the Sage Grouse Task Force. The LMPA provides management direction through desired conditions, standards, and guidelines regarding what activities the Forest Service can and cannot approve in greater sage-grouse habitat on NFS lands in Utah. The LMPA emphasizes moving toward desired conditions and these standards and guidelines are intended to reduce the disturbances occurring in the habitat and for the disturbances that do occur, to limit the duration, timing, and location of activities to best protect greater sage-grouse during all of its life stages. The LMPA provides for a comprehensive and effective conservation strategy to address the threats identified by the USFWS and preclude the need for

additional protections under the ESA.

I base my decision on a careful and reasoned comparison of the environmental consequences of and responses to issues and concerns for each alternative. The LMPA provides the best opportunity for a balance of management activities to respond to the purpose and need and is responsive to the diverse needs, issues, concerns, and opportunities expressed by tribes, local governments, State and Federal agencies, organizations, and the public.  This decision balances interests of the public at large and those with special interests in the resources located in the planning area while providing for sagebrush and associated habitats for the long-term viability of the greater sage-grouse. These interests include managing future forest and grassland activities to provide sustainable habitat conditions, while continuing to provide for recreation and access opportunities, livestock grazing, access to locatable mineral resources, development of renewable energy resources, and active habitat restoration efforts on NFS lands in accordance with the Multiple-Use Sustained-Yield Act of 1960, the NFMA, and the existing land management plans. While meeting these interests, my decision provides methods to achieve resilient and resistant ecosystems, and to improve greater sage-grouse habitat through providing plan components that will conserve, enhance, or restore sagebrush and associated habitats for the long-term viability of the greater sage-grouse.

The review of comments and internal scoping identified issue topics in the 2018 DEIS and 2019 FEIS including: Habitat Management Area (HMA) Designation; Elimination of Sagebrush Focal Area (SFA) Designations/Withdrawals; Changing Net Conservation Gain and Adjustment of Compensatory Mitigation Frameworks; Including Waivers, Exceptions, and Modifications on No Surface Occupancy (NSO) Stipulations; Modifying Desired Conditions; Changing Livestock Grazing Guidelines; Adaptive Management Review Process; Treatment of Invasive Species; Consistency with the 2012 Planning Rule; specifying HMA with noise standards. Rationale for issues raised are discussed in the section below.

As previously described, my decision removes approximately 28,100 acres of GHMA designation in Utah. Part of the purpose and need for action was to more closely align with BLM and State partners. Comments from state and local agencies in Utah suggested GHMA be removed. I decided to remove GHMA designation in Utah, because the 28,100 acres of GHMA is spread across four forests and is largely non-habitat, and with very few birds.  My decision makes management of NFS lands more consistent with the March 2019, BLM decision to remove GHMA from BLM lands (Record of Decision and Approved Utah Greater Sage-Grouse Resource Management Plan Amendment). Because the GHMA was primarily found in slivers or in the fringe around BLM land, my decision to remove the GHMA designation for NFS lands will have minimal effect (See effects analysis in the FEIS, Chapter 4, Section 4.5.1 Habitat Management Area Designations, Eliminate the GHMA and Anthro Mountain designation).

The State of Utah Alternative was developed when the State suggested removing Anthro Mountain management area. However, my decision retains and re-designates Anthro Mountain management area as PHMA for the following reasons:

- Removing PHMA allows development and surface occupancy, and depending on activity, could cause extirpation of greater sage-grouse on Anthro Mountain.
- Anthro Mountain habitat is naturally fragmented, and fragmentation creates greater risk.
- The Anthro Mountain management area is only on the Ashley NF and there are 16 leks on the Ashley National Forest, and 7 of which occur on Anthro Mountain (44% of Ashley NF leks).
- The average number of males on Anthro Mountain leks is 66, or 38% of all 172 males on the Ashley NF.

- Threats to the Anthro Mountain greater sage-grouse may not immediately result in a loss of persistence on the Ashley NF, but the loss of Anthro Mountain greater sage-grouse would reduce the ability of greater sage-grouse to persist on the Ashley NF in the long term. The Regional Forester has identified the greater sage-grouse as a potential species of conservation concern (SCC) for the Ashley National Forest under the planning rule.  The species meets the criteria of occurring in the plan area on NFS lands covered by a plan, and the best available scientific information indicates substantial concern about the species' capability to persist over the long-term in the plan area.  Because conserving the greater sage-grouse is part of the purpose and need of the LMPA, the LMPA must provide plan components for the ecological conditions to maintain a viable population in the plan area.

### *HOW ISSUES WERE ADDRESSED AND CONSIDERED*

Some preliminary issues were identified as a result of implementation of the 2015 ROD and LMPA, new scientific information, and working with other agencies. The interdisciplinary team evaluated comments received from scoping, the DEIS and proposed LMPA comment period and from cooperating agencies to determine if they identified issues relevant to this planning process. Planning issues can drive the development of an alternative, may involve resources that are adversely affected by the proposed action, or may concern conflicts about alternative uses of available resources. These planning issues inform modifications or alternatives to the proposed action, provide focus for the analysis, or are the basis for comparing the environmental effects of the alternatives in the EIS, all of which informed my decision.

This section addresses how the issues that were carried forward for additional analysis in the DEIS and FEIS were addressed and considered. Modifying lek buffers and modifying disturbance caps are two issue topics discussed in the EIS; however, they are not discussed in this ROD because it is not applicable to NFS lands located in Utah.

**Habitat Management Area Designations**
- **Issue:  The process for evaluating and updating HMA boundaries is unclear.**
- **Response:  Alternatives 2 and 3 include addition of management approach to clarify the process.**

The 2015 Great Basin ROD (Idaho, Montana, Nevada, and Utah) addressed updating of HMA boundaries: "As new information about greater sage-grouse habitat becomes available, including seasonal habitats, in coordination with the State wildlife agency and USFWS, and based on best available scientific information, the Forest Service may revise the greater sage-grouse habitat management area maps and associated management decisions through LMPA or forest plan revision, as appropriate" (page 22). Maps of the alternatives can be found in the FEIS, Appendix A and ROD, Attachment B. Many public and cooperating agency comments are concerned that changing an HMA boundary requires a new forest plan amendment and could be an onerous process. Other commenters are concerned and want a process to change HMAs that is open and transparent and provides an opportunity for public comment.

I consider the need for clarity to be important.  HMAs, or in some instances, lek buffers, are used to identify where plan components apply. Alternatives 2 and 3 include a management approach that identifies the process for evaluating and updating HMA boundary maps, and the appropriate planning process would be applied if a change is needed.

Differences in mapping layers between the 2015 and 2019 amendments can also be examined using a map web-tool at the following link:
https://usfs.maps.arcgis.com/apps/PublicInformation/index.html?appid=9f1cf6d8425e49949d0006a0ae574b84

- **Issue:  The protections of the HMAs appeared similar, making the separate designations unnecessary.**
- **Response:  Alternative 2 was modified to make distinguishable the protections under the different designations and focusing protection in PHMA.**

Many of the LMPAs in both the 2015 Rocky Mountain ROD and the 2015 Great Basin ROD, provided the same protections to PHMAs as GHMA and other HMA designations.

After reviewing comments, I determined that clarity to the level of protection could be provided and more focus placed on PHMA. Alternatives 2 and 3 were developed to clarify the differences between the HMAs and to focus protection in PHMAs. This focus on PHMAs will ensure that restrictions are applied in the appropriate areas, while allowing development to occur in areas that would result in few or no impacts to greater sage-grouse.

- **Issue:  There is disagreement on the need for the GHMA designation in Utah or for the PHMA designation for Anthro Mountain.**
- **Response:  Alternative 2 reclassifies Anthro Mountain management area as PHMA and Alternative 3 was developed to analyze the effects of removing GHMA and Anthro Mountain management area designations in Utah.**

To address issues brought up by the State of Utah, the Forest Service developed Alternative 3 – the State of Utah Alternative and analyzed the effects of removing GHMA and Anthro Mountain management area designations in Utah.  Alternative 3 incorporates all aspects of Alternative 2, except for two modifications, specifically, the removal of GHMA designation from NFS lands in Utah and no designation of the Anthro Mountain management area on the Ashley National Forest.  Alternative 2 also let me consider effects of designating Anthro Mountain as PHMA.

In the 2015 FEIS, all plan components that applied to the Anthro Mountain habitat designation also applied to PHMA designation. The change in designation would have all plan components relevant to PHMA be applicable to the portion of habitat formerly known as Anthro Mountain. Reclassifying Anthro Mountain as PHMA clarifies that PHMA protections apply and makes it consistent with the other plans.

No impact to greater sage-grouse is anticipated from the PHMA designation, in most cases, Anthro Mountain overlaid (i.e., covered the same area) as PHMA designations on the maps. There was one change from the 2015 ROD/LMPA that did not result in additional impacts. The 2015 ROD/LMPA included a standard for an exception which outlined conditions for approval on existing fluid mineral leases on Anthro Mountain (GRSG-M-FML-ST-81-Standard). The GRSG-M-FML-ST-81-Standard was removed in the LMPA and Fluid Minerals: stipulations were provided (See FEIS, Appendix G or ROD Attachment D). The exception for fluid minerals on Anthro Mountain in the selected alternative still provides for protection of greater sage-grouse and its habitat.

- **Issue:  Concern about 2015 HMA boundaries.**
- **Response:  Correction of HMA boundaries.**

The boundaries of the habitat management areas have been adjusted to correct administrative mapping errors that occurred when habitat management areas were designated in 2015. Habitat management area boundary changes also include removing some areas of non-habitat that were included in the 2015 ROD/LMPA. Alternatives 2 and 3 include adjustments to HMA boundary maps.  FEIS, Appendix A includes maps for each alternative by state and forest or grassland.  I consider it important to have maps with the best available precision and accuracy to facilitate implementation. No impact to greater sage-grouse is anticipated from the HMA boundary adjustment.

**Sagebrush Focal Area Designations/Withdrawals**
- **Issue:  Sagebrush Focal Areas (SFAs) duplicate many protections that are already in place through the designation of PHMA in the absence of mineral withdrawals.**
- **Response:  Alternatives 2 and 3 eliminate SFAs.**

In the 2015 ROD/LMPA, SFAs were shown as a subset of PHMA (with few exceptions) and are managed as PHMA with some additional management. Both SFA and PHMA are managed as no surface occupancy (NSO) for fluid mineral leasing, the only difference is that PHMA allows for a limited exception and the exceptions must meet a stringent series of criteria to be approved. Alternatives 2 and 3 eliminated the SFA designation to add flexibility for responsible development with stringent requirements including mitigation to achieve a no net loss to greater sage-grouse habitat in PHMA. There is virtually no overlap of active oil and gas well development with the 2015 SFA designated areas, which indicates that the potential for development of oil and gas in the areas previously designated as SFAs is very low (Chambers et al. 2017).  I considered that the removal of SFA designations would have no measurable effect on the conservation of greater sage-grouse because the management direction proposed for PHMA would remain in place and continue to protect greater sage-grouse habitat, but the clarity and efficiency of implementation of the plans would increase by consolidating management area designations.

- **Issue:  Concern about not pursuing Sagebrush Focal Area Mineral Withdrawal**
- **Response:  FEIS tiers to previous analysis of not moving forward with withdrawal**

The proposed mineral withdrawal was canceled with a Notice of Cancellation published in the Federal Register on October 11, 2017, which canceled the BLM's application to withdraw SFA from locatable mineral entry (82 FR 47248, October 11, 2017). The impacts associated with not pursuing withdrawal were analyzed in the 2016 Sagebrush Focal Area DEIS which analyzed the impacts of not moving forward with a withdrawal in the No Action Alternative. Applicable analyses from the 2015 FEIS and 2016 DEIS explain the impacts from these actions, and are incorporated by reference (See FEIS, Chapter 4, Table 4-1).  Withdrawal decisions are made by the BLM and outside of Forest Service decisionmaking authority. Withdrawing SFA from locatable mineral entry was determined to have a nominal benefit to greater sage-grouse, and didn't have the effect intended. I considered the prior analyses to be sufficient.

**Changing Net Conservation Gain and Adjustment of Compensatory Mitigation Frameworks**
- **Issue:  Need to align mitigation with state mitigation strategies.**
- **Response:  Alternatives 2 and 3 change net conservation gain to no net loss of habitat**

The decision incorporates changes to the compensatory mitigation framework in Utah. Net conservation gain was analyzed in the No Action Alternative and changed to no net loss of habitat in the 2018 DEIS and 2019 FEIS. This change to no net loss of habitat will promote landscape-scale effectiveness by aligning the FS framework with the state-based compensatory mitigation systems. For desired condition,

mitigation strategy, and adaptive management see FEIS, Appendix E – Utah or ROD, Attachments E, G, and H.

I considered that biologically there is no measurable effect on the conservation of greater sage-grouse in changing from net conservation gain to no net habitat loss, in part because of the wide definition of net conservation gain in the 2015 decision.  Specifically, the definition of net conservation gain was, "the actual benefit or gain above baseline conditions," which translated to an uncertain degree of improvement, which could be a minimal number of acres, but is not necessarily tied to habitat.  The use of no net habitat loss, defined as, "retaining an equivalent amount of sage-grouse habitat after a proposed action that is equal to or above baseline conditions that existed before the proposed action," is consistent with the purpose and need in that it provides a clearer link to acres and equivalency or uplift for the species than the previous net conservation gain definition.

- **Issue:  Need to align mitigation with State of Utah Compensatory Mitigation Program**
- **Response:  Alternatives 2 and 3 align with State of Utah Compensatory Mitigation Program.**

Net conservation gain was incorporated into the Mitigation Strategies between the 2015 DEIS and the 2015 FEIS, which did not provide the public opportunity to comment on this approach. In the 2018 DEIS and 2019 FEIS, net conservation gain was analyzed under the No Action Alternative.

In Utah, the change to compensatory mitigation changed "net conservation gain" to "no net habitat loss" to align with the State of Utah's Compensatory Mitigation Program which was developed following the 2015 ROD/LMPA. Biologically, there is no measurable effect on the conservation of greater sage-grouse in changing from net conservation gain to no net habitat loss, in part because of the wide definition of net conservation gain in the 2015 decision. Mitigation would only be required in PHMA, where protections are being focused under Alternatives 2 and 3, because PHMA provides higher quality habitat.

I considered that changing to "no net habitat loss" in PHMA could encourage proponents to develop in GHMA or outside of greater sage-grouse habitat. The selected alternative removes GHMA designation in Utah as analyzed in Alternative 3 – State of Utah Alternative, and proponents could develop outside PHMA, similar to what was already being encouraged. Because the LMPA removes any forest plan components or management approaches related to GHMA in Utah, there could be a loss and degradation of greater sage-grouse habitat outside of PHMA. However, I also considered that improving higher quality habitat would be expected to benefit greater sage-grouse more than focusing efforts in the lower quality habitat that GHMA.

The mitigation strategy for Alternatives 2 and 3 for Utah can be found in the FEIS, Appendix E or ROD, Attachment G.

**Including Waivers, Exceptions, and Modifications on NSO Stipulations**
- **Issue: Changing the unanimous finding requirement from other agencies to the proper level of decisionmaking authority (i.e., authorized officer) on NFS lands.**
- **Response:  Alternatives 2 and 3 include the following:**
  - **exceptions must result in no effects to greater sage-grouse or habitat or all impacts could be offset through mitigation.**
  - **there is a change in requirements for the USFWS to approve exceptions, but waivers and modifications remain disallowed.**

I considered the need for the Forest plan direction to apply only to the Forest Service.  Forest Service decision authority cannot be delegated to other agencies or the state.  The removal of the requirement for a unanimous finding between FS, FWS, and the State of Utah to grant an exception for NSO in fluid minerals development would be replaced by the authorization being granted by the authorized officer (i.e., responsible official). The responsible official must disclose effects of and rationale for the decision.

The FEIS clarifies that geothermal leases included in fluid leases. Geothermal leases in Utah were added to GRSG-M-FMUL-ST-064-Standard (see FEIS, Table 2-8).

The no surface occupancy (NSO) exception includes appropriate surface use and timing stipulations.

Appendix G of the FEIS includes Fluid Minerals: Stipulations. The following stipulations apply to greater sage-grouse habitat on NFS land in Utah and have been included in Attachment D:
- STIPULATION C: NO SURFACE OCCUPANCY STIPULATION, Greater Sage-grouse in Priority Habitat Management Areas (GRSG-M-FMUL-ST-067)
- STIPULATION E: TIMING LIMITATION STIPULATION, Greater Sage-grouse Breeding and Nesting Habitats (GRSG-GEN-GL-007)
- STIPULATON G: CONTROLLED SURFACE USE STIPULATION, Tall Structures near Greater Sage-grouse Occupied Leks (GRSG-GEN-GL-008)
- STIPULATION I: TIMING LIMITATION STIPULATION, Greater Sage-grouse – Noise Limitation (GRSG-GEN-ST-006)

**Modifying Desired Conditions**
- **Issue: Desired condition tables do not have the flexibility to reflect the latest scientific information.**
- **Response:  Alternatives 2 and 3 update desired condition table values.**

In the 2015 FEIS, Alternative D includes an objective to "maintain or restore vegetation to provide habitat for lekking, nesting, brood rearing, winter, and transition areas" and specifies that the "desired cover percentages and heights for sagebrush, grasses, and forbs in seasonal habitats will be managed to meet habitat guidelines from scientific literature (e.g., Connelly et al. 2000 and Hagen et al. 2007), where such standards can be met" (page 2-85 to 2-86). Additionally, "adjustments from the guidelines may be made, but must be based on documented regional variation of habitat characteristics (e.g., sagebrush type, ecological site potential), quantitative data from population and habitat monitoring, and evaluation of local research" (page 2-86).

I consider it important for the desired conditions to reflect the latest scientific information.  I also considered that applicable analyses from the 2015 FEIS explain the impacts from these actions and are incorporated by reference. No additional analysis is needed. See ROD, Attachment E or FEIS, Appendix E, Table E-1 Utah - Seasonal habitat desired conditions for greater sage-grouse at the landscape scale.

**Changing Livestock Grazing Guidelines**
- **Issue:  The livestock grazing desired condition statement is circular.**
- **Response:  Alternatives 2 and 3 remove the desired condition statement.**

I consider it important to eliminate the circular desired condition statement.  The 2015 Greater Sage-Grouse Plan Amendments listed a Desired Condition for livestock grazing being "managed to maintain or

move towards desired conditions" (UT- GRSG-LG-DC-034-Desired Condition). This desired condition is being removed because it does not provide any specific direction and is a circular statement; a desired condition cannot be to maintain or move toward a desired condition. The desired conditions for breeding, nesting, upland summer, and winter habitats are defined for each state (see FEIS, Chapter 2, Tables 2-8 and 2-8a).

- **Issue: Livestock management guidelines do not allow for reflecting the latest scientific information or adjusting for local habitat conditions.**
- **Response:  Alternatives 2 and 3 replace stringent requirements with standardized evaluation methods for livestock management.**

I consider it important that plan components have the flexibility to reflect the latest scientific information and to adjust livestock management as needed if livestock grazing is limiting achievement of greater sage-grouse habitat conditions. Alternatives 2 and 3 revise livestock management guidelines to replace specific grass-height requirements with standardized evaluation methods (e.g., the habitat assessment framework) to better reflect current research and to align local management with local habitat conditions. Based on new research into habitat characteristics, the biological foundation for the development of the 2015 Greater Sage-Grouse Plan Amendments grazing guidelines has changed and this changed condition warrants this change to grazing guidelines, which are not necessary as conservation measures for greater sage-grouse.

- **Issue: Interpretation of the water development standard for PHMA could preclude developments that could indirectly benefit greater sage-grouse.**
- **Response:  Alternatives 2 and 3 modify the standard to avoid the misinterpretation.**

This standard addressing water developments stated that in PHMAs, construction was not to be approved unless beneficial to sage-grouse habitat.  Limiting approval or construction of water developments only to situations that are beneficial to sage-grouse can preclude the use of water developments as an effective tool to help ensure proper grazing management. The original intent of this standard was to ensure that construction of water developments would not cause adverse effects to sage-grouse or cause the degradation or loss of sage-grouse habitat, however the standard as written does not communicate that intent clearly. Water developments are a tool that could improve or maintain habitat indirectly over time.

I consider it important for the plan component to be clear about water developments that could indirectly benefit greater sage-grouse.  The approval and/or the construction of a water development is inherently a site-specific determination, which would be considered in a separate analysis process which would consider effects to biological resources, including greater sage-grouse. The GRSG-LG-ST-034-Standard was modified to say, "In priority habitat management area, do not approve construction of water developments that would cause adverse effects to greater sage-grouse habitat."

**Adaptive Management Review Process**
- **Issue:  The adaptive management review process needs to be clarified to address reversal of management once causal factors are identified and resolved.**
- **Response:  Alternatives 2 and 3 provide a process for reviewing or reverting to an adaptive management response when causal factor is resolved.**

The identification of causal factors and the identification of a reversal process if habitat or populations improve allows for more flexibility and applicability of the adaptive management process. The Forest Service, with partners, would review the scientific information, complete causal factor analysis, and identify corrective strategy. This may include changing management on the ground or changing the forest plans through the appropriate processes. More information regarding the adaptive management strategy can be found in the FEIS in Appendix E or ROD, Attachment H.

I considered that no appreciable additive impacts are anticipated from updating the adaptive management process as described in Alternatives 2 and 3. This update would ensure that the FS is utilizing the best available scientific information and decision support tools to guide management at the appropriate spatial scale, thus improving the FS's assessment and response to changing conditions that could impact greater sage-grouse populations and/or habitat.

**Treatment of Invasive Plant Species**
- **Issue:  Adverse effects of invasive plant species on greater sage-grouse habitat needs to be better addressed.**
- **Response:  Alternatives 2 and 3 add desired conditions and management approaches to address invasive plant species in PHMA.**

I consider the need to address invasive plant species to be highly important.  Alternatives 2 and 3 include the addition of desired conditions and management approaches that emphasize invasive plant treatments, with a focus on annual grasses.  The impact of invasive species and the effect of treatments on sage-grouse habitat were analyzed in each state 2015 FEIS and the analysis is incorporated by reference. Impacts are similar to those disclosed in the 2015 analysis; however, the addition of direction to emphasize mapping and treatment of invasive species would improve efficiency for removal of this threat.

**Consistency with the 2012 Planning Rule**
- **Issue:  Consistency with the 2012 Planning Rule.**
- **Response: Alternatives 2 and 3 identify management approaches to be consistent with the 2012 Planning Rule.**

The FS is required to amend plans consistent with the 2012 Planning Rule. The previous amendment was approved in 2015 and was completed using the 1982 Planning Rule as allowed by 36 CFR 219.17(b). Some procedural and substantive requirements have changed with the 2012 Planning Rule, including the definitions of plan components. Standards and guidelines must now apply as "constraint[s] on project and activity decisionmaking." (36 CFR 219.7(e)(1)) The DEIS identifies several plan components that were changed to management approaches when it was determined that they did not meet the definition of a standard or guideline under the 2012 Planning Rule.  In the FEIS, some of these plan components remain management approaches, but some were changed back to a standard or guideline and reworded, if needed, to more closely meet the current definitions. Keeping some of these plan components management approaches so they are correctly labeled will have no reduction in protection to greater sage-grouse or its habitat and no effect on other resources. The definition of management approaches in this amendment as "optional content" means that it was optional for the FS to include them in the plan, but I intend for management approaches to be followed when practicable.

**Noise Standards**
- **Issue: In 2015 analysis was done that specified HMA designations for applying noise standards, but that was not carried forward into the 2015 ROD/LMPA.**
- **Response: Alternatives 2 and 3 clarify HMA designations when applying noise standards.**

I consider the need for clarity to be important. In 2015, analysis was done specifying HMAs designations for applying the noise standard.  For Utah it was PHMA.  The specification of HMAs was not included in the 2015 FS ROD/LMPA; they are being included in this amendment to improve implementation of the plan components.

The impacts associated with clarifying that the noise measurement and monitoring would apply only to leks within greater sage-grouse PHMA would have similar impacts as those described under the No Action Alternative for the 2015 LMPA (Location of analysis is found in Chapter 4, Table 4-1, Noise/Soundscape). Project-level noise measurement and monitoring would be done at the time of site-specific environmental review. Impacts of noise on greater sage-grouse have been shown to include temporary displacement of the birds from breeding and nesting habitat, increased stress, and reduced reproductive success. In addition, adverse effects on communication abilities of strutting males and reduced lek attendance may be a result of noise. PHMA are areas that were identified as having the highest conservation values for maintaining sustainable greater sage-grouse populations. Therefore, standards to limit noise in PHMA would reduce displacement of birds from nesting and breeding areas and provide the greatest benefit to greater sage-grouse. The removal of standards to limit noise in GHMA may result in localized, adverse impacts on greater sage-grouse but would not affect greater sage-grouse conservation in Utah.

## OTHER ELEMENTS OF MY DECISION

This section highlights other elements of my decision that are presented in the LMPA that were developed to maintain, restore, or enhance greater sage-grouse and its habitat.

### MONITORING (See Attachment F)

The Forest Service will monitor the implementation of the LMPA direction within the designated greater sage-grouse habitat management areas (i.e., PHMA and GHMA) consistent with the planning rule (36 CFR 219.12). This monitoring will be based on The Greater Sage-Grouse Monitoring Framework developed by the Interagency Greater Sage-Grouse Disturbance and Monitoring Sub-team, May 30, 2014 and monitored elements described in the framework have been inserted in the Monitoring Attachment F of this decision.

The Monitoring section in Attachment F is a simplified version derived directly from the Monitoring Framework. It describes how the Forest Service expects to conduct implementation monitoring (i.e., if actions taken are consistent with the plan decisions) and effectiveness monitoring (effectiveness monitoring includes monitoring disturbance in habitats, as well as landscape habitat attributes at the landscape scale).

Monitoring, Attachment F to the LMPA, describes the expected management approach to implement monitoring. An annual Implementation Monitoring Report will describe the number and types of authorized actions in each of the sage-grouse management areas and will document whether the

authorized actions are in conformance with the applicable land management plan.

### MITIGATION (See Attachment G)

The Forest Service will require mitigation that provides habitat equivalency (i.e., no net habitat loss), aligned with state-based compensatory mitigation programs and strategies, for the greater sage-grouse when undertaking Forest Service management actions, and consistent with existing rights and applicable law, in authorizing third party actions that result in greater sage-grouse habitat loss and degradation. This will be achieved by avoiding, minimizing, and compensating for impacts by applying beneficial mitigation actions. Mitigation will follow the regulations from the White House Council on Environmental Quality (CEQ) (40 CFR 1508.20) and the steps of avoid, minimize, and compensate, hereafter referred to as the mitigation hierarchy. If impacts from Forest Service management actions and authorized third party actions, which result in habitat loss and degradation that would otherwise not be allowed, remain after applying avoidance and minimization measures (i.e., residual impacts), then compensatory mitigation will be used to provide a no net habitat loss to the greater sage-grouse. Mitigation actions should account for any uncertainty associated with the effectiveness of such mitigation. Any compensatory mitigation will be durable, timely, and in addition to that which would have resulted without the compensatory mitigation. Forest Service mitigation policy and CEQ regulations will serve as a framework for developing and implementing the compensatory mitigation. The Mitigation Strategy, Attachment G to the LMPA describes the expected management approach to implement these standards.

### ADAPTIVE MANAGEMENT (See Attachment H)

Adaptive management triggers are used for identifying when potential management changes are needed to continue meeting greater sage-grouse conservation objectives. The Forest Service may adjust management decisions through an adaptive management process consistent and in accordance with applicable law. The adaptive management strategy includes soft and hard triggers and responses. These triggers are not specific to any particular project, but identify habitat and population thresholds outside of natural fluctuations or variations. Triggers are based on the key metrics that are being monitored, which habitat loss and population declines on biological scales Adaptive management with specific triggers provide additional certainty that the regulatory mechanisms included in the LMPA are robust and able to respond to a variety of conditions and circumstances quickly and effectively to conserve greater sage-grouse habitat.

Soft triggers represent an intermediate threshold indicating that management changes are needed at the implementation level to address habitat or population losses. If a condition of a soft trigger is reached, the Forest Service response aims for reprioritization or activities and measures to mitigate for the causal factors identified in the decline of any of the key metrics, with consideration of local knowledge and conditions. During implementation of the LMPA, an interagency team lead by state agencies in Utah may evaluate the key metrics for populations and habitat on an annual basis. These evaluations are intended to be used to assess the need for adjustments in management activities and provide recommendations for change to Forest Service line officers. Working groups would recommend to the appropriate Forest Service line officer any adjustment to management activities actions as a result of tripping a soft trigger. These adjustments will be made to preclude reaching a "hard" trigger, which signals more severe habitat loss or population declines.

A national forest in Utah would coordinate with the interagency group where the triggers are situated and follow the adaptive management team approach as described in the ROD, Attachment H. Some

national forests would work with more than one interagency group, with the location of the NFS lands determining which group would evaluate the key metrics.  For example, for those NFS lands of the Uinta, Wasatch, Cache, Ashley National Forests that extend into the State of Wyoming, the working group in Wyoming would evaluate the key metrics for those lands in Wyoming on an annual basis; whereas, for those NFS lands of those Forests that are in the State of Utah, the working group in Utah would evaluate the key metrics.

Hard triggers represent a threshold indicating that immediate action is necessary to stop a severe deviation from greater sage-grouse conservation objectives set forth in the LMPA. Hard triggers and responses to hard triggers are discussed in the adaptive management ROD, Attachment H. In the event that new scientific information becomes available demonstrating that the hard trigger response would be insufficient to stop a severe deviation from greater sage-grouse conservation objectives as set forth in the LMPA, the Forest Service may determine that further actions may be needed to protect greater sage-grouse and its habitat and ensure that conservation options are not foreclosed.

## ALTERNATIVES CONSIDERED

Three alternatives were analyzed in detail in the DEIS and FEIS. The alternatives were developed to incorporate new information to improve the clarity, efficiency, and implementation of the 2015 Greater Sage-Grouse Plan Amendments and to align better with BLM and state plans, to benefit greater sage-grouse conservation at the landscape scale.  All alternatives comply with Federal laws, rules, regulations, and policies.

Each action alternative, Alternatives 2 and 3, emphasized an altered combination of resource uses, allocations, and restoration measures to address issues and resolve conflicts among uses so that greater sage-grouse desired conditions and objectives would be met in varying degrees across the alternatives. The action alternatives offered a range of possible approaches for responding to planning issues and concerns identified through public scoping to maintain or increase greater sage-grouse abundance and distribution in the planning area. While the purpose and need was the same across the action alternatives, each contained a discrete set of plan content. The purpose and need were met in varying degrees, with the potential for different long-range outcomes and conditions for greater sage-grouse and its habitat.

The relative emphasis given to particular resources and resource uses differed as well, including allowable uses, restoration measures, and specific direction pertaining to individual resource programs. When resources or resource uses are mandated by law or are not tied to planning issues, there are typically few or no distinctions between alternatives.

### ALTERNATIVE 1 – NO ACTION ALTERNATIVE

Alternative 1 meets the Council on Environmental Quality requirement that a No Action Alternative be considered. This alternative continues current management direction and is derived from the existing land management plans, as amended. Desired condition and objectives for resources and resource uses are based on the most recent land management plan decisions, along with associated amendments and other management decision documents. Laws, regulations, and Forest Service policies that supersede land management plan decisions would apply.

Under the No Action Alternative, the Forest Service would not amend land management plans (for a complete list see ROD Table 1-1 and FEIS, Chapter 1, Table 1-1). Greater sage-grouse habitat would continue to be managed under current land management plan direction, including the 2015 *LMPA*.

Desired conditions and objectives for Forest Service administered lands and federal mineral estate would not change. Allowable uses and restrictions would also remain the same, as they pertain to such activities as mineral leasing and development, recreation, lands and realty, and livestock grazing. This alternative also maintains the designation of sagebrush focal areas (SFAs), although the BLM has cancelled the proposal withdrawal of SFAs from locatable mineral entry (Notice of Cancellation, 82 *Federal Register* 195, October 11, 2017, p. 47248). See FEIS, Section 2.3.3 for a complete description of the No Action Alternative.

Because the purpose of the proposed action is to "incorporate new information to improve the clarity, efficiency, and implementation of the 2015 Greater Sage-Grouse Plan Amendments," the No Action Alternative was not chosen.  It would not incorporate new information for clarity and efficiency of implementation.  It would not incorporate additional collaboration efforts between the Forest Service, BLM, and State Agencies that has been done since the 2015 decision.

### ALTERNATIVE 2 – PROPOSED ACTION ALTERNATIVE

This Proposed Action Alternative changes the No Action Alternative to improve the clarity, efficiency, and implementation of greater sage-grouse plans, including better alignment with BLM and state plans, to benefit greater sage-grouse conservation on the landscape scale.

This alternative was developed to promote continued collaboration with the BLM, states, and stakeholders to improve management, compatibility, and consistency between federal management plans and other plans and programs at the state level, and to continue to provide protection of greater sage-grouse habitat. This enhanced collaboration is expected to improve management and coordination with states and thus improve greater sage-grouse habitat across the range of greater sage-grouse.

The changes made under this alternative include updating and making adjustments to habitat management area boundaries; removing SFA designations; removing the Anthro Mountain habitat designation and replacing it with PHMA designation; incorporating causal factor review and response processes into the adaptive management strategies; changing  net conservation gain to no net loss of habitat and aligning better with states' mitigation strategies; revising livestock management guidelines to replace grass height requirements with standardized evaluation methods; clarifying the restriction on water developments within habitat management areas; emphasizing treatment of invasive plants in PHMAs; providing consistency with the 2012 Planning Rule; and clarifying noise standards. These modifications are shown in the FEIS Section 2.5, which describes the Proposed Action in detail.  The issues identified in the FEIS in column four of Table 2-8 correspond with issues identified in FEIS Chapter 1, Table 1-2.

Under this alternative, the habitat management areas would be identified as "management areas," as defined in 36 CFR 219.19.  A footnote in the 2015 RODs explained that the habitat management areas were treated as "overlays" instead of replacing existing management areas, because each amended plan had management areas that did not overlap and which would have required extensive adjustments of management area allocations with no meaning for greater sage-grouse habitat or conservation (page 17

of the 2015 ROD). This amendment is being developed under the current planning rule, which allows management areas to overlap existing ones. The identification of habitat management areas as "management areas" under the current planning rule definition will facilitate implementation while not changing boundaries of other management areas that are identified in the land management plans.

Consistent with the Notice of Cancellation of the BLM's application to withdraw SFAs from locatable mineral entry (82 *Federal Register* 195, October 11, 2017, p. 47248), this alternative would also remove the recommendation for withdrawal. The effects of such action are included in Chapter 4.

To be consistent with the planning rule, those plan components of the 2015 Greater Sage-Grouse Plan Amendments that do not meet the definitions for plan components in 36 CFR 219.7(e)(1) were changed to management approaches.

The planning rule also states that "Plans should not repeat laws, regulations, or program management policies, practices, and procedures that are in the Forest Service Directive System." 36 CFR 219.2(b)(2). To be consistent with the planning rule, redundant plan components of the 2015 Greater Sage-Grouse Plan Amendments would be removed.

Alternative 2, with modifications is the selected alternative – rationale has been provided under Decision Rationale.

### ALTERNATIVE 3 – STATE OF UTAH ALTERNATIVE

This alternative incorporates all aspects of Alternative 2, except for two differences, specifically removal of the GHMA designation from NFS lands in Utah, including no designation of the Anthro Mountain management area on the Ashley National Forest. See Section 2.5, Table 2-8a, which describes the State of Utah alternative in detail.

### ENVIRONMENTALLY PREFERRED ALTERNATIVE

Alternative 2 the Proposed Action Alternative is the environmentally preferred alternative, as defined in 36 CFR 220.3. Question 6A of CEQ's 40 most-asked questions regarding CEQ's National Environmental Policy Act (NEPA) regulations defines that term to ordinarily mean the alternative which best protects, preserves, and enhances historic, cultural, and natural resources. Alternative 2 the Proposed Action Alternative, as presented in the FEIS and LMPA is the most environmentally preferable because this alternative emphasizes improvement and protection of habitat for greater sage-grouse and was applied to all occupied greater sage-grouse habitat.

Since the 2015 ROD was signed, the Forest Service has continued to work with the State of Utah and other agencies to look at local actions and conditions on the ground. New scientific information and research has been reviewed and incorporated into Alternative 2. Monitoring data and site-specific information has been gathered from implementation of projects on the ground. By reclassifying Anthro Mountain Management Area as PHMA, it assures continued protection for that area. Research and data gathered helped the Forest Service develop Alternative 2 the Proposed Action Alternative to benefit greater sage-grouse conservation on the landscape scale. Finally, clarifications of plan component and other plan content will likely increase efficiency of implementation, making the chosen alternative the environmentally preferred alternative. NEPA expresses a continuing policy of the Federal government to "use all practicable means and measures . . . to foster and promote the general welfare, to create and

maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans" (Section 101 of NEPA).

### ALTERNATIVES CONSIDERED BUT NOT ANALYZED IN DETAIL

Federal agencies are required by NEPA to rigorously explore and objectively evaluate all reasonable alternatives and to briefly discuss the reasons for eliminating any alternatives that were not developed in detail (40 CFR 1502.14). Public comments received in response to the proposed action provided suggestions for alternative methods for achieving the purpose and need.

Alternatives not analyzed in detail, may have been dismissed from detailed consideration for some of the following reasons:
- They did not meet the purpose and need.
- They were outside the scope to conserve, enhance, and/or restore habitat for greater sage-grouse.
- They would not meet the requirements of NFMA or other existing laws and regulations.
- They were duplicative of the alternatives considered in detail or already captured within the range of alternatives analyzed in the FEISs.
- They were determined to be components that would cause unnecessary environmental harm.
- They were already part of an existing plan, policy, or administrative function.
- They did not fall within the limits of the planning criteria.

During scoping, some commenters asked the Forest Service to consider additional constraints on land uses and ground-disturbing development activities to protect greater sage-grouse habitat. Such constraints would be beyond those in the current land management plans. Other commenters, in contrast, asked the Forest Service to consider eliminating or reducing constraints on land uses, or incorporating other flexibilities into the land management plan components. Some commenters wanted the Forest Service to change the land management plans back to how they were prior to the 2015 ROD/LMPA (In 2015, this was Alternative A in each state, see FEIS, Section 2.2.1). Other commenters wanted the provisions of the 2015 RODs left in place. The Forest Service considered public scoping comments, including comments from States and cooperating agencies, in developing the Alternatives.

As the responsible official, I set the scope of the amendment based on the purpose and need, as described above. As such, this planning process does not revisit every issue that the Forest Service and the BLM evaluated in the 2015 planning process. The FEIS has its foundation in the comprehensive 2015 FEIS and ROD/LMPA and incorporates those documents in the administrative record by reference, including the entire range of alternatives evaluated through the 2015 planning process. An alternative to remove the 2015 amendment would be equivalent to the No Action alternative in the 2015 FEIS. A description of those alternatives by state can be found in the FEIS in Section 2.2.1.

## PUBLIC INVOLVEMENT

On June 7, 2017, the Secretary of the Interior issued Secretarial Order 3353 with a purpose of enhancing cooperation among eleven western states and the BLM in managing and conserving GRSG. It also directed an Interior Review Team, consisting of the BLM, the USFWS, and the US Geological Survey (USGS), to coordinate with the Sage-Grouse Task Force. A June 14, 2017 letter from the Forest Service Chief directed

Forest Service Regions 1, 2, and 4 to cooperate in the review. On August 4, 2017, the Interior Review Team submitted its Report in Response to SO 3353. In this report the team recommended modifying the GRSG plans and associated policies to better align with the individual state plans. The Forest Service identified preliminary issues and the need to change the plan. (See FEIS, Chapter 1, Section 1.1 for additional background information).

To solicit public comment on greater sage-grouse management issues that could warrant LMPAs, the FS published a Notice of Intent (NOI) to prepare an Environmental Impact Statement (EIS) (82 FR 55346, (November 21, 2017) and 83 FR 654 (January 5, 2018)). The notice initiated a scoping process that provided the public with an opportunity to provide feedback on the preliminary issues and need for change to the 2015 amendments, and encouraged the public to help identify any issues, management questions, or concerns that should be addressed. The Forest Service received 55,000 comments as a result of the 2017 NOI. A March 2018, Executive Summary of comments can be found here: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd576258.pdf.

As the proposed action was further refined, the Forest Service issued a Supplemental Notice of Intent inviting further comment for a proposed action to make amendments to the plans (83 FR 28608 (June 20, 2018)). This Supplemental NOI identified the planning rule provisions of 36 CFR 219.8 through 219.11 likely to be directly related, and so applicable, within the scope and scale of the approved plan amendments. On July 2, 2018, a corrected Supplemental NOI was published to clarify that the FS is not proposing to amend land management plans for NFS lands in Montana (83 FR 30909 (July 2, 2018)). On August 1, 2018 the comment period was extended for two weeks in response to public concerns and cooperating agencies regarding the ability to provide comments on the BLM Draft Environmental Impact Statement (DEIS) and Forest Service comment period, which ended the same day (83 FR 37460 (August 2, 2018)). The Forest Service received 7,300 comments. A September 2018, Executive Summary of comments is located on the project page at:
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd595810.pdf.

In addition to soliciting input from the public through scoping, the Forest Service also has been heavily engaged with the states with NFS lands with land management plans amended by the 2015 greater sage-grouse amendments. Government-to-government consultation between the Forest Service with interested or affected federally recognized Indian Tribes is occurring. Indian Tribes were invited to consult on the proposed changes. Gaining and acknowledging Tribal expertise and perspective is important to the success of the EIS planning effort. A Tribe's participation as a cooperating agency does not replace our Federal agency obligation to consult on a government-to-government basis. Therefore, regardless of the Tribe's decision to participate or not as a cooperating agency, government-to-government consultation will continue throughout the process.

On October 5, 2018 a Notice of Availability (NOA) for the Greater Sage-grouse Proposed LMPAs and DEIS for the Intermountain and Rocky Mountain Regions was published in the Federal Register (83 FR 50362 and 83 FR 50331 (October 5, 2018)). In addition, a news release was published in the Newspapers of Record for the Intermountain Region and Rocky Mountain Regions.

During the 90-day public comment period, a series of open house meetings were held to provide an opportunity for the public to learn more about the proposed amendments and to ask questions and provide comments on the actions being considered. Public Open Houses were held in Utah were held on the following dates (see Table 1-5 below for additional meetings):
- December 11, *Cedar City*, Festival Hall

- December 12, *Vernal*, Utah State University-Uintah Basin
- December 13, *Tooele*, Utah State University Extension Office

The 90-day comment period for the proposed amendment and DEIS drew 33,192 comment letters.  The Forest Service received letters, emails, form letters, and public comment forms from individuals, organizations, agencies, businesses, and groups. The Forest Service analyzed 2,935 comments of which 622 contained unique and substantially different comments.  Additional comments came from: within-agency scoping, 11 public open-house meetings, monitoring activities, cooperating agencies, and from coordination with the Western Governors' Association Sage Grouse Task Force (with members from state agencies, BLM, USFWS, and the Natural Resources Conservation Service). The comments provided new information that could improve the clarity, efficiency, and implementation of GRSG plans, including better alignment with BLM and state plans. The comment letters were used to identify the significant issues driving the alternatives. Public comments resulted in the addition of clarifying text, but did not significantly change the proposed LMPAs. A February 2019 Executive Summary of comments is located on the Intermountain Region webpage at: https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd610376.pdf.  A summary of the responses to comments is included in Appendix I – Response to Comments in the FEIS. A spreadsheet containing all unique comments and response to comments is available at: https://data.ecosystem-management.org/nepaweb/nepa_project_exp.php?project=52904.


## INTERAGENCY COORDINATION

During development of the DEIS, FEIS, and the LMPAs, the Forest Service coordinated with the BLM and the USFWS and collaborated with the States in the analysis of particular resources and in establishing direction to protect and/or restore greater sage-grouse habitat.  In the NOI announcing the development of the DEIS, the FS invited agencies and tribes with interests within the planning area to request Cooperating Agency status. A list of cooperating agencies can be found in the FEIS, Chapter 1, Section 1.8.

**Table 1-5. Public open houses and interagency and cooperating agency meetings held.**

| Date | Meeting Location | Meeting Type and Purpose | Summary of Attendees *Sign in sheet in Record |
|------|------------------|--------------------------|------------------------------------------------|
| June 6, 2018 | WGFD – Cheyenne, WY | Cooperator Meeting to solicit feedback on proposed action in advance of June 21 NOI | USFWS, BLM, WCCA, WDA, WGFD, Governor's Office, USFS* |
| July 12, 2018 | WGFD – Cheyenne, WY | Cooperating Agency Meeting to review proposed actions and provide updates on NOI and NEPA timelines | USFWS, BLM, WCCA, WDA, WGFD, Governor's Office, USFS, Conservation Districts* |
| September 6, 2018 | Salt Lake City, UT | Shivik, UT Sage-grouse plan for Plan Implementation Committee, Salt Lake City | Led by John Shivik |
| Sept 11, 2018 | Tampa, FL | Shivik, Harper, FS Update to the WAFWA Sagebrush Executive Oversight Committee | |
| Sept 11, 2018 | WGFD – Cheyenne, WY | Cooperator Meeting to review proposed actions prior to release of DEIS | USFWS, BLM, WCCA, WDA, WGFD, Governor's Office, USFS, Conservation Districts* |

| Date | Meeting Location | Meeting Type and Purpose | Summary of Attendees *Sign in sheet in Record |
|------|------------------|--------------------------|-----------------------------------------------|
| September 12-13, 2018 | Denver, CO | Buchannan and Shivik, WGA FS update for Sage-grouse Task Force, Denver | |
| September 14, 2018 | Carson City, NV | Nelson, Shivik, Sage-grouse plan for Nevada Counties and Cooperating Agencies/Carson City | |
| September 14, 2018 | OSC – Boise, ID | Rob Mickelsen and Andy Brunelle, Cooperator Meeting to solicit feedback on proposed action in advance of DEIS | Office of Species Conservation (OSC), Idaho Fish and Game, Idaho Dept of Agriculture, Governor's office of Minerals and Energy Resources, USFWS, BLM |
| September 20, 2018 | Virtual Webinar | Shivik webinar, Sage-grouse plan for Utah Counties and Cooperating Agencies, Webinar | |
| October 22, 2018 | Cheyenne, WY | Open House | Public, various agencies |
| October 23, 2018 | Pinedale, WY | Open House | Public, various agencies |
| November 7, 2018 | Sparks, NV | Open House | Public, various agencies |
| November 8, 2018 | Elko, NV | Open House | Public, various agencies |
| November 15, 2018 | St. George, UT | Annual Convention – Shivik presentation to UT Association of Counties | UT Association of Counties |
| November 26, 2018 | Boise, ID | Shivik/Mickelsen briefing for ID Task Force, OSC, Fish and Game, Cattleman | ID Task Force, OSC, Fish and Game, Cattleman |
| November 26, 2018 | Boise, ID | Open House | Public, various agencies |
| November 29, 2018 | Jerome, ID | Open House | Public, various agencies |
| December 6, 2018 | WGFD – Cheyenne, WY | Cooperator Meeting to review proposed actions prior to end of 90-day comment period | USFWS, BLM, WCCA, WDA, WGFD, Governor's Office, USFS, Conservation Districts* |
| December 11, 2018 | Cedar City, UT | Open House | Public, various agencies |
| December 12, 2018 | Vernal, UT | Open House | Public, various agencies |
| December 13, 2018 | Tooele, UT | Open House | Public, various agencies |
| December 17, 2018 | Challis, ID | Open House | Public, various agencies |
| December 18, 2018 | Idaho Falls, ID | Open House | Public, various agencies |
| April 3, 2019 | WGFD Cheyenne, WY | Cooperating Agency Meeting for final review of Draft ROD/FEIS in advance of April publication | USFWS, BLM, WCCA, WDA, WGFD, Governor's Office, USFS, Conservation Districts* |

### BUREAU OF LAND MANAGEMENT

In 2017, the BLM began their environmental analysis process that culminated with decisions in March 2019. The Forest Service worked in partnership with the BLM to align with their plans in order to provide a landscape-level greater sage-grouse conservation strategy and to incorporate conservation measures to protect, restore, and enhance greater sage-grouse and its habitat.

### STATE GOVERNMENTS

Representatives from the Forest Service met frequently with the States and cooperating agencies throughout the planning process. State conservation plans were reviewed to see how the components could better align with those plans.  Components of these State conservation plans and comments from the States were used to develop the LMPA, where applicable.

In addition, the Western Governors Association Sage Grouse Task Force was established in 2011 to identify and implement high priority conservation actions and integrate ongoing actions necessary to preclude the need for the greater sage-grouse to be listed under the ESA. This group, which includes designees from the 11 Western States where greater sage-grouse is found as well as representatives from USFWS, BLM, Natural Resources Conservation Service, Forest Service, US Geological Survey, and the Department of the Interior, played an integral role throughout this land use planning process.

### CONSULTATION WITH AMERICAN INDIAN TRIBES

In accordance with the National Historic Preservation Act and several other legal authorities and in recognition of the government-to-government relationship between individual tribes and the Federal government, the Forest Service conducted tribal consultation when preparing the DEIS and FEIS and proposed LMPAs. Coordination with tribes occurred throughout the planning process. In June 2018, Regional Foresters in the Intermountain, Rocky Mountain, and Northern Regions sent letters of contact and information for 67 tribal governments, providing initial notification of the planning effort, background information on the project, an invitation to be a cooperating agency, and notification of subsequent consultation efforts related to the planning process. The FS welcomes comments and coordination with tribal governments.

### ENDANGERED SPECIES ACT SECTION 7 CONSULTATION

Consultation with USFWS is required under Section 7 (a)(2) of the ESA before the start of any Forest Service action that may affect any federally listed, threatened, or endangered species or its designated critical habitat. For this planning process, the Forest Service built on its close work with the USFWS during the 2015 amendment process.

In 2015, before the release of the Proposed LMPAs/FEISs, the Forest Service submitted the biological assessments to the USFWS. With this submission, the Forest Service requested concurrence for the 13 species that may be affected by the action, but were not likely to be adversely affected and formal consultation for the one species (Utah prairie dog) that may be affected and was likely to be adversely affected by the action. The 13 species included Canada lynx, Utah prairie dog, California condor, Mexican spotted owl, autumn buttercup, clay phacelia, clay reed-mustard, last chance townsendia, shrubby reed-mustard, Uinta Basin hookless cactus, and Ute ladies'-tresses for the Utah FEIS; grizzly bear and Ute ladies'-tresses for the Idaho/SW Montana FEIS, and Webber's ivesia for the Nevada/California FEIS.

Across the three planning sub-regions the USFWS concurred with our "not likely to adversely affect" determination for the 13 species listed above and provided a biological opinion for the Utah prairie dog. In the biological opinion, conservation measures for Utah prairie dog were outlined to ensure the protection of this species. In consideration of a potential vegetation/habitat management conflict, the Forest Service developed an LMPA standard for the areas that greater sage-grouse priority habitat and identified Utah prairie dog habitat overlapped.  Specifically, GRSG-GRSGH-ST-025-Standard "On the Dixie and Fishlake National Forests, where greater sage-grouse priority habitat management areas overlap with identified Utah prairie dog habitat, the most current version of conservation measures developed by the U.S. Fish and Wildlife Service will be used during implementation of recovery actions," has been retained, unaltered, within this decision.

The FS has concluded that no additional effects beyond the 2015 decision are anticipated to occur. The Forest Service contacted the USFWS regarding Section 7 consultation in letters sent the week of April 15, 2019 and requested concurrence on the species which would require consideration during consultation. The USFWS offices in Wyoming and Nevada acknowledged the FS conclusion that this LMPA will not trigger the requirement to reinitiate ESA consultation on May 15, 2019 and May 15, 2019, respectively. The USFWS offices in Idaho and Utah on May 31, 2019, and July 8, 2019, respectively, acknowledged and agreed with the FS conclusion that reinitiation is not needed.

## FINDINGS REQUIRED BY LAWS AND REGULATIONS

The Forest Service manages the National Forests and Grasslands in conformance with many laws and regulations. This decision is consistent with national laws and regulations: specifically, NEPA, NFMA, ESA, the Clean Air Act of 1970 (CAA), the Clean Water Act of 1972 (CWA), and the National Historic Preservation Act (NHPA). It would not affect civil rights or environmental justice. The LMPA is strategic and programmatic in nature, providing guidance and direction to future site-specific projects and activities. Following are summaries of how the LMPA addresses compliance with some of the more prominent applicable laws and regulations.

My decision is consistent with all laws, regulations, and agency policy. I considered the potential direct, indirect, and cumulative effects and reasonably foreseeable activities.  I also considered the potential impacts identified in the FEIS and the potential for irreversible and irretrievable commitment of resources in the project area.  My decision is based on the documentation in the FEIS and the associated project record, public comments, and the DEIS.

### NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

NEPA requires public involvement and consideration of potential environmental effects of new projects and programs. The environmental analysis and public involvement process complies with the major elements of the requirements set forth by the Council on Environmental Quality's (CEQs) regulations for implementing NEPA (40 CFR 1500-1508). These include: 1) considering a broad range of reasonable alternatives; 2) disclosing cumulative effects; 3) using high quality and accurate scientific information; 4) consideration of long-term and short-term effects; and 5) disclosure of unavoidable adverse effects.

CEQ's implementing regulations for NEPA were followed in preparing the FEIS.

This planning process did not revisit every issue that the Forest Service and the BLM evaluated in the 2015 planning process. Instead, the Forest Service included changes and clarifications to the 2015 Greater Sage-Grouse Plan Amendments, consistent with the purpose and need for action. Accordingly, this FEIS has its foundation in the comprehensive 2015 GRSG FEIS and ROD/LMPA and incorporates those documents in the administrative record by reference, including the entire range of alternatives evaluated through the 2015 planning process. Thus, the range of alternatives was adequate to understand and analyze issues. This decision adopts all practical means to avoid or minimize environmental harm. These means include provisions for providing the ecological conditions needed to support biological diversity and standards and guidelines to mitigate adverse environmental effects that may result from implementing various management practices.

The LMPA does not represent an irreversible or irretrievable commitment of resources (see FEIS, Chapter 4, Section 4.8). The LMPA is a programmatic level planning effort and does not directly authorize any ground disturbing activities or projects. Future ground disturbing activities and projects will be made consistent with the LMPA and will be subject to additional site-specific environmental analysis. Because none of the proposed changes identified in the 2019 FEIS identify additional irreversible or irretrievable commitments of resources, there is no expectation that impacts additional to or different from those identified in the 2015 FEISs would occur.

### *CIVIL RIGHTS AND ENVIRONMENTAL JUSTICE*

The Forest Service considered information on the presence of minority and low-income populations to assess the potential for disproportionately high and adverse impacts on minority or low-income populations. Consideration of impacts includes existence of high and adverse human health and environmental effects and the degree to which low-income populations are more likely to be exposed or vulnerable to those effects.

Conservation measures to protect, restore, and enhance and other requirements under this action would be implemented consistently across all identified habitat, with no discrimination over particular populations.

Several counties in some of the states have minority presence, and/or concentrations of low income populations considerably above that of State averages, and the Forest Service considered the possibility that potential adverse impacts resulting from the action could be concentrated in a few counties of minority or low-income concern. However, based on available information about the nature and geographic incidence of impacts, specific minority populations, tribal populations, or low-income populations are not expected to be exposed to disproportionately high and adverse impacts under any of the alternatives considered. See 2015 FEIS, Chapter 4, Section 4.23 which has been incorporated by reference.

### *NATIONAL HISTORIC PRESERVATION ACT*

The National Historic Preservation Act and subsequent amendments require Federal agencies to consider the effects of their undertakings on historic properties. As required under the Act, site-specific project areas are subject to requirements for survey, identification of resources, determination of eligibility, evaluation of effect, consultation and resolution of adverse effects, if any. This decision is programmatic and does not authorize site-specific activities. Projects will comply fully with the laws and regulations that ensure protection of cultural resources. This decision complies with the Act and other statues that pertain

to the protection of cultural resources.

### NATIONAL FOREST MANAGEMENT ACT (NFMA) AND THE PLANNING RULE

Consistency with the NFMA is based on consistency with the planning rule. The planning rule provides requirements for amending and revising plans (36 CFR 219; 16 USC 1600 *et seq.*).

Because this amendment was analyzed in an environmental impact statement, it is considered a significant change in the plan for the purposes of the NFMA; therefore, a 90-day public comment period was required and provided for the proposed plan amendment and draft environmental impact statement (§36 CFR 219.16(a)(2), 36 CFR 219.13(b)(3)), as described under "Public Involvement."

### COMPLIANCE WITH THE PROCEDURAL REQUIREMENTS OF THE PLANNING RULE

As explained below, this amendment complies with the procedural provisions of the planning rule (36 CFR Part 219.13(b)).

### Using the best available scientific information to inform the planning process (§ 219.3)

The planning rule requires the responsible official to use the best available scientific information to inform the planning process for developing, amending, or revising a forest plan, including plan components (36 CFR 219.3 and 219.14(a)(3)). The LMPA was based on the best available scientific information and analyses therein. The determination and use of best available scientific information is discussed in the FEIS, Chapter 4, Section 4.2.

### Amend the plan consistent with NEPA procedures (§219.13 (b)(3))

The planning rule requires the Forest Service to amend plans consistent with Forest Service NEPA procedures. The DEIS and FEIS were prepared to disclose the reasonably foreseeable effects of the proposed amendment and alternatives. Consistency with the NEPA is described above in Findings Required by Laws and Regulations, National Environmental Policy Act.

### Applying the planning rule's format requirements for plan components (§ 219.13 (b)(4))

In order to comply with the requirement that plan components must be written in accordance with the definitions set out in 219.7(e), 2015 amendment plan components that were retained or modified were reworded or recategorized. The plan content now meets the format required by the planning rule.

### Base the amendment on the preliminary identification of the need to change the plan (§219.13 (b)(1))

The section "How the Selected Alternative Responds to the Purpose and Need" of my Decision Rationale, above, explains how the amendment responds to the identified need to change the plan.

### Providing opportunities for public participation (§ 219.4) and providing public notice (§ 219.16; § 219.13(b)(2))

The requirements for providing opportunities for public participation and providing public notice were met through the actions described above in the Public Involvement section. See Chapter 1 in the FEIS for

extensive discussion of the Forest Service's efforts to engage with the public, states, and Tribes.

***COMPLIANCE WITH THE PLANNING RULE'S APPLICABLE SUBSTANTIVE PROVISIONS***

The planning rule requires that those substantive rule provisions within 36 CFR 219.8 through 219.11 that are directly related to the amendment are applicable to this amendment. The applicable substantive provisions apply only within the scope and scale of the amendment (36 CFR 219.13(b)(5)).

As explained in the discussion that follows, both the purpose and the effects of the amendment are such that provisions in § 219.8(b) - social and economic sustainability; § 219.9 - diversity of plant and animal species; § 219.10(a) - integrated resource management; § 219.10(4), specifically, opportunities to coordinate with neighboring landowners are directly related to the amendment (see rationale and Table 1-6 below). I have applied those provisions within the scope and scale of the amendment.

**Scope and Scale of the Amendment**

The scope and scale of the amendment is based on the need to change the plan.  As described above, the need to change the plan is to include new information to improve the clarity, efficiency, and implementation of the 2015 amendment, including better alignment with BLM and state plans, to benefit GRSG conservation on the landscape scale.

For each land management plan, I am setting the scope of the amendment based on the need is the greater sage-grouse habitat and greater sage grouse.  I also include in the scope the uses or activities specified in the amendment.

The scale of the amendment for each land management plan is the occupied habitat of the designated greater sage-grouse habitat management areas of each plan area.  Although conservation at the landscape scale is part of the need, the plan amendment would not apply beyond the plan area.

**Planning rule provisions that are directly related to the amendment**

The planning rule requires that substantive rule provisions (§ 219.8 through 219.11) that are directly related to the amendment must be applied to the amendment, within the scope and scale of the amendment.  A determination that a planning rule provision is directly related to the amendment is based on any one or more of the following criteria:
1. The purpose of the amendment (§ 219.13(b)(5)(i));
2. Beneficial effects of the amendment (§ 219.13(b)(5)(i));
3. Substantial adverse effects associated with a rule requirement (§ 219.13(b)(5)(ii)(A));
4. Substantial lessening of protections for a specific resource or use (§ 219.13(b)(5)(ii)(A));
5. Substantial impacts to a species or substantially lessening protections for a species (36 CFR 219.13(b)(6).

Because the FEIS, Chapter 4, identifies no significant adverse effects from the selected LMPA to any resource or use, no substantial adverse effect or lessening of protections for a specific resource is expected; therefore, criteria 3, 4, and 5 do not apply to the selected LMPA.  Criteria 1 and 2 apply, as described below.

*Provisions directly related to the purpose of the amendment:* The purpose of the LMPA is to include new

information to improve the clarity, efficiency, and implementation of greater sage-grouse plans, including better alignment with the BLM and state plans, in order to benefit greater sage-grouse conservation on the landscape scale. In determining which provisions are directly related to the purpose of the amendment, I considered the purposes of improving greater sage-grouse conservation, aligning better with the BLM and States, and needing to change plan components for specific resources and uses.

*Purpose relating to greater sage-grouse conservation*: The plan components provide the ecological conditions for greater sage-grouse. As such, the directly related provisions are 219.9 – diversity of plant and animal species as they pertain to greater sage-grouse and greater sage-grouse habitat within greater sage-grouse habitat management areas. See Viable Population Determination below in ROD.

The LMPA emphasizes moving toward desired conditions, and these standards and guidelines are intended to reduce the disturbances occurring in the habitat and, for the disturbances that do occur, to limit the duration, timing, and location of activities to best protect GRSG during all of its life stages. To do this, the LMPA also needed to change plan components for resources and uses, identified and categorized in Table 2.8 of the FEIS. The directly related provisions are 219.8(b), social and economic sustainability, and 219.10(a), integrated resource management. Of those provisions, I applied the specific subsections of each pertaining to the amended plan components to the extent of the scope and scale of the amendment.

Having applied those rule provisions to the scope and scale of the amendment, as described above, I find that the amendment would meet those requirements. Refer to Decision Rationale.

*Purpose as it relates to aligning with BLM and State management*: Part of the purpose and need was to align with neighboring public land owners. (See FEIS, Chapter 2, Comparison of Alternatives Tables 2-8 and 2-8a which identify these plan components). As such, the directly related rule provision is 219.10(4), specifically, opportunities to coordinate with neighboring landowners . . . and take into account joint management objectives where feasible and appropriate.

Having applied the rule provision to the scope and scale of the amendment, as described above, I find that the amendment would meet the requirement. While the LMPA applies only to NFS lands, it was developed in conjunction with the BLM and States to facilitate coordinated management across the agencies, including for the overall management objective of improving greater sage-grouse habitat across the species range. See Public Involvement section, also refer to the FEIS, Chapter 1, Section 1.8.

*Purpose as it relates to the need to change plan components for specific resources and uses*: The topics and associated specific subsections of 219.8(b) and 219.10(a) that are directly related provisions are listed in Table 1-6. For recreation, the table also includes the applicable subsection of 219.10(b), because it is the multiple use complement to the identified subsection of 219.8(b).

**Table 1-6. Topics and associated specific subsections of 219.8(b) and 219.10(a) that are directly related provisions.**

| Resource or Use | Subsection of Directly Related Planning Rule Provision 219.10(a) |
|---|---|
| Lands and realty – special use authorizations | 219.10(a)(3) Appropriate placement and sustainable management of infrastructure, such as . . . utility corridors 219.10(a)(6) . . . use |

| Resource or Use | Subsection of Directly Related Planning Rule Provision 219.10(a) |
|---|---|
| Lands and realty - land ownership adjustments | 219.10(a)(6) Land status and ownership |
| Land withdrawal | 219.10(a)(6) Land status and ownership |
| Wind and solar | 219.10(a)(2) Renewable. . . energy |
| Livestock grazing | 219.10(a)(1) . . . grazing and rangelands |
| Fire management | 219.10(a)(8) System drivers, . . . [specifically] wildland fire |
| Recreation | 219.8(b)(2) sustainable recreation. . . [specifically] opportunities, and access<br>219.10(a)(1) . . . recreational opportunities<br>219.10(b)(1) sustainable recreation. . . [specifically] opportunities and access |
| Roads/transportation | 219.10(a)(1). . . trails<br>219.10(a)(3) Appropriate placement and sustainable management of infrastructure, such as . . . [specifically] transportation |
| Fluid - unleased | 219.10(a)(2) . . . nonrenewable . . . mineral resources |
| Fluid - leased | 219.10(a)(2) . . . nonrenewable . . . mineral resources |
| Fluid operations | 219.10(a)(2) . . . nonrenewable . . . mineral resources |
| Coal mines – unleased | 219.10(a)(2) . . . nonrenewable . . . mineral resources |
| Coal mines - leased | 219.10(a)(2) . . . nonrenewable . . . mineral resources |
| Locatable minerals | 219.10(a)(2) . . . nonrenewable . . . mineral resources |
| Non-energy leasable minerals | 219.10(a)(2) . . . nonrenewable . . . mineral resources |
| Mineral materials | 219.10(a)(2) . . . nonrenewable . . . mineral resources |

In that all of the above resources and uses provide human benefit, provision 219.10(a)(1) ecosystem services also applies.

Having applied those rule provisions to the scope and scale of the amendment, as described above, I find that the amendment would meet those requirements.   The listed resources and uses were analyzed in the 2015 FEIS. The LMPA would not substantially alter management direction or result in different outcomes for the resources or uses.  Because of this, no additional analysis was completed; therefore, no new information on affected environment is provided. The 2015 analysis was incorporated by reference and references to the page numbers can be found in Chapter 4, Tables 4-1 and 4-12 Environmental consequences and Cumulative effects analysis for the No Action Alternative incorporated by reference. Refer to Chapter 3, Section 3.3 Resources Not Carried Forward for Analysis and Table 3-11 Resources and resource uses not carried forward for analysis.  Based on the FEIS, including analysis in the incorporated 2015 FEIS, the LMPA does not eliminate any of the identified resources or uses from NFS lands to which the LMPA applies.  It provides for the continuation of those resources and uses while also managing for greater sage-grouse conservation.

*Provisions directly related to beneficial effects of the amendment:* The FEIS, through incorporation of the 2015 *Utah Greater Sage-Grouse Proposed LUPA/Final EIS*, identifies beneficial effects for resources and uses that are in addition to those identified under criterion 1.  These additional resources and uses and their directly related provisions are in Table 1-7.

Table 1-7.  Resources and uses with beneficial effects from the amendment and the associated directly related rule provision.

| Resource or Use | 2015 Utah FEIS* | Substantive provision |
|---|---|---|
| Air quality | Chapter 4, Section 4.4 | 219.8(a)(2)(i) |
| Soil resources | Chapter 4, Section 4.6 | 219.8(a)(2)(ii) |
| Water resources | Chapter 4, Section 4.7 | 219.8(a)(2)(iii) and (iv) |
| Other special status species | Chapter 4, Section 4.9 | 219.9 |
| Wildlife species | Chapter 4, Section 4.10 | 219.9 |
| Social and economic | Chapter 4, Section 4.23 (beneficial to groups with conservation interests) | 219.10(a)(5), . . . observing. . . other activities |

*2015 *Utah Greater Sage-Grouse Proposed LUPA/Final EIS*.

My finding for rule provisions related to the purpose and need include those relating to resources or uses beneficially affected by the LMPA.

Having applied those rule provisions to the scope and scale of the amendment, as described above, I find that the amendment would meet those requirements.  The FEIS, in the sections identified in Table 1-7, indicate beneficial effects; therefore, the amendment would provide for the identified rule provisions within the scope and scale of the amendment.

*Provisions directly related because of substantial adverse effects*: The analysis in the FEIS indicated that the changes proposed in the action alternative would not substantially alter management direction or result in different outcomes for any resource or use.  Based on this and the incorporated 2015 FEIS and the 2016 DEIS by the BLM that found mineral withdrawals on SFAs would be of little to no effect, no significant negative impacts on any resources or uses would be expected from managing under the LMPA either directly or through lessening of protections.  See 2019 FEIS, Chapter 4, Environmental Consequences, including Tables 4-1, 4-2, and 4-13.  As such, the LMPA would have neither substantial adverse effect on resources or uses nor result in substantial lessening of protections for any resource or use.  Criteria 3, 4, and 5 do not apply.

**In applying 36 CFR 219.8(a)(1), the Forest Service took into account the relevant aspects of the list at 36 CFR 219.8(a)(1):**
   **(i) Interdependence of terrestrial and aquatic ecosystems in the plan area.**
   **(ii) Contributions of the plan area to ecological conditions within the broader landscape influenced by the plan area.**
      *How relevant aspects of 219.8(a)(i)(ii) were taken into account: Monitoring data, Biological Assessments (BAs), and the Biological Evaluations (BEs) for each state were reviewed and new information was updated in the DEIS and FEIS. Population data from the State was incorporated in Chapter 3, Table 3-2. Greater sage-grouse counts by state. As the FEIS's discussion of effects shows, the amendments' effects will be minor, and far from substantially adverse (see FEIS, Chapter 4 for effects and Chapter 3, Section 3.2.3 Riparian Areas and Wetlands and Water Resources). Monitoring reports, 2015 BAs, and BEs are located in the project record.*

   **(iii) Conditions in the broader landscape that may influence the sustainability of resources and ecosystems within the plan area.**

**(iv) System drivers, including dominant ecological processes, disturbance regimes, and stressors, such as natural succession, wildland fire, invasive species, and climate change; and the ability of terrestrial and aquatic ecosystems on the plan area to adapt to change.**

**(v) Wildland fire and opportunities to restore fire adapted ecosystems.**

*How relevant aspects of 219.8(a)(iii)(iv)(v) were taken into account: The FEIS discussed plan components and analysis for Fire Management and Invasive Species (See FEIS, Tables 2-5 through 2-9, 3.2.7 Wildland Fire, 4.5.9 Treatment of Invasive Species, 4.7.4 Cumulative Effects - Wildland Fire, 4.7.13 Cumulative Effects - Treatment of Invasive Species). Climate Change was analyzed in the 2015 FEIS and analysis reviewed to determine if it could have potentially significant effects based on the actions considered in Chapter 2. The changes proposed in the action alternative would not substantially alter management direction or result in different outcomes for the resource. Because of this, no additional analysis was completed; therefore, no new information on affected environment is provided. The 2015 analysis was incorporated by reference and references to the page numbers can be found in the FEIS, Chapter 4, Tables 4-1 and 4-12 Environmental consequences and cumulative effects analysis for the No Action Alternative incorporated by reference.*

**In applying 36 CFR 219.8(b), the Forest Service took into account the relevant aspects of the list at 36 CFR 219.8(b):**

**(1)  Social, cultural, and economic conditions relevant to the area influenced by the plan;**

*How relevant aspects of 219.8(b)(1) were taken into account: Social and Economic Conditions and Environmental Justice was analyzed in the 2015 FEIS. The analysis was reviewed to determine if the actions considered in Chapter 2 could have potentially significant effects. The scope of the amendments is narrow, and the changes proposed in the action alternatives would not substantially alter management direction or result in different outcomes to social, cultural, or economic conditions. Because of this, no additional analysis was completed and no new information on affected environment is provided. The 2015 analysis was incorporated by reference and references to the page numbers can be found in the FEIS, Chapter 4, Tables 4-1 and 4-12 Environmental consequences and cumulative effects analysis for the No Action Alternative incorporated by reference.*

*It is noted in the FEIS, Chapter 4, Section 4.7.3 Past, Present, and Reasonably Foreseeable Actions that State GRSG plans establish the management actions necessary for the States to continue to enhance and conserve the GRSG while still allowing for economic opportunities. Closely aligning with state plans, including using their mitigation and adaptive management strategies where applicable, will provide an opportunity for economic development to occur while offsetting the impacts to GRSG and its habitat. (See FEIS, Appendices B-F and ROD Attachments G and H).*

*The increased flexibility in these amendments is not expected to result in a large increase in development proposals on public land. Similarly, the increased protections from the 2015 FEISs have not resulted in a large decrease in ROW applications or an increase in rejected applications; therefore, the changes proposed under the Proposed Action and the State of Utah Alternative are not expected to result in large changes to the rate of development in the five states or in their economy.*

**(2) Sustainable recreation; including recreation settings, opportunities, and access; and scenic character;**

*How relevant aspects of 219.8(b)(2) were taken into account: See FEIS Chapter 3, Section 3.2.8*

*Recreation for additional information. The existing condition of recreation in the planning area and the program's impacts on greater sage-grouse remains as described in the 2015 FEISs. Within the planning area authorized recreation uses included outfitter and guide permits, recreation site infrastructure, and special recreation use permits (such as races). Since 2015, authorized recreation uses were consistent with the state-specific 2015 ROD direction (USDA FS 2017b and USDA FS 2018d). The FS continues to manage the recreation programs following the management direction in the 2015 RODs. The 2015 analysis was incorporated by reference and references to the page numbers can be found in the FEIS, Chapter 4, Tables 4-1 and 4-12 Environmental consequences and cumulative effects analysis for the No Action Alternative incorporated by reference.*

**(3) Multiple uses that contribute to local, regional, and national economies in a sustainable manner;**

<u>*How relevant aspects of* 219.8*(b)(3) were taken into account:*</u> *All alternatives represent, to varying degrees, the principles of multiple-use, and ecological and economic sustainability. The alternatives provide protection of greater sage-grouse and its habitat and comply fully with applicable laws, regulations, and policies. See response to* 219.8*(b)(1).*

**(4) Ecosystem services;**

<u>*How relevant aspects of* 219.8*(b)(4) were taken into account:*</u> *See response to 219.8(a)(i)(ii) and 219.8(b)(1). To address social and economic sustainability, the amendments and effects to reasonably foreseeable projects will continue to provide people and communities with a range of social and economic benefits for present and future generations (See FEIS, Chapter 4, Section 4.7.3 Past, Present, And Reasonably Foreseeable Actions). The benefit to people (i.e., the goods and services provided) are the "ecosystem services" from the ecosystem.*

**(5) Cultural and historic resources and uses; and**

<u>*How relevant aspects of* 219.8*(b)(5) were taken into account:*</u> *Cultural and historic resources were analyzed in the 2015 FEIS and analysis reviewed to determine if it could have potentially significant effects based on the actions considered in Chapter 2. The changes proposed in the action alternative would not substantially alter management direction or result in different outcomes for the resource. Because of this, no additional analysis was completed; therefore, no new information on affected environment is provided. The 2015 analysis was incorporated by reference and references to the page numbers can be found in the FEIS, Chapter 4, Tables 4-1 and 4-12 Environmental consequences and cumulative effects analysis for the No Action Alternative incorporated by reference.*

**(6) Opportunities to connect people with nature.** 219.8*(b)(6) is not relevant to the amendments.*

***36 CFR 219.9***

The relevant provision in 36 CFR 219.9 is the requirement for sustainability and diversity of plant and animal communities within the scope and scale of the amendment. With respect to the requirements of the rule at 219.9, regarding the diversity of plan and animal communities, the rule requires that the Forest Service consider whether an amendment would have substantial adverse effects to, or substantially lessen protections for, a species.  If so, there must be further analysis, to determine whether the species is a potential species of conservation concern, and apply the rule as if the species were in fact a species of conservation concern.  36 CFR 219.13 (b)(6).  The analysis in the FEIS does not show substantial adverse

effects to or substantial lessoning of protections for greater sage-grouse or any other species; therefore, the Forest Service does not have to apply the requirement of 219.9. Nevertheless, the Forest Service took the very conservative approach of applying the requirements of 219.9 to the greater sage-grouse as if it were a species of conservation concern (SCC) in the plan areas for all the land management plans.  On the Ashley and Salmon-Challis National Forests, where revision of the land management plans is underway, the greater sage-grouse has been identified as SCC.  The analysis in the FEIS shows that the amendments meet the requirements of 219.9; they maintain ecological conditions necessary for a viable population of greater sage-grouse in all the plan areas to which the amendments would apply.  See the FEIS at Chapter 4, and the BAs and BEs located in the project record.

***36 CFR 219.10***

The relevant provision in section 219.10 is the requirement to include plan components for integrated resource management to provide for ecosystem services and multiple uses in the plan area, 36 CFR 219.10 (a)(1). With respect to the requirement of the rule at 219.10, the analysis in the FEIS shows that the minor adjustments that loosen some of the restrictions in the 2015 amendments should improve the capability of the plan areas to provide for ecosystem services and multiple uses.

**In applying 36 CFR 219.10, the Forest Service took into account the relevant aspects of the list at 36 CFR 219.10:**

**(1) Aesthetic values, air quality, cultural and heritage resources, ecosystem services, fish and wildlife species, forage, geologic features, grazing and rangelands, habitat and habitat connectivity, recreation settings and opportunities, riparian areas, scenery, soil, surface and subsurface water quality, timber, trails, vegetation, viewsheds, wilderness, and other relevant resources and uses.**

*How relevant aspects of 219.10(a)(1) were taken into account: Many of the resources listed were analyzed in the 2015 FEIS.  The analysis was reviewed to determine if it could have potentially significant effects based on the actions considered in the FEIS, Chapter 2. The changes proposed in the action alternative would not substantially alter management direction or result in different outcomes for the resource. Because of this, no additional analysis was completed; therefore, no new information on affected environment is provided. The 2015 analysis was incorporated by reference and references to the page numbers can be found in Chapter 4, Tables 4-1 and 4-12 Environmental consequences and Cumulative effects analysis for the No Action Alternative incorporated by reference. Refer to the FEIS, Chapter 3, Section 3.3 Resources Not Carried Forward for Analysis and Table 3-11 Resources and resource uses not carried forward for analysis.*

*Relevant resources and uses from 219.10(a)(1) considered in the plan components and analyzed include: GRSG General, GRSG Habitat, Livestock Grazing, and Wild Horse and Burro. In addition, the Biological Evaluation and Biological Assessments evaluated the effects to wildlife and plant species. (See FEIS, Chapter 2, Comparison of Alternatives Tables 2-5 through 2-9 which identify plan components by state, see Biological Evaluation by State).*

**(2) Renewable and nonrenewable energy and mineral resources.**

*How relevant aspects of 219.10(a)(2) were taken into account: Depending on availability of the energy and mineral resources in the planning area, plan components were considered for Wind and Solar, Fluid Minerals (Unleased, Leased, Operations), Coal Mines (Unleased and Leased), Locatable Minerals, Non-energy Leasable Minerals, Mineral Materials (See FEIS, Chapter 2, Comparison of Alternatives Tables 2-5 through 2-9 which identify these plan components by state;*

*Appendix G identified Fluid Mineral Stipulations).*

**(3) Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors.**

*How relevant aspects of 219.10(a)(3) were taken into account: Plan components were considered for the appropriate placement and sustainable management of infrastructure in Lands and Realty - Special-use Authorizations (non-recreation), Recreation, and Roads/Transportation sections (See FEIS, Chapter 2, Comparison of Alternatives Tables 2-5 through 2-9 which identify these plan components by state).*

**(4) Opportunities to coordinate with neighboring landowners to link open spaces and take into account joint management objectives where feasible and appropriate.**

*How relevant aspects of 219.10(a)(4) were taken into account: There are some plan components for Land Ownership Adjustments. While this decision only applies to NFS lands within the planning area, it was developed in conjunction with the BLM and States. Part of the purpose and need was to align with neighboring public land owners. (See FEIS, Chapter 2, Comparison of Alternatives Tables 2-5 through 2-9 which identify these plan components by state).*

**(5) Habitat conditions, subject to the requirements of §219.9, for wildlife, fish, and plants commonly enjoyed and used by the public; for hunting, fishing, trapping, gathering, observing, subsistence, and other activities (in collaboration with federally recognized Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments).**

*How relevant aspects of 219.10(a)(5) were taken into account: The FS previously evaluated hunting, but did not include it in the 2015 FEIS. Hunting is not carried forward for detailed analysis in the 2019 FEIS for the same reasons they were dismissed in 2015 (see 2015 FEIS, Chapter 1, section 1.6.3).*

**(6) Land status and ownership, use, and access patterns relevant to the plan area.**

*How relevant aspects of 219.10(a)(6) were taken into account: Some forest plan components address Land Ownership Adjustments. (See FEIS, Chapter 2, Comparison of Alternatives Tables 2-5 through 2-9 which identify these plan components by state).*

**(7) Reasonably foreseeable risks to ecological, social, and economic sustainability.**

*How relevant aspects of 219.10(a)(7) were taken into account: Social and Economic Conditions and Environmental Justice was analyzed in the 2015 FEIS and reviewed to determine if they could have potentially significant effects based on the actions considered in Chapter 2. The changes proposed in the action alternative would not substantially alter management direction or result in different outcomes for the resource. Because of this, no additional analysis was completed, below; therefore, no new information on affected environment is provided. The 2015 analysis was incorporated by reference and references to the page numbers can be found in Chapter 4, Tables 4-1 and 4-12 Environmental consequences and Cumulative effects analysis for the No Action Alternative incorporated by reference.*

**(8) System drivers, including dominant ecological processes, disturbance regimes, and stressors, such as natural succession, wildland fire, invasive species, and climate change; and the ability of the terrestrial and aquatic ecosystems on the plan area to adapt to change (§219.10(a)(8));**

*See response to 219.8(a)(iii)(iv)(v).*

**(9) Public water supplies and associated water quality.**

*How relevant aspects of 219.10(a)(9) were taken into account: Riparian Areas, Wetlands, and Water Resources were analyzed in the 2015 FEIS and reviewed to determine if they could have potentially significant effects based on the actions considered in Chapter 2. The changes proposed in the action alternative would not substantially alter management direction or result in different outcomes for the resource. Because of this, no additional analysis was completed, below; therefore, no new information on affected environment is provided. The 2015 analysis was incorporated by reference and references to the page numbers can be found in Chapter 4, Tables 4-1 and 4-12 Environmental consequences and Cumulative effects analysis for the No Action Alternative incorporated by reference.*

**(10) Opportunities to connect people with nature. §219.10(a)(10)**

*See response to 219.8(b)(6).*

### VIABLE POPULATION DETERMINATION

The 2012 Planning Rule requires the responsible official to determine whether ecosystem plan components "provide the ecological conditions necessary to . . . maintain a viable population of a species of conservation concern within the plan area" and if that is not the case, "then additional, species-specific plan components, including standards or guidelines, must be included in the plan to provide such ecological conditions in the plan area" (36 CFR, § 219.9(b)(1)). Greater sage-grouse are potential species of conservation concern in the plan area, so the Forest Service is treating them as a species of conservation concern for purposes of this decision.  Therefore, the Forest Service included species-specific plan components that will help maintain a viable population of greater sage-grouse in the plan area.

Each plan component and other plan content in the amendments are specifically designed to provide conservation protection for greater sage-grouse and habitat sufficient for a viable population on each planning unit. The Forest Service developed plan components based on the best available scientific information, including new research published since the 2015 RODs. The impacts associated with these new changes, such as elimination of Sagebrush Focal Areas, modifications to lek buffers, and new grazing guidelines would have minimal impacts across the range of greater sage-grouse. Biological Evaluations prepared for the FEIS identified and evaluated the contribution of habitat within the plan area to the maintenance of greater sage-grouse and concluded that implementation of these amendments will provide habitat to support viable populations on each involved planning unit.

Collaborative land management is essential to effectively conserve a species or habitat; therefore, the Forest Service works in partnership with States when developing NFS LMPs. However, Forest Service LMPs may differ from State plans to meet our viable population requirement within each national forest. When this is the case, the Forest Service works with our State partners to develop direction that meets our viable population requirement, while considering State plan direction.

### ENDANGERED SPECIES ACT

The purpose of the Endangered Species Act of 1973 (ESA) is for the conservation of threatened and endangered plants and animals and their habitats. By its very nature, the LMPA seeks to conserve wildlife and plant habitats. In 2015, the Forest Service, BLM, and USFWS coordinated closely on potential impacts to threatened, endangered, and proposed species through the ESA section 7 consultation process.

Throughout the process, in conjunction with the USFWS, the Forest Service has ensured compliance with the ESA. A summary of the results of ESA, section 7 consultation is found above under the section titled Endangered Species Act Section 7 Consultation. Therefore, this decision is compliant with this Act.

### CLEAN AIR ACT

The Forest Service is tasked through the Federal Clean Air Act of 1970 to provide particular protection to Air Quality Related Values. This decision is consistent with the Clean Air Act. The LMPA does not create, authorize, or execute any activities with the potential to alter air quality. There are no emissions related to implementation of this decision. This decision will result in additional restrictions on activities that emit air pollutants; none of the direction in the LMPA will produce adverse impacts to air quality. Implementation of the LMPA direction will not result in exceedance of Colorado Air Pollution Control Division, Nevada Ambient Air Quality, Idaho Air Quality Division standards, or the Utah Division of Air Quality regulations. Therefore, this decision is compliant with this Act.

### CLEAN WATER ACT

The Federal Water Pollution Control Act of 1948, expanded and reorganized in 1972 (Federal Water Pollution Control Amendments of 1972), is commonly known as the Clean Water Act (CWA). The objective of the CWA is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. Nothing in this decision will change or modify standards, guidelines, and direction contained in the LMPA, best management practices, applicable Forest Service manual and handbook direction, or the existing land management plans. Ongoing and future site-specific projects will adhere to these standards, guidelines, and direction, and by doing so will continue to be consistent with the Clean Water Act and amendments. Therefore, this decision is compliant with this Act.

## TRANSITION TO AMENDED PLAN DIRECTION

Application to future projects and authorizations:  Projects with decisions made on or after the effective date of the LMPA must be consistent with the forest plan as amended at the time of such decision. Projects with decisions made before the effective date of the LMPA may proceed unchanged; however, any related authorization for such a project that was not made with the project decision would need to be consistent with the forest plan as amended at the time of the authorization.

_Application to existing authorizations and approved projects or activities_
The FEIS and LMPA were developed with the understanding that when a plan is amended, existing permits must be made consistent with the LMPA "as soon as practicable" (16 USC 1604(i)).  It is my decision that the direction in the LMPA will be implemented over several years.  This will allow time for close, careful, and considered consultation, cooperation, and coordination with all involved parties. Making existing permits consistent with the LMPA will be subject to valid existing rights.

How existing permits will be made consistent with the LMPA is described below.

### LANDS AND REALTY TRANSITION

During renewal, amendment, or reissuance of existing authorizations, the authorization must be consistent with the forest plan at the time of the authorization.  Consistency with the LMPA, for example,

plan components relating to noise, tall structures, guy wire removal, and perch deterrent installation would be required for authorizations renewed, amended, or reissued authorizations after the effective date of the LMPA.

### GREATER SAGE-GROUSE PLAN AMENDMENT DIRECTION

This LMPA replaces the 2015 greater sage-grouse ROD/LMPA. This supersedes other greater sage-grouse direction in existing land management plans inside HMAs. The applicable components (e.g., restrictions based on lek buffers) supersede greater sage-grouse direction outside HMAs, unless existing direction provide equal or greater protection for greater sage-grouse or its habitat.

## EFFECTIVE DATE OF THE AMENDMENT

The effective date of the LMPA will be 30 days after the notice of its approval.

## PRE-DECISIONAL ADMINISTRATIVE REVIEW PROCESS (OBJECTION PROCESS)

This decision is subject to objection pursuant to the 36 CFR Part 219. Objections must be filed by way of regular mail, fax, e-mail, hand-delivery, or express delivery with the Objection Reviewing Officer, USDA Forest Service.

1. Electronic objections must be submitted to the Objection Reviewing Officer- Chris French via the Comment and Analysis Response Application (CARA) objection web form https://cara.ecosystem-management.org/Public/CommentInput?project=52904, with a subject line stating: "Objection regarding the Greater Sage-grouse Draft ROD and LMPA for NFS Land in Utah." Electronic submissions must be submitted in a format (Word, PDF, or Rich Text) that is readable and searchable with optical character recognition software.

2. Faxed objections must be sent and addressed to "Objection Reviewing Officer-Chris French" and must include a subject line stating: "Objection regarding the Greater Sage-grouse Draft ROD and LMPA for NFS Land in Utah." The fax coversheet should specify the number of pages being submitted. The fax number is 801-625-5277.

3. Hardcopy submissions must include a subject line on page one stating: "Objection regarding the Greater Sage-grouse Draft ROD and LMPA for NFS Land in Utah." Hardcopy objections may be submitted by regular mail to the following address:

      USDA Forest Service
      Attn: Objection Reviewing Officer- Chris French
      1400 Independence Ave., SW
      EMC-PEEARS, Mailstop 1104
      Washington, DC 20250

4. Hardcopy objections also may be submitted by carrier or hand deliveries to the following address:

      USDA Forest Service
      Attn: Objection Reviewing Officer- Chris French
      210 14th Street, SW,
      EMC-PEEARS, Mailstop 1104

Washington, DC 20250

Office hours are Monday through Friday, 8:00am to 5:00pm, excluding Federal holidays. Carrier deliveries may call 202-791-8488 during regular business days and hours, above, to coordinate delivery of objections. Hardcopy submissions must include a subject line on page one stating: "Objection regarding the Greater Sage-grouse Draft ROD and LMPA for NFS Land in Utah."

5. Individuals who need to use telecommunication devices for the deaf (TDD) to transmit objections may call the Federal Information Relay Service (FIRS) at 1-800-877-8339 between 8:00 a.m. and 8:00 p.m., Eastern Standard Time, Monday through Friday.

Objections, including attachments, must be filed within 60 days following the day after publication of the notice of the opportunity to object in the Salt Lake Tribune, the newspaper of record. The objection period begins the first day after the publication date of the notice. Objections or attachments received after the 60-day objection period will not be considered. The publication date in the newspaper of record is the exclusive means for calculating the time to file an objection. Those wishing to object to this land management plan revision should not rely upon dates or timeframe information provided by any other source.

Individuals and entities who have submitted substantive formal comments related to land management plan revision during the opportunities for public comment (as provided in subpart A of 36 CFR part 219) during the planning process for that decision may file an objection. Objections must be based on previously submitted substantive formal comments attributed to the objector unless the objection concerns an issue that arose after the opportunities for formal comment. Objections received in response to the notice, including names and addresses of those who object, will be considered part of the public record and will be available for public inspection.

Prior to the issuance of the reviewing officer's written response, either the reviewing officer or the objector may request to meet to discuss issues raised in the objection and their potential resolution. Interested persons who wish to participate in meetings to discuss issues raised by objectors must have previously submitted substantive formal comments related to the objection issues. Interested persons must file a request to participate as an interested person within 10 days after a legal notice of objections received has been published. Requests must be sent to the same email or address identified for filing objections, above, and the interested person must identify the specific issues they have interest in discussing. During the objection meeting, interested persons will be able to participate in discussions related to issues on the agenda that they have listed in their request to be an interested person.

## CONTACT PERSON

For additional information concerning this decision, contact:

John Shivik, National Sage-grouse Coordinator
USDA Forest Service, Intermountain Region,
Federal Building, 324 25th Street, Ogden, UT 84401
801-625-5667

# ATTACHMENT A –
# LAND MANAGEMENT PLAN AMENDMENT
# FOR NFS LANDS IN UTAH
# ON THE ASHLEY, DIXIE, FISHLAKE,
# MANTI-LA SAL, UINTA-WASATCH-CACHE,
# AND SAWTOOTH NATIONAL FORESTS

**ATTACHMENT A – LAND MANAGEMENT PLAN AMENDMENT FOR NFS LANDS IN UTAH ON THE ASHLEY, DIXIE, FISHLAKE, MANTI-LA SAL, UINTA-WASATCH-CACHE, AND SAWTOOTH NATIONAL FORESTS**

**FOREST SERVICE PLAN COMPONENTS AND OPTIONAL CONTENT IN THE PLAN**

On National Forest System (NFS) lands, land management plans (LMP) guide management activities and contain desired conditions and objectives as well as standards and guidelines that provide direction for project planning and design. Forest Service plan component definitions are in the planning rule at 36 CFR 219.7(e)(1). The following terms and definitions are used throughout this LMPA:

- **Desired Condition (DC)** - A description of specific social, economic, and/or ecological characteristics of the plan area, or a portion of the plan area, toward which management of the land and resources should be directed. Desired conditions must be described in terms that are specific enough to allow progress toward their achievement to be determined, but do not include completion dates.

- **Objective (O)** - A concise, measurable, and time-specific statement of a desired rate of progress toward a desired condition or conditions. Objectives should be based on reasonably foreseeable budgets.

- **Standard (ST)** - A mandatory constraint on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements.

- **Guideline (GL)** - A constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met. Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements.

The planning rule also provides for inclusion of optional content in the plan, such as potential management approaches or strategies and partnership opportunities or coordination activities (36 CFR 219.7(f)(2)). The planning rule does not require project consistency with optional content in the plan (36 CFR 219.15(d)). Optional content in the plan can be changed after public notification under the planning rule provision for administrative changes (36 CFR 219.13(c)). This plan amendment includes the optional content of "management approaches":

- **Management Approach (MA) -** A management approach is a statement of the principal strategies and program priorities the Responsible Official intends to employ to carry out projects and activities in the plan area. A management approach is optional content in a land management plan, is not a plan component, and can be changed, or added to or removed from a land management plan, following notice to the public. 36 CFR §219.7(e)(2), and 219.13(c).

Optional content in the plan could facilitate transparency and give the public and governmental entities a clear understanding of the plan and how outcomes would likely be delivered. The definition of management approaches in this amendment as "optional content" means that it was optional for the FS to include them in the plan, but management approaches should be followed when practicable.

If used, management approaches would describe the principal strategies and program priorities the Responsible Official intends to employ to carry out projects and activities developed under the plan. The management approaches can convey a sense of priority and focus among objectives and the likely management emphasis. Management approaches should relate to desired conditions and may indicate the future course or direction of change, recognizing budget trends, program demands and accomplishments.

Management approaches may discuss potential processes such as analysis, assessment, inventory, project planning, or monitoring (FSH 1909.20 section 22.4).

## LAND MANAGEMENT PLAN AMENDMENT FOR NFS LANDS IN UTAH

Priority habitat management areas may contain non-habitat.  Management direction would not apply to those areas of non-habitat if the proposed activity in non-habitat does not preclude effective sage-grouse use of adjacent habitats. For a comparison of alternatives and description of what changed between the DEIS and FEIS, see FEIS, Chapter 2, Tables 2-8 and 2-8A.

**Greater Sage-grouse General**

**GRSG-GEN-DC-001-Desired Condition -** The landscape for the greater sage-grouse encompasses large contiguous areas of native vegetation to provide for multiple aspects of species life requirements. Within these landscapes, a variety of sagebrush- community compositions exist without invasive species, which have variations in subspecies composition, co-dominant vegetation, shrub cover, herbaceous cover, and stand structure to meet seasonal requirements for food, cover, and nesting for the greater sage-grouse.

**GRSG-GEN-DC-002-Desired Condition -** Anthropogenic disturbance is focused in non-habitat areas outside of PHMA. There is little to no disturbance in priority habitat management areas except for existing rights and existing authorized uses.

**GRSG-GEN-DC-003-Desired Condition -** At the landscape scale, in greater sage-grouse seasonal habitat, including all seasonal habitats, 70% or more of lands capable of producing sagebrush have from 10 to 30% sagebrush canopy cover and less than 4% conifer canopy cover. In addition, within breeding and nesting habitat, sufficient herbaceous vegetation structure and height provides overhead and lateral concealment for nesting and early brood rearing life stages. Within brood rearing habitat, wet meadows and riparian areas sustain a rich diversity of perennial grass and forb species relative to site potential. Within winter habitat, sufficient sagebrush height and density provides food and cover for the greater sage-grouse during this seasonal period. When and where breeding and nesting habitat overlaps with other seasonal habitats, the desired conditions are those for breeding and nesting habitat.  Specific desired conditions for the greater sage-grouse based on seasonal habitat requirements are in Appendix E, Table E-1.  The values in the tables should be considered as initial references and do not preclude development of local desired conditions or utilizing other indicators/values, based on site selection preferences of the local population and ecological site capability of sagebrush communities.

**GRSG-GEN-ST-004-Standard -** In PHMA, do not issue new discretionary written authorizations unless all existing discrete anthropogenic disturbances cover less than 3% of the total greater sage-grouse habitat within the Biologically Significant Unit and the proposed project area, regardless of ownership, and the new use will not cause exceedance of the 3% cap. Discretionary activities that might result in disturbance above 3% at the Biologically Significant Unit and proposed project area would be prohibited unless approved by the forest supervisor with concurrence from the regional forester after review of new or site- specific information that indicates the project results in no net loss of habitat at the Biologically Significant Unit and proposed project area scale. Within existing designated utility corridors, the 3% disturbance cap may be exceeded at the project scale if the site specific NEPA analysis indicates no net loss of habitat. This exception is limited to projects that fulfill the use for which the corridors were designated (e.g., transmission lines, pipelines) and the designated width of a corridor will not be exceeded as a result of any project co-location. Consider the likelihood of surface disturbing activities as a result of development of existing rights when authorizing new projects in priority habitat

management areas.

**GRSG-GEN-ST-005-Standard -** In PHMA, only allow new authorized land uses if after avoiding and minimizing impacts, any remaining residual impacts to the greater sage-grouse or its habitat are fully offset by compensatory mitigation projects that result in no net loss, subject to existing rights, by applying beneficial mitigation actions. Any compensatory mitigation will be durable, timely, and in addition to what would have resulted without the compensatory mitigation as addressed in the Mitigation Strategy (Appendix E).

**GRSG-GEN-ST-006-Guideline** - In PHMA, do not authorize new large scale infrastructure or facilities that create sustained noise levels of ≥10 dB above ambient baseline at the perimeter of an occupied lek during lekking (from March 1 to April 30) from 6 p.m. to 9 a.m.

**GRSG-GEN-MA-007-Management Approach -** When implementing GRSG-GEN-ST-006-Standard, in coordination with the State of Utah, specific noise protocols for measurement and implementation will be developed as additional research and information emerges and as needed and mutually agreed to. These measures would be considered at the site-specific project level where and when appropriate.

**GRSG-GEN-GL-008-Guideline -** During breeding and nesting (from March 1 to June 15), surface disturbing and disruptive activities to nesting birds should be avoided.

**GRSG-GEN-GL-009-Guideline -** Development of tall structures within 2 miles from the perimeter of occupied leks, as determined by local conditions (e.g., vegetation or topography), with the potential to disrupt breeding or nesting by creating new perching/nesting opportunities for avian predators or by decreasing the use of an area, should be restricted within nesting habitat.

**GRSG-GEN-MA-010-Management Approach -** Every 5 years or in conjunction BLM and State of Utah, evaluate the Habitat Management Area (HMA) Map and Biologically Significant Unit (BSU) Map when a demonstrated need for change exists.  These evaluations will occur in conjunction with an interagency team to ensure consistency across administrative boundaries.

## Adaptive Management

**GRSG-AM-ST-011-Standard -** If a hard or soft trigger is reached, and the causal factor is related to FS management, defer issuance for such projects or activities until an appropriate interagency management response strategy is implemented. The management response strategy shall include reverting back to prior management once the identified causal factor is resolved.

**GRSG-AM-MA-012-Management Approach -** If a hard or soft trigger is identified based on either population monitoring or habitat monitoring, apply the Utah Adaptive Management Plan (Appendix E) to determine causal factors related to population and habitat hard and soft triggers and to identify and implement appropriate management responses**.**

## Lands and Realty
## Special-use Authorizations (Non-recreation)

**GRSG-LR-SUA-GL-013-Guideline -** In nesting habitat in PHMA, do not authorize new or reissued special use permits unless measures to mitigate negative impacts to greater sage-grouse and habitat are

included.

**GRSG-LR-SUA-ST-014-Standard -** In PHMA, only authorize new lands special-use authorizations for infrastructure, such as high-voltage transmission lines, major pipelines, distribution lines, and communication tower sites when infrastructure is co-located with existing infrastructure, roads, or already disturbed areas. Impacts to greater sage-grouse must be avoided. In limited circumstances, when other alternatives are not feasible or impacts cannot be avoided, offset by using compensatory mitigation (GRSG-GEN-ST-005-Standard).

**GRSG-LR-SUA-ST-015-Standard -** In PHMA, do not authorize temporary lands special-uses (i.e., facilities or activities) that result in long-term (i.e., greater than 5 years) negative impact on the greater sage-grouse or its habitat.

**GRSG-LR-SUA-ST-016-Standard -** In PHMA, require protective stipulations (e.g., noise, tall structure, guy wire marking, perch deterrent installation, etc.) when issuing new authorizations or during renewal, amendment, or reissuance of existing authorizations that authorize infrastructure (e.g., high-voltage transmission lines, major pipelines, roads, distribution lines, and communication tower sites).

**GRSG-LR-SUA-ST-017-Standard -** In PHMA, locate upgrades to existing transmission lines within the existing designated corridors or rights-of way unless an alternate route would benefit the greater sage-grouse or its habitat.

**GRSG-LR-SUA-ST-018-Standard -** In PHMA, when a lands special-use authorization is revoked or terminated and no future use is contemplated, authorization holder must remove overhead lines and other surface infrastructure in compliance with 36 CFR 251.60(i).

## Land Ownership Adjustments

**GRSG-LR-LOA-ST-019-Standard -** In PHMA, do not approve landownership adjustments, including land exchanges, unless the action results in no net loss of greater sage-grouse habitat or it will not directly or indirectly adversely affect greater sage-grouse conservation.

**GRSG-LR-LOA-MA-020-Management Approach -** In PHMA with minority federal ownership, when landownership adjustments are being authorized, consider a landownership pattern (e.g., consolidation, reducing fragmentation, etc.) that supports improved greater sage-grouse population trends and habitat.

## Wind and Solar

**GRSG-WS-ST-021-Standard -** In PHMA, do not authorize new solar utility-scale and/or commercial energy development except for on-site power generation associated with existing industrial infrastructure (e.g., mine sites).

**GRSG-WS-ST-022-Standard -** In PHMA, do not authorize new wind utility-scale and/or commercial energy development except for on-site power generation associated with existing industrial infrastructure (e.g., mine sites).

## Greater Sage-grouse Habitat

**GRSG-GRSGH-O-023-Objective -** Improve greater sage-grouse habitat by removing invading conifers and other undesirable species annually, based upon the 10 year average number of acres shown in Appendix E, Table E-2.

**GRSG-GRSGH-DC-024-Desired Condition -** Invasive annual grasses are either not present or in low abundance and not increasing in sage-grouse habitat.

**GRSG-GRSGH-ST-025-Standard -** On the Dixie and Fishlake National Forests, where greater sage-grouse PHMA overlap with identified Utah prairie dog habitat, the most current version of conservation measures developed by the U.S. Fish and Wildlife Service will be used during implementation of recovery actions.

**GRSG-GRSGH-GL-026-Guideline -** When removing conifers that are encroaching into greater sage-grouse habitat, avoid persistent woodlands (i.e., old growth relative to the site or more than 100-years old).

**GRSG-GRSGH-GL-027-Guideline -** In PHMA, actions and authorizations should be not be approved unless the spread of invasive annual and noxious plant species is designed to be prevented.

**GRSG-GRSGH-GL-028-Guideline -** In PHMA, do not authorize fuel treatments in high-risk areas unless to reduce the spread and/or intensity of wildfire or the susceptibility of greater sage-grouse attributes to move away from desired conditions (FEIS, Appendix E, Table E-1 and ROD, Attachment E).

**GRSG-GRSGH-GL-029-Guideline -** In PHMA, native plant species should be used when practicable to maintain, restore, or enhance desired conditions (Appendix E, Table E-1 and ROD Attachment E).

**GRSG-GRSGH-GL-030-Guideline -** In PHMA, vegetation treatment projects should only be conducted if they maintain, restore, or enhance desired conditions (Appendix E, Table E-1 and ROD Attachment E).

**GRSG-GRSGH-O-031-Objective -** Within 2 years of the Record of Decision, develop a map of areas prone to annual grass invasion within sage-grouse habitat using resistance and resilience concepts, ecological site descriptions, and state and transition models for each National Forest and Grassland.

**GRSG-GRSGH-MA-032-Management Approach -** In designing post wildfire recovery treatments, consider resistance and resilience ecological site descriptions and state and transition models.

**GRSG-GRSGH-MA-033-Management Approach -** Prioritize treatments for established invasive plant populations that have the potential to impact sage-grouse habitat in PHMA. Early detection and rapid response treatments remain the focus.

## Livestock Grazing

**GRSG-LG-ST-034-Standard -** In PHMA, do not approve construction of water developments that would cause adverse effects to greater sage-grouse habitat.

**GRSG-LG-GL-035-Guideline -** In PHMA, if livestock grazing is limiting achievement of seasonal desired conditions, adjust livestock management, as appropriate, to address greater sage-grouse habitat requirements.

**GRSG-LG-GL-036-Guideline -** Bedding sheep and placing camps within 0.62 miles (1 km) from the perimeter of a lek during lekking (from March 1 to April 30) should be restricted to prevent disturbance to breeding and nesting GRSG.

**GRSG-LG-GL-037-Guideline -** During the breeding and nesting season, trailing livestock through breeding and nesting habitat should be avoided to the extent practicable to prevent disturbance to breeding and nesting GRSG behaviors. Specific routes should be identified, existing trails should be used, and stopovers on active leks during the breeding season should be restricted.

**GRSG-LG-GL-038-Guideline -** Fences should not be constructed or reconstructed within 1.2 miles from the perimeter of occupied leks unless the collision risk can be mitigated through design features or markings (e.g., mark, laydown fences, or other design features).

**GRSG-LG-GL-039-Guideline -** To prevent predation from perching raptors, new tall permanent livestock facilities that could serve as hunting perch (e.g., windmills, water tanks, corrals, etc.) should not be constructed within 1.2 miles from the perimeter of occupied leks unless perch deterring modifications are made to the structure.

## Fire Management

**GRSG-FM-DC-040-Desired Condition -** In PHMA, sage-grouse habitat is protected from loss due to unwanted wildfires or damages resulting from management related activities while using agency risk management protocols to manage for firefighter and public safety and other high priority values. In all fire response, first priority is the management of risk to firefighters and the public. Sage grouse habitat is prioritized as a high value resource along with other high value resources and assets.

**GRSG-FM-GL-041-Guideline -** In PHMA, do not use prescribed fire in 12-inch or less precipitation zones unless necessary to facilitate restoration of greater sage-grouse habitat consistent with desired conditions in Appendix E, Table E-1 or for pile burning.

**GRSG-FM-MA-042-Management Approach -** In PHMA, if it is necessary to use prescribed fire for restoration of greater sage-grouse habitat consistent with desired conditions in Appendix E, Table E-1, the associated National Environmental Policy Act analysis must identify how the project would move towards greater sage-grouse desired conditions; why alternative techniques were not selected; and how potential threats to greater sage-grouse habitat would be minimized.

**GRSG-FM-GL-043-Guideline -** In order to maintain sagebrush in wintering or breeding and nesting habitat, sagebrush removal or manipulation, including prescribed fire, should be restricted unless the removal strategically reduces the potential impacts from wildfire or supports the attainment of desired conditions.

**GRSG-FM-GL-044-Guideline -** In PHMA, when reseeding in fuel breaks, fire-resistant native plant species should be used if available and practicable or use fire-resistant non-native species.

**GRSG-FM-GL-045-Guideline -** Wildfire suppression facilities (i.e., base camps, spike camps, drop points, staging areas, helibases, etc.) should be located in areas where physical disturbance to GRSG habitat can be minimized. These include disturbed areas, grasslands, near roads/trails, or in other areas where there is existing disturbance or minimal sagebrush cover.

**GRSG-FM-GL-046-Guideline -** In PHMA, cross-country vehicle travel during fire operations should be restricted. When needed to best provide for firefighter or public safety or to minimize fire size in greater sage-grouse habitat, impacts to the greater sage-grouse should be considered, and removal of sagebrush should be limited to the extent practicable to achieve suppression objectives.

**GRSG-FM-GL-047-Guideline -** In PHMA, use fire management tactics and strategies that seek to minimize loss of existing sagebrush habitat. The safest and most practical means to do so will be determined by fireline leadership and incident commanders.

**GRSG-FM-GL-048-Guideline -** In PHMA, do not approve prescribed fire prescriptions that do not result in improvement of desired conditions for GRSG and not result in undesirable effects on vegetation and/or soils (e.g., minimize mortality of desirable perennial plant species and reduce risk of hydrophobicity).

**GRSG-FM-GL-049-Guideline -** In PHMA, planned fuel-breaks should incorporate roads and natural fuel breaks to improve effectiveness and minimize loss of existing sagebrush habitat.

**GRSG-FM-ST-050-Standard -** In PHMA, all fire-associated vehicles and equipment are to be inspected and cleaned using standardized protocols and procedures and approved vehicle/equipment decontamination systems before entering and exiting the area beyond initial attack activities to minimize the introduction of invasive annual grasses and other invasive plant species and noxious weeds.

**GRSG-FM-MA-051-Management Approach -** Include unit-specific greater sage-grouse fire management-related information should be added to wildland fire decision support systems (currently, the Wildland Fire Decision Support System); use local operating plans and resource advisor plans during fire situations to inform management decisions; and aid in development of strategies and tactics for resource prioritization.

**GRSG-FM-MA-052-Management Approach -** In or near PHMA, a greater sage-grouse resource advisor should be assigned to all extended attack fires.

**GRSG-FM-GL-053-Guideline -** On critical fire weather days, when allocation of resource positioning is being decided, protection of greater sage-grouse habitat should receive high consideration, along with other high values.

**GRSG-FM-MA-054-Management Approach -** Line officers should be involved in setting pre-season wildfire response priorities and prioritizing protection of PHMA along with other high values. During periods of multiple fires or limited resource availability, fire management organizational structure (local, regional, national) will prioritize fires and allocation of resources in which greater sage-grouse habitat is a consideration along with other high values.

**GRSG-FM-GL-055-Guideline -** In PHMA, fire retardant and mechanized equipment should only be used if it is likely to result in minimizing burned acreage; preventing the loss of other high value resources; or increasing the effectiveness of other tactical strategies. Agency administrators, their designee, or fireline leadership should consider fire suppression effects while determining suppression strategy and tactics; the use of fire retardant and mechanized equipment may be approved by agency administrators, their designee, or fireline leadership.

**GRSG-FM-GL-056-Guideline -** In PHMA, the full range of suppression techniques should be used to protect unburned islands, doglegs, and other greater sage-grouse habitat features that may exist within the perimeter of wildfires to retain as much GRSG habitat as possible and minimize sagebrush loss.

## Recreation

**GRSG-R-GL-057-Guideline -** In PHMA, do not authorize temporary recreation uses (i.e., facilities or activities) that result in long-term (i.e., greater than 5 years) negative impacts on the greater sage-grouse or its habitat.

**GRSG-R-GL-058-Guideline -** In PHMA, when authorizing new recreation special-use authorizations, terms and conditions that protect and/or restore greater sage-grouse habitat within the permit area should be included. During renewal, amendment, or reauthorization, terms and conditions in existing permits and operating plans should be modified to protect and/or restore greater sage-grouse habitat.

**GRSG-R-GL-059-Guideline -** In PHMA, new recreational facilities or expansion of existing recreational facilities (e.g., roads, trails, campgrounds), including special-use authorizations for facilities, should not be approved unless the development results in no net loss of greater sage-grouse habitat or the development is required for safety.

## Roads/Transportation

**GRSG-RT-DC-060-Desired Condition -** In PHMA, within the forest transportation system and on roads and trails authorized under a special use authorization, greater sage-grouse experience minimal disturbance and mortality.

**GRSG-RT-ST-061-Standard -** In PHMA, do not conduct or allow new road or trail construction (does not apply to realignments for resource protection) except when necessary for administrative access to existing and authorized uses, public safety, or to access existing rights. If necessary to construct new roads and trails for one of these purposes, construct them to the minimum standard, length, and number and avoid, minimize, and mitigate impacts.

**GRSG-RT-ST-062-Standard -** Do not conduct or allow road and trail maintenance activities within 2 miles from the perimeter of active leks during lekking (from March 1 to April 30) from 6 p.m. to 9 a.m.

**GRSG-RT-GL-063-Guideline -** In PHMA, dust abatement terms and conditions should be included in road-use authorizations when dust has the potential to affect the greater sage-grouse.

**GRSG-RT-GL-064-Guideline -** In PHMA, road and road-way maintenance activities should not increase the risk of vehicle- or human-caused wildfires and the spread of invasive plants.

**Minerals**
**Fluid-Unleased**

**GRSG-M-FMUL-ST-065-Standard -** In PHMA, any new oil and gas leases or geothermal leases must include a No Surface Occupancy stipulation. There will be no waivers or modifications. An exception, after review by an interagency technical team, could be granted by the authorized officer if:

- There would be no direct, indirect, or cumulative effects to the greater sage-grouse or its habitat; or
- Impacts could be fully offset through mitigation; and
- The exception will include appropriate controlled surface use and timing limitation stipulations

**GRSG-M-FMUL-MA-066-Management Approach -** Appendix G has stipulations developed for when standards and guidelines call for specific restrictions on fluid minerals activities.

**Fluid-Leased**

**GRSG-M-FML-ST-067-Standard -** In PHMA, the Surface Use Plan of Operation portion of the Application for Permit to Drill on existing leases that are not yet developed, will require Conditions of Approval (COA) that will avoid and minimize surface disturbing and disruptive activities consistent with the rights granted in the lease.

**GRSG-M-FML-ST-068-Standard -** In PHMA, when facilities are no longer needed or leases are relinquished, reclamation plans must include terms and conditions to restore habitat to desired conditions as described in Appendix E, Table E-1.

**GRSG-M-FML-GL-069-Guideline -** Compressor stations should be located on portions of a lease that are non-habitat and are not used by the greater sage-grouse and if there would be no direct, indirect, or cumulative effects on the greater sage-grouse or its habitat.

**GRSG-M-FML-MA-070-Management Approach -** If locating compressor stations in non-habitat or areas that would have no impact on greater sage-grouse is not possible, work with the operator to use mufflers, sound insulation, or other features to reduce noise consistent with GRSG-GEN-ST-006-Standard.

**GRSG-M-FML-GL-071-Guideline -** In PHMA, the Surface Use Plan of Operation portion of the Application for Permit to Drill will include terms and conditions to reduce disturbance to greater sage-grouse habitat where appropriate, practicable, and consistent with lease rights.

**GRSG-M-FML-GL-072-Guideline -** On existing federal leases PHMA, when surface occupancy is requested due to existing rights or development requirements, disturbance and surface occupancy should be restricted to areas that will minimize the impact to the greater sage-grouse based on vegetation, topography, or other habitat features.

**GRSG-M-FML-GL-073-Guideline -** In PHMA, where the federal government owns the surface and the mineral estate is in non-federal ownership, coordinate with the mineral estate owner/lessee to apply appropriate stipulations, conditions of approval, conservation measures, and required design features to the appropriate surface management instruments to the maximum extent permissible under existing authorities.

**Fluid- Operations**

**GRSG-M-FMO-ST-074-Standard -** In PHMA do not authorize employee camps.

**GRSG-M-FMO-ST-075-Standard -** In PHMA, when feasible do not locate tanks or other structures that may be used as raptor perches. If this is not feasible, use perch deterrents.

**GRSG-M-FMO-GL-076-Guideline -** In PHMA, closed-loop systems should be used for drilling operations with no reserve pits, where feasible.

**GRSG-M-FMO-GL-077-Guideline -** In PHMA, during drilling operations, soil compaction should be minimized and soil structure should be maintained using the best available techniques to improve vegetation reestablishment.

**GRSG-M-FMO-GL-078-Guideline -** In PHMA, dams, impoundments, and ponds for mineral development should be constructed to reduce potential for West Nile virus.

**GRSG-M-FMO-MA-079-Management Approach -** Utilize the following methods to reduce to potential for West Nile virus include the following:
- Increase the depth of ponds to accommodate a greater volume of water than is discharged.
- Build steep shorelines (greater than 2 feet) to reduce shallow water and aquatic vegetation around the perimeter of impoundments to reduce breeding habitat for mosquitoes.
- Maintain the water level below that of rooted aquatic and upland vegetation. Avoid flooding terrestrial vegetation in flat terrain or low-lying areas.
- Construct dams or impoundments that restrict down-slope seepage or overflow by digging ponds in flat areas rather than damming natural draws for effluent water storage or lining constructed ponds in areas where seepage is anticipated.
- Line the channel where discharge water flows into the pond with crushed rock or use a horizontal pipe to discharge inflow directly into existing open water.
- Line the overflow spillway with crushed rock and construct the spillway with steep sides.
- Fence pond sites to restrict access by livestock and other wild ungulates.
- Remove or re-inject produced water.
- Treat waters with larvicides to reduce mosquito production where water occurs on the surface.

**GRSG-M-FMO-GL-080-Guideline -** In PHMA, to keep habitat disturbance at a minimum, a phased development approach should be applied to fluid mineral operations wherever possible, consistent with the rights granted under the lease. Disturbed areas should be reclaimed as soon as they are no longer needed for mineral operations.

**Coal Mines- Unleased**

**GRSG-M-CMUL-ST-081-Standard -** When consenting to coal leases or coal lease modifications where development would be by underground mining methods, prescribe a lease stipulation prohibiting the location of surface facilities in PHMA. At coal lease readjustment, bring forward stipulations for prohibiting the location of surface facilities in priority habitat management areas.

For coal exploration licenses, prohibit surface facilities in PHMA; prescribe stipulations to protect greater sage-grouse and its habitat. Recommend operating conditions for exploration plans to reduce invasive species, prevent fire, limit permanent tall structures and new permanent roads, and design reclamation of surface disturbance to restore applicable greater sage-grouse habitat.

## Coal Mines- Leased

**GRSG-M-CML-ST-082-Standard -** If not stipulated in a coal lease, during the state agency permitting process, recommend against placement of surface facilities related to existing underground mines in PHMA. If new surface facilities associated with existing leases cannot be located outside of priority habitat management areas, then recommend location within any existing disturbed areas. If location within an existing disturbed area is not possible, then locate the facilities in an area least harmful to greater sage-grouse habitat based on vegetation, topography, or other habitat features, and recommend to the authorizing state agency that reclamation be designed to restore any disturbed greater sage-grouse habitat.

**GRSG-M-CML-GL-083-Guideline -** When responding to the authorized state agency regarding mine permitting actions that cause surface disturbance, if applicable, include conditions for surface use occupancy and timing prohibitions and restrictions based on habitat present. During permitting actions and/or 5-year permit reviews, advise the state agency that the post-mining land use is wildlife habitat involving greater sage-grouse habitat.

## Locatable Minerals

**GRSG-M-LM-ST-084-Standard -** In PHMA, only approve Plans of Operation with mitigation (avoid and minimize) to protect the greater sage-grouse and its habitat, consistent with the rights provided for under the Mining Law of 1872, as amended.

**GRSG-M-LM-GL-085-Guideline -** In PHMA, to keep habitat disturbance at a minimum, a phased development approach should be applied to operations consistent with the rights granted under the General Mining Act of 1872, as amended. Disturbed areas should be reclaimed as soon as they are no longer needed for mineral operations.

**GRSG-M-LM-GL-086-Guideline -** In PHMA, when closing abandoned mine sites remove tall structures that could provide nesting opportunities and perching sites for predators to reduce predation of greater sage-grouse, consistent with the National Historic Preservation Act.

## Non-energy Leasable Minerals

**GRSG-M-NEL-GL-087-Guideline -** In PHMA, include stipulations to restrict surface use, occupancy and seasonal activities for exploration with either recommendations or consent (as applicable) to the BLM regarding issuance of prospecting permits and exploration licenses.

In PHMA, where development would be by surface mining methods, consider potential impacts to sage-grouse habitat and appropriate stipulations (see standards and guidelines 004-009), and/or applying appropriate compensatory mitigation (as described in the Mitigation Framework) when assessing whether or not to consent to, or recommend leasing.

In PHMA where development would be by underground mining methods, include stipulations that restrict surface use, occupancy and seasonal activities with either recommendations or consent (where applicable) to the BLM regarding issuance of new leases and lease modifications.

At lease readjustment or lease renewal, evaluate stipulations to forward to the BLM to restrict surface use, occupancy and seasonal activities in PHMA.  Where existing leases either are, or will be, developed by surface mining methods, include stipulations to reclaim disturbed lands to applicable greater sage-grouse habitat.

**GRSG-M-NEL-GL-088-Guideline -** In PHMA, include in recommendations to the BLM regarding exploration plan or mining plans conditions to reduce invasive species, prevent fire, limit permanent tall structures and new permanent roads, and to design reclamation of surface disturbance to restore applicable greater sage-grouse habitat.

## Mineral Materials

**GRSG-M-MM-ST-089-Standard -** In PHMA, do not authorize new mineral material disposal or development.

**GRSG-M-MM-ST-090-Standard -** Do not allow mineral material collection from March 1 to April 30 between 6 p.m. and 9 a.m. within 2 miles from the perimeter of occupied leks.

**GRSG-M-MM-ST-091-Standard -** In PHMA, management of existing or expansion of existing pits, will include appropriate requirements for operation and reclamation of the site to maintain, restore, or enhance desired habitat conditions.

# ATTACHMENT B –
# HMA MAPS OF ALTERNATIVE 2,
# WITH MODIFICATIONS

# ATTACHMENT B - HMA MAPS OF ALTERNATIVE 2, WITH MODIFICATIONS

Attachment B includes a map of HMA in the selected Alternative 2, with modifications on NFS lands in Utah. Differences in mapping layers between the 2015 and 2019 amendments can also be examined using a map web-tool at the following link:

https://usfs.maps.arcgis.com/apps/PublicInformation/index.html?appid=9f1cf6d8425e49949d0006a0ae574b84

## Map 1 - GRSG Habitat Management Areas on the Ashley National Forest in Utah.



Refer to the *Greater Sage-grouse Draft ROD and LMPA for NFS land in Wyoming* for portions of the Ashley NF located in Wyoming.

**Map 2 - GRSG Habitat Management Areas on the Dixie National Forest in Utah.**



**Map 3 - GRSG Habitat Management Areas on the Fishlake National Forest in Utah.**



**Map 4 - GRSG Habitat Management Areas on the Manti-La Sal National Forest in Utah.**



**Map 5 - GRSG Habitat Management Areas on the Sawtooth National Forest in Utah.**



*Refer to the Greater Sage-grouse Draft ROD and LMPA for NFS land in Idaho for portions of the Sawtooth NF located in Idaho.*

**Map 6 - GRSG Habitat Management Areas on the Uinta-Wasatch-Cache National Forest in Utah.**



Refer to the *Greater Sage-grouse Draft ROD and LMPA for NFS land in Wyoming* for portions of the U-W-C NF located in Wyoming.

# ATTACHMENT C – GLOSSARY OF TERMS USED IN THE FEIS AND THIS ROD AND LMPA

## ATTACHMENT C - GLOSSARY OF TERMS USED IN THE FEIS AND THIS ROD AND LMPA

**Active lek** – Any lek that has had two or more males observed at least twice in the last five years.

**Additionality (Additive)** – In the context of compensatory mitigation, the conservation benefits of compensatory mitigation are a demonstrably new replacement for a loss of habitat that would not have resulted without the compensatory mitigation project.

**Adjacent** – Installation of a project or improvement parallel, near, or next to existing projects or improvements.

**Administrative access** – Access for resource management and administrative purposes such as wildfire suppression, cadastral surveys, permit compliance, law enforcement, and military in the performance of their official duty, or other access needed to manage National Forest System lands or uses.

**Allotment** – A designated area of land in which one or more livestock operators graze their livestock. An allotment may include one or more separate pastures. Livestock numbers and periods of use are specified for each allotment.

**Ambient (noise level)** – Sometimes called background noise level, reference sound level, or room noise level; the background sound pressure level at a given location, normally specified as a reference level to study a new intrusive sound source.

**Anthropogenic disturbances** – Human-created features including but not limited to paved highways, graded gravel roads, transmission lines, substations, wind turbines, oil and gas wells and associated facilities, geothermal wells and associated facilities, pipelines, landfills, agricultural conversion, homes, and mines.

**Appurtenant (minerals)** – A piece of equipment (e.g., pump jack, separator, storage tank, compressor station, metering equipment, etc.) necessary for production.

**Authorized (Forest) officer** – The Forest Service employee delegated the authority to perform a duty described in 36 CFR §228.104.  Generally, a Regional Forester, Forest Supervisor, District Ranger, or Minerals Staff Officer, depending on the scope and level of the duty to be performed.

**Authorized use** – An activity (i.e., resource use) occurring on public lands that is either explicitly or implicitly recognized or legalized by law or regulation. The term may refer to activities occurring on public lands for which the Forest Service has issued a formal authorization document (e.g., livestock grazing permit, special-use authorization, approved plan of operation, etc.). Formal authorized uses can involve both commercial and non-commercial activity, facility placement, or event. These authorized uses are often spatially or temporally limited. Unless constrained or bounded by statute, regulation, or an approved forest plan decision, legal activities involving public enjoyment and use of the public lands (e.g., hiking, camping, hunting, etc.) require no formal Forest Service authorization.

**Avoidance mitigation** – Avoiding the impact altogether by not taking a certain action or parts of an action. (40 CFR §1508.20(a)) (e.g., may also include avoiding the impact by moving the proposed action to a different time or location.)

**Baseline condition** – The pre-existing condition of a defined area and/or resource that can be quantified by an appropriate metric(s). During environmental reviews, the baseline is considered the affected environment that exists at the time of the review's initiation and is used to compare predictions of the effects of the proposed action or a reasonable range of alternatives.

**Biologically Significant Unit** – A geographical/spatial area within greater sage-grouse habitat that contains relevant and important habitat that is used as the basis for comparative calculations to support evaluation of changes to habitat. A Biologically Significant Unit or subset of the unit is used in the calculation of the anthropogenic disturbance threshold and in the adaptive management habitat trigger. Specifically:

- *NW Colorado-* A geographical/spatial area within greater sage-grouse habitat that contains relevant and important habitat that is used as the basis for comparative calculations to support evaluation of changes to habitat. A Biologically Significant Unit or subset of the unit is used in the calculation of the anthropogenic disturbance threshold and in the adaptive management habitat trigger.
- *Idaho-* All of the modeled nesting and delineated winter habitat, based on 2011 data, within priority and/or important habitat management areas within a Conservation Area.
- *Utah-* The total priority habitat management area associated with a greater sage-grouse population area.
- *Nevada-* Represents nested lek clusters with similar climate and vegetation conditions. A BSU boundary is defined by similar environmental conditions where GRSG population dynamics are likely driven by larger scale variations (e.g., climate). BSUs are defined by the USGS (Coates et al. 2017) and are also used for anthropogenic disturbance calculations.

**Causal factor** – A resource use or activity (e.g., livestock grazing or oil and gas development) or other factor (e.g., wildfire or drought) contributing to the decline of GRSG habitat and/or populations as identified under Adaptive Management*,* resulting in a soft or hard trigger being tripped. A causal factor can occur singly or in combination with one another.

**Co-location** – Installation of new projects or improvements (i.e., communication towers, electrical lines, other rights-of-way, or designated corridors) in, on, or adjacent to existing projects or improvements.

**Communication tower site** – Sites that include broadcast types of uses (e.g., television, AM/FM radio, cable television, broadcast translator) and non-broadcast uses (e.g., commercial or private mobile radio service, cellular telephone, microwave, local exchange network, or passive reflector).

**Compensatory mitigation** – Compensating for the residual impact of a certain action or parts of an action by replacing or providing substitute resources or environments(s). (40 CFR §1508.20)

**Compensatory mitigation projects** – The restoration, creation, enhancement, and/or preservation of impacted resources (adopted and modified from 33 CFR §332), such as on-the-ground actions to improve and/or protect habitat (e.g., chemical vegetation treatments, land acquisitions, conservation easements, etc.).

**Compensatory mitigation sites** – The durable areas where compensatory mitigation projects will occur.

**Connectivity Habitat Management Area (CHMA)** – Management areas whose boundaries match Wyoming State designated Connectivity areas.  They are identified as important to maintain transmission

of genetic material between core area populations.  CHMA may or may not include breeding, late brood-rearing, and winter habitats.  Connectivity Habitat Management Areas are only in Wyoming.

**Conservation Area (Idaho and Utah as administered by the Sawtooth NF)** – Areas determined to be necessary to monitor population objectives to evaluate the disturbance density and adaptive regulatory triggers and engage adaptive management responses. Conservation Areas may contain priority, important, and general habitat management areas. Specifically, these areas are Mountain Valleys, Desert, and West Owyhee.

**Controlled surface use** – A category of moderate constraint stipulations that allows some use and occupancy of public land while protecting identified resources or values and is applicable to fluid mineral leasing and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads, etc.).

**Core Habitat** – Core habitats are areas designated in the State of Wyoming's Sage-grouse Executive Order as the most important for Greater Sage-Grouse and include breeding, late brood-rearing, and winter habitats. They do not include known migration or connectivity corridors or winter concentration areas. In Wyoming, PHMA boundaries match Core Habitat boundaries identified in the Wyoming Sage-grouse Executive Order, Version 4 maps.

**Corridor** – A tract of land varying in width forming passageway through which various commodities such as oil, gas, and electricity are transported.

**Desired Condition (DC)** – A description of specific social, economic, and/or ecological characteristics of the plan area, or a portion of the plan area, toward which management of the land and resources should be directed. Desired conditions must be described in terms that are specific enough to allow progress toward their achievement to be determined, but do not include completion dates.

**Disruptive activities** – Land resource uses/activities that are likely to alter the behavior, displace, or cause excessive stress to the greater sage-grouse population occurring at a specific location and/or time. Actions that alter behavior or cause the displacement of individuals such that reproductive success is negatively affected or an individual's physiological ability to cope with environmental stress is compromised.

**Distribution line** – An electrical utility line with a capacity of less than 100kV or a natural gas, hydrogen, or water pipeline less than 24" in diameter.

**Diversity (biological)** – The number and distribution of plant and animal species within a specified geographic area. For purpose of the National Forest Management Act, the geographic area is a national forest or grassland unit.

**Durable (protective and ecological)** – The administrative, legal, and financial assurances that secure and protect the conservation status of a compensatory mitigation site and the ecological benefits of a compensatory mitigation project, for at least as long as the associated impacts persist.

**Enhance** – The improvement of habitat by increasing missing or modifying unsatisfactory components and/or attributes of the habitat (e.g., road commissioning) to meet greater sage-grouse objectives.

**Exception (minerals)** – A case-by-case exemption from a lease stipulation. The stipulation continues to apply to all other sites within the leasehold to which the restrictive criteria apply. The authorized officer (any employee of the Forest Service to whom has been delegated the authority to perform the duties described in the applicable Forest Service manual or handbook) may grant an exception if an environmental record of review determines that the action, as proposed or conditioned, would not impair the function or utility of the site for the current or subsequent seasonal habitat, life-history, or behavioral needs of the greater sage-grouse.

**Existing rights** – Documented legal rights or interests in the land that allow a person or entity to use said land for a specific purpose and that are still in effect. Such rights include but are not limited to fee title ownership, mineral rights, and easements. Such rights may have been reserved, acquired, granted, permitted, or otherwise authorized under various statutes of law over time.

**Feasible** – See technically/economically feasible.

**Fluid minerals** – Oil, gas, coal bed natural gas, and geothermal resources.

**Forage reserve** – Designation for allotments on which there is no current term permit obligation for some or all of the estimated livestock grazing capacity and where there has been a determination made to use the available forage on the allotment to enhance management flexibility for authorized livestock use (FSH id_2209.13-2007-1).

**Forest transportation system** – Roads, trails, and areas designated for motor vehicle use that provide access to National Forest System lands for both motorized and non-motorized uses in a manner that is socially, environmentally, and economically sustainable over the long-term; enhances public enjoyment of National Forest System roads; and maintains other important values and uses.

**General Habitat Management Area (GHMA)** – Management areas that are likely to be occupied seasonally or year-round outside of PHMAs or other defined management areas where GHMA management would apply to sustain the GRSG population. GHMA may include active leks, seasonal habitats, and fragmented or marginal habitat. These areas have been identified by the FS and BLM in coordination with respective state wildlife agencies. Idaho, Nevada, Utah, Wyoming, and Colorado have GHMA.

**Guideline (GL)** – A constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met. Guidelines are established to help achieve or maintain a desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements.

**Habitat** – An environment that meets a specific set of physical, biological, temporal, or spatial characteristics that satisfy the requirements of a plant or animal species or group of species for part or all of its life cycle.

**Hard trigger** – A threshold indicating that immediate action is necessary to stop a severe deviation from greater sage-grouse conservation objectives set forth in the land and RMP.

**High-voltage transmission line** – An electrical power line that is 100 kilovolts or larger.

**High elevation** – High elevation covers mid to high elevation areas comprised primarily of basin (mid-elevation) and mountain big sagebrush (high-elevation), as well as other mesic and higher elevation vegetation communities. (Previously the Mesic precipitation zone).

**Holder** – An individual or entity that holds a special-use authorization.

**Impact** – The effect, influence, alteration, or imprint caused by an action.

**Important Habitat Management Areas (IHMA)** – Areas that contain additional habitat and populations that provide a management buffer for PHMA and to connect patches of PHMA. IHMAs are typically adjacent to PHMAs but generally reflect somewhat lower GRSG population status and/or reduced habitat value due to disturbance, habitat fragmentation or other factors. IHMAs are only in Idaho.

**Indicators** – Factors that describe resource condition and change and can help the BLM and the Forest Service determine trends over time.

**Invasive species (invasive plant species, invasives)** – An alien species whose introduction does or is likely to cause economic or environmental harm or harm to human health. The species must cause or be likely to cause harm and be exotic to the ecosystem it has infested before considered invasive.

**Isolated parcel** – An individual parcel of land that may share a corner but does not have a common border with another parcel.

**Key habitat** – Key habitat includes areas of generally intact sagebrush that provide sage-grouse habitat during some portion of the year.  The Key Habitat Map in Idaho is intended to be updated annually and tracks effective habitat, effects to that habitat from fire, restoration efforts and use by GRSG.

**Landownership adjustment** – Land adjustments to National Forest System lands by purchase, exchange, interchange, or conveyance under authority delegated by law to the Secretary of Agriculture.

**Landscape** – A distinct association of land types that exhibit a unique combination of local climate, landform, topography, geomorphic process, surficial geology, soil, biota, and human influences. Landscapes are generally of a size that the eye can comprehend in a single view.

**Landscape scale** – At a scale that allows for bird dispersal and migration movements within the population and subpopulation area (Stiver et al 2015).

**Lease** – A contract granting use or occupation of property during a specified period in exchange for a specified rent or other form of payment; a type of special-use authorization (usually granted for uses other than linear rights-of-way) that is used when substantial capital investment is required and when conveyance of a conditional and transferable interest in National Forest System lands is necessary or desirable to serve or facilitate authorized long-term uses and that may be revocable and compensable according to the terms.

**Leasable minerals** – Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920, as amended, and the Mineral Leasing Act for Acquired Lands of 1947. These include energy-related mineral resources such as oil, natural gas, coal, and geothermal and some non- energy minerals, such as phosphate, sodium, potassium, and sulfur. Geothermal resources are also leasable under the Geothermal

Steam Act of 1970.

**Lek** – A courtship display area attended by the male greater sage-grouse in or adjacent to sagebrush-dominated habitat.

**Lek Buffer** – An area, identified using state-based or disturbance-based distances from the center or perimeter of a lek, where restrictions on permitted activities may be implemented.

**Lek cluster** – A group of leks in the same vicinity, among which GRSG may interchange over time and representing a group of closely related individuals. A lek cluster boundary is defined by minimal GRSG movement between clusters, so demographic rates are influenced by birth/death rates rather than immigration/emigration. Lek clusters are defined by the USGS (Coates et al. 2017).

**Lek Perimeter** – The outer perimeter of a lek and associated satellite leks (if present). Perimeters of all leks should be mapped by experienced observers using accepted protocols, by state. Perimeters may vary over time as population levels or habitat and weather conditions fluctuate. However, mapped perimeters should not be adjusted unless grouse use consistently (2+ years) demonstrates the existing perimeter is inaccurate. The lek location must be identified and recorded as a specific point within the lek perimeter. This point may be the geographic center of the perimeter polygon calculated though a GIS exercise, or a GPS waypoint recorded in the field, which represents the center of breeding activity typically observed on the lek (WDFG 2012).

**Lessee** – A person or entity holding record title in a lease issued by the United States; a person or entity authorized to use and occupy National Forest System lands under a specific instrument identified as a lease.

**Livestock conversion** – To change the kind of livestock authorized to graze on National Forest System lands (e.g., a change from sheep to cows).

**Locatable minerals** – Mineral disposable under the General Mining Act of 1872, as amended, that was not excepted in later legislation. These include hardrock, placer, and industrial minerals and uncommon varieties of rock found on public domain lands.

**Low Elevation** – Low elevation areas in the state, comprised primarily of Wyoming big sagebrush communities, with some basin big sagebrush included. (Previously the Arid precipitation zone).

**Major pipeline** – A pipeline that is 24 inches or more in outside-pipe diameter (Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 181; 36 CFR §251.54(f)(1)).

**Management Approach** – A management approach is a statement of the principal strategies and program priorities the Responsible Official intends to employ to carry out projects and activities in the plan area.  A management approach is optional content in a land management plan, is not a plan component, and can be changed, or added to or removed from a land management plan, following notice to the public.  36 CFR §219.7(e)(2), and §219.13(c).

**Marginal habitat** – An area that supports the species but has generally lower survival rates and reproductive success by comparison and may or may not have the potential to become suitable in the future (Stiver et al. 2015).

**Mineral** – Any naturally formed inorganic material; solid or fluid inorganic substance that can be extracted from the earth; any of various naturally occurring homogeneous substances (e.g., stone, coal, salt, sulfur, sand, petroleum, water, or natural gas) obtained usually from the ground. Under federal laws, considered as locatable (subject to the general mining laws), leasable (subject to the Mineral Leasing Act of 1920, as amended), and salable (subject to the Materials Act of 1947).

**Mineral materials** – Common varieties of mineral materials such as soil, sand and gravel, stone, pumice, pumicite, and clay that are not obtainable under the mining or leasing laws but that can be acquired under the Materials Act of 1947, as amended.

**Minimization mitigation** – Minimizing impacts by limiting the degree or magnitude of the action and its implementation (40 CFR §1508.20 (b)).

**Mitigation** –Mitigation, as described in the White House Council on Environmental Quality's (CEQ's) NEPA regulations at 40 CFR 1508.20, is the hierarchy of avoiding environmental impacts, minimizing impacts, and/or compensating for residual impacts.  Thus, mitigation can include avoiding the impact altogether by not taking a certain action or parts of an action, minimizing the impact by limiting the degree of magnitude of the action and its implementation, rectifying the impact by repairing, rehabilitating, or restoring the affected environment, reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action, and compensating for the impact by replacing or providing substitute resources or environments.

**Modification (oil and gas)** – A fundamental change to the provisions of a lease stipulation either temporarily or for the term of the lease. A modification may include an exemption from or alteration to a stipulated requirement. Depending on the specific modification, the stipulation may or may not apply to all other sites within the leasehold to which the restrictive criteria applied.

**Native plant species** – A plant species that occurs naturally in a particular region, state, ecosystem, and habitat without direct or indirect human actions.

**Net conservation gain** – The actual benefit or gain realized after compensating for a proposed action that degrades greater sage-grouse habitat; it may be shown by a net increase in sage-grouse habitat above the baseline conditions that existed before a proposed action.

**No surface occupancy** – A major constraint where use or occupancy of the land surface for fluid mineral exploration or development and all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes, construction of wells and/or pads) are prohibited to protect identified resource values. Areas identified as No Surface Occupancy are open to fluid mineral leasing, but surface occupancy or surface-disturbing activities associated with fluid mineral leasing cannot be conducted on the surface of the land.  Access to fluid mineral deposits would require horizontal drilling from outside the boundaries of the No Surface Occupancy area.

**No net habitat Loss** – Retaining an equivalent amount of sage-grouse habitat after a proposed action that is equal to or above baseline conditions that existed before the proposed action.

**Non-habitat** – An area within the historical distribution of sage-grouse that is unoccupied, does not currently provide habitat, and does not have the potential to provide habitat in the foreseeable future (<100 years) (Stiver et al. 2015).

**Objective (O)** – A concise, measurable, and time-specific statement of a desired rate of progress toward a desired condition or conditions. Objectives should be based on reasonably foreseeable budgets.

**Occupied lek** – A lek that has been active during at least one strutting season within the prior 10 years.

**Other Habitat Management Area (OHMA)** – Areas determined to be moderate to low habitat suitability for greater sage-grouse in areas of estimated low space use. This habitat management class represents areas with appropriate environmental conditions for greater sage-grouse, but that are less frequently used by greater sage-grouse.  OHMA is only designated in Nevada.

**Pending lek** – Any lek that has two or more males observed only once in the last five years.

**Permit** – A special-use authorization that provides permission, without conveying an interest in land, to occupy and use National Forest System lands or facilities for specified purposes and which is both revocable and terminable.

**Permit cancellation** – Action taken to permanently invalidate a term grazing permit in whole or part.

**Persistent woodlands** – Long-lived pinyon-juniper woodlands that typically have sparse understories and occur on poor substrates in the assessment area.

**Plan of operation** – A Plan of Operation is required for all mining activity conducted under the General Mining Act of 1872, as amended, if the proposed operations will likely cause significant disturbance of surface resources. The Plan of Operation describes the type of operations proposed and how they would be conducted; the type and standard of existing and proposed roads or access routes; the means of transportation to be used; the period during which the proposed activity will take place; and measures to be taken to meet the requirements for environmental protection (36 CR 228.4).

**Practicable**— Useful for the intended purpose and able to be done or put into practice successfully.

**Prescribed fire** – Any fire ignited by management actions to meet specific objectives. A written, approved prescribed fire plan must exist, and National Environmental Policy Act requirements, where applicable, must be met before ignition.

**Priority Habitat Management Areas (PHMA)** – Management areas that have been identified as having the highest conservation value to maintaining sustainable GRSG populations. These areas are occupied seasonally or year-round and include breeding, late brood-rearing, and winter habitat. The FS and BLM have identified these areas in coordination with respective state wildlife agencies. Idaho, Nevada, Utah, Wyoming, and Colorado have PHMA. In Wyoming, PHMA boundaries match Core Areas identified in the Wyoming Sage-grouse Executive Order, Version 4 maps.

**Prohibit** – To forbid (something) by law, rule, or other authority; no authorizations will be issued, meaning no authorization will be granted.

**Proper Functioning Condition** – Ecosystems at any temporal or spatial scale are in a properly functioning condition when they are dynamic and resilient to perturbations to structure, composition, and processes of their biological or physical components.  For riparian-wetlands: an area in which adequate vegetation

or other structure components are present to dissipate energy, reduce erosion and improve water quality, filter sediment and aid in floodplain development, improve flood-water retention and ground-water recharge, stabilize streambanks and shorelines, develop diverse ponding and channel characteristics for fish and wildlife habitat among other things, and support greater biodiversity.

**Reclamation plans** – Plans that guide the suite of actions taken within an area affected by human disturbance, the outcome of which is intended to change the condition of the disturbed area to meet pre-determined objectives and/or make it acceptable for certain defined resources (e.g., wildlife habitat, grazing, ecosystem function, etc.).

**Residual impacts** – Impacts from an implementation-level decision that remain after applying avoidance and minimization mitigation; also referred to as unavoidable impacts.

**Responsible official** – The Agency employee who has the authority to make and implement a decision on a proposed action (36 CFR 220.3).

**Restoration** – Implementation of a set of actions that promotes plant community diversity and structure that allows plant communities to be more resilient to disturbance and invasive species over the long-term. The long-term goal is to create functional, high quality habitat that is occupied by the greater sage-grouse. The short-term goal may be to restore the landform, soils, and hydrology and increase the percentage of preferred vegetation, seeding of desired species, or treatment of undesired species.

**Restriction/restrict** – A limitation or constraint, not a prohibition, on public land uses and operations. Restrictions can be of any kind but most commonly apply to certain types of vehicle use, temporal and/or spatial constraints, or certain authorizations.

**Right-of-way** – Land authorized to be used or occupied for the construction, operation, maintenance, and termination of a project or facility passing over, upon, under, or through such land.

**Road or trail** – A road or trail wholly or partly within or adjacent to and serving the National Forest System that the Forest Service determines is necessary for the protection, administration, and utilization of the National Forest System and the use and development of its resources.

**Sagebrush Focal Areas** – Areas identified by the U.S. Fish and Wildlife Service that represent recognized "strongholds" for the greater sage-grouse that have been noted and referenced as having the highest densities of greater sage-grouse and other criteria important for the persistence of the species.

**Satellite lek** – A relatively small lek (usually less than 15 males) within about 500 meters of a large lek often documented during years of relatively high grouse numbers. Locations of satellite leks should be encompassed within lek perimeter boundaries.

**Soft triggers** – An intermediate threshold indicating that management changes are needed at the implementation level to address habitat or population losses.

**Special-use authorization** – A written permit, term permit, lease, or easement that authorizes use or occupancy of National Forest System lands and specifies the terms and conditions under which the use or occupancy may occur.

**Standard (ST)** – A mandatory constraint on project and activity decisionmaking, established to help achieve or maintain the desired condition or conditions, to avoid or mitigate undesirable effects, or to meet applicable legal requirements.

**Stipulation (general)** – A term or condition in an agreement, contract, or written authorization.

**Stipulation (oil and gas)** – A provision that modifies standard lease rights and is attached to and made a part of the lease. Lease stipulations include No Surface Occupancy, Timing Limitations, and Controlled Surface Use.

**Suitable habitat** – An area that provides environmental conditions necessary for successful survival and reproduction to sustain stable populations (Stiver et al. 2015).

**Surface disturbing activities** – Actions that alter the vegetation, surface/near surface soil resources, and/or surface geologic features beyond natural site conditions and on a scale that affects other public land values. Examples of surface disturbing activities may include operation of heavy equipment to construct well pads, roads, pits, and reservoirs; installation of pipelines and power lines; maintenance activities; and several types of vegetation treatments (e.g., prescribed fire, etc.). Surface disturbing activities may be restricted, not allowed, or not authorized.

**Surface occupancy** – Placement or construction on the land surface of semi-permanent or permanent facilities requiring continual service or maintenance. Casual use is not included.

**Surface use** – Activities that may be present on the surface or near-surface (e.g., pipelines) of public lands. When administered as a use restriction (e.g., No Surface Occupancy), this phrase prohibits all but specified resource uses and activities in a certain area to protect particular sensitive resource values and property. This designation typically applies to small acreage sensitive resource sites (e.g., plant community study exclosure, etc.) and/or administrative sites (e.g., government ware-yard, etc.) where only authorized agency personnel are admitted.

**Tall structures** – A wide array of infrastructures (e.g., poles that support lights, telephone, and electrical distribution; communication towers; meteorological towers; high-tension transmission towers; and wind turbines) that have the potential to disrupt lekking or nesting birds by creating new perching/nesting opportunities and/or decreasing the use of an area. A determination as to whether something is considered a tall structure would be based on local conditions such as vegetation or topography.

**Technically/economically feasible** – Actions that are practical or feasible from the technical and economic standpoint and using common sense rather than simply desirable from the standpoint of the applicant. It is the Forest Service's responsibility to determine what actions are technically and economically feasible based on a review of the applicant's rationale and the available best science. The Forest Service will consider whether implementation of the proposed action is likely given past and current practice and technology; this consideration does not necessarily require a cost-benefit analysis or speculation about an applicant's costs and profit.

**Temporary special-use permit** – A type of permit that terminates within 1 year or less after the approval date. All other provisions applicable to permits apply fully to temporary permits.
Temporary special-use permits are issued for seasonal or short-duration uses involving minimal

improvement and investment.

**Term permit** – An authorization to occupy and use National Forest System lands other than rights- of-way for a specified period that is both revocable and compensable according to its terms.

**Timeliness** – The lack of a time lag between impacts and the achievement of compensatory mitigation goals and objectives.

**Timely** – The conservation benefits from compensatory mitigation accruing as early as possible or before impacts have begun.

**Timing limitations** – A moderate constraint, applicable to fluid mineral leasing, on all activities associated with fluid mineral leasing (e.g., truck-mounted drilling and geophysical exploration equipment off designated routes; construction of wells and/or pads); and other surface disturbing activities (i.e., those not related to fluid mineral leasing). Areas identified for Timing Limitations are closed to fluid mineral exploration and development; surface-disturbing activities; and intensive human activity during identified timeframes. This stipulation does not apply to operation and basic maintenance activities, including associated vehicle travel, unless otherwise specified. Construction, drilling, completions, and other operations considered to be intensive in nature are not allowed. Intensive maintenance, such as workovers on wells, is not permitted. Timing Limitations can overlap spatially with No Surface Occupancy and Controlled Surface Use, as well as with areas that have no other restrictions.

**Transmission line** – An electrical utility line with a capacity greater than or equal to 100kV or a natural gas, hydrogen, or water pipeline greater than or equal to 24" in diameter.

**Unsuitable habitat** – An area that does not currently provide one or more of the life requisites and therefore does not provide habitat, but it may provide habitat sometime in the foreseeable future (<100 years) through succession or restoration (Stiver et al. 2015).

**Utility-scale and/or commercial energy development** – A project that is capable of producing 20 or more megawatts of electricity for distribution to customers through the electricity-transmission- grid system.

**Vegetation treatments** – Management practices that are designed to maintain current vegetation structure or change the vegetation structure to a different stage of development. Vegetation treatment methods may include managed fire, prescribed fire, chemical, mechanical, and seeding.

**Waived without preference** – A permittee waives a term grazing permit to the United States without identifying a preferred applicant (i.e., a third party that has purchased either permitted livestock, base property, or both).

**Waiver (oil and gas)** – Permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

**West Nile virus** – A virus that is found in temperate and tropical regions of the world and most commonly transmitted by mosquitoes. West Nile virus can cause flu-like symptoms in humans and can be lethal to birds, including the greater sage-grouse.

**Wildfire suppression** – An appropriate management response to wildfire or prescribed fire that results

in curtailment of fire spread and eliminates all identified threats from the particular fire.

**Winter Concentration Areas** – Areas that are a habitat feature exclusively designated by the State of Wyoming and mapped by the Wyoming Game and Fish Department (WGFD). Winter Concentration Areas are designated and mapped areas where biologically significant numbers of core habitat birds persistently congregate in an area outside of PHMA between December 1 to March 14. No Winter Concentration Areas are currently mapped on NFS lands in Wyoming. If Winter Concentration Areas are designated by the State of Wyoming and mapped by WGFD, the appropriate plan components would be applied. Winter Concentration Areas are only in Wyoming.

**Withdrawal (land)** – Withholding an area of federal land from settlement, sale, location, or entry under some or all of the general land laws, including the mining and mineral leasing laws, for the purpose of limiting activities under those laws to maintain other public values in the area or for reserving the area for a particular public purpose or program.

# ATTACHMENT D – MANAGEMENT APPROACH FOR FLUID MINERALS: STIPULATIONS FOR NFS LANDS IN UTAH

## ATTACHMENT D – MANAGEMENT APPROACH FOR FLUID MINERALS: STIPULATIONS

Appendix G in the FEIS contains Fluid Minerals: Stipulations for all five states located in the planning area. Attachment D is a modified version of Appendix G and only contains stipulations that are applicable to National Forest System land in Utah. The stipulations have been developed as management strategies for when standards and guidelines call for specific restrictions on fluid minerals activities.

**Summary of Forest Plan Component Reference and Applicable Stipulation**

| Stipulation | Component |
|---|---|
| A | Stipulation A refers to Colorado. See FEIS, Appendix G. |
| B | Stipulation B refers to Nevada. See FEIS, Appendix G. |
| **C** | **GRSG-M-FMUL-ST-065 (UT)** |
| D | Stipulation D refers to Idaho. See FEIS, Appendix G. |
| **E** | **GRSG-GEN-GL-008 (UT)** |
| F | Stipulation F refers to Nevada. See FEIS, Appendix G. |
| **G** | **GRSG-GEN-GL-009 (UT)** |
| H | Stipulation H refers to Idaho. See FEIS, Appendix G. |
| **I** | **GRSG-GEN-ST-006 (UT)** |
| J | Stipulation J refers to Nevada. See FEIS, Appendix G. |

**STIPULATION C:  NO SURFACE OCCUPANCY STIPULATION**
**Greater Sage-Grouse in Priority Habitat Management Areas**
GRSG-M-FMUL-ST-065 (UT)

**No surface occupancy or use is allowed on the lands described below (legal subdivision or other description).**

Insert applicable legal land description here.

**For the purpose of:**

Protecting greater sage-grouse (GRSG) habitat.

**Exceptions:**  An exception could be granted by the authorized officer if:

- There would be no direct or indirect effects to the greater sage-grouse or its habitat; or

- Impacts could be fully offset through additional mitigation

**Modifications:**  None.

**Waiver:**  None.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.  (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

**STIPULATION E:  TIMING LIMITATION STIPULATION**
**Greater Sage-Grouse Breeding & Nesting Habitats**
GRSG-GEN-GL-008 (UT)

**No surface use is allowed during the following time period(s).  This stipulation does not apply to operation and maintenance of production facilities.**

Breeding and nesting seasonal use periods:
March 1 to June 15 (UT)

**On the lands described below:**

Insert applicable legal land description here.

**For the purpose of:**

Protecting greater sage-grouse (GRSG) and its habitat from surface disturbing and disruptive activities during breeding and nesting.

**Exceptions:**  The authorized officer may grant an exception if an environmental record of review determines that the action, as proposed or conditioned, will not affect reproductive displays, nest attendance, egg or chick survival, or early brood-rearing success. Actions designed to enhance the long-term utility or availability of suitable GRSG habitat may be exempted from this timing limitation. The FS can and does grant exceptions to seasonal restrictions if the FS, in coordination with the state agency, determines that granting an exception would not adversely impact the population being protected.

**Modifications:**  The authorized officer may modify the size and shape of the area or the criteria if an environmental record of review indicates the actual habitat suitability for seasonal GRSG activities is greater or less than the stipulated area, or it is identified through scientific research or monitoring that the existing criteria are inadequate or overly protective for maintaining the function or utility of the site for the seasonal habitat, life-history, or behavioral needs of the GRSG, including (but not limited to) reproductive display, daytime loafing/staging activities, and nesting.

**Waiver:**  A waiver may be granted if the deciding official determines through coordination with the state agency, that new habitat studies demonstrate the entire lease area affected by this stipulation no longer contains nesting habitat.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.  (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

---

**STPULATON G:  CONTROLLED SURFACE USE STIPULATION**
**Tall Structures near Greater Sage-Grouse Occupied Leks**
GRSG-GEN-GL-009 (UT)

**Surface occupancy or use is subject to the following special operating constraints.**

Development of tall structures within 2 miles from the perimeter of occupied leks, as determined by local conditions (e.g., vegetation or topography), with the potential to disrupt breeding or nesting by creating new perching/nesting opportunities for avian predators or by decreasing the use of an area, should be restricted within nesting habitat.

**On the lands described below:**

Insert applicable legal land description here.

**For the purpose of:**

Protecting greater sage-grouse (GSRG) and its habitat by limiting (not prohibiting) the placement of structures that introduce new perching and/or nesting opportunities for avian predators or by decreasing the use of an area.

**Exceptions:**  The authorized officer may approve actions that are within the applicable lek buffer distance identified above only if:
- it is not possible to relocate the project outside of the applicable lek buffer distance(s) identified above; and
- the FS determines that a lek buffer-distance other than the applicable distance identified above offers the same or a greater level of protection to GRSG and its habitat, including conservation of seasonal habitat outside of the analyzed buffer area, based on best available science, landscape features, and other existing protections, (e.g., land use allocations, state regulations); or
- the FS determines that impacts to GRSG and its habitat are minimized such that the project will cause minor or no new disturbance (ex. co-location with existing authorizations).

Justifiable departures to decrease or increase from these distances, based on local data, best available science, landscape features, and other existing protections (e.g., land use allocations and state regulations) may be appropriate for determining activity impacts. All variations in lek buffer distances will require appropriate analysis and disclosure as part of activity authorization.

**Modifications:**  A modification may be granted if the authorized officer determines through coordination with the state agency, that new habitat studies demonstrate a portion of the lease area affected by this stipulation no longer contains nesting and breeding habitat.

**Waiver**:  A waiver may be granted if the authorized officer determines through coordination with the state agency, that new habitat studies demonstrate the entire lease area affected by this stipulation no longer contains nesting and breeding habitat.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.  (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)**

---

Attachment D – Minerals: Stipulations                                    Stipulation G (UT)

**STIPULATION I:  TIMING LIMITATION STIPULATION**
**Greater Sage-Grouse – Noise Limitation**
GRSG-GEN-ST-006 (UT)

**Surface occupancy or use is subject to the following special operating constraints.**

New large scale infrastructure or facilities that create sustained detrimental noise levels at the perimeter of an occupied lek during lekking from <u>March 1</u> to <u>April 30</u> from <u>6:00 p.m.</u> to <u>9:00 a.m.</u>, will not be authorized.

**On the lands described below:**

Insert applicable legal land description here.

**For the purpose of:**

Limiting disturbances to greater sage-grouse (GRSG) during lekking.

**Exceptions:**  The authorized officer may grant an exception if an environmental record of review determines that the action, as proposed or conditioned, would not impair the function or utility of the site for the current or subsequent seasonal habitat, life-history, or behavioral needs of GRSG. Actions designed to enhance the long-term utility or availability of suitable GRSG habitat may be exempted from this timing limitation. The FS can and does grant exceptions to seasonal restrictions if the FS, in coordination with the state agency, determines that granting an exception would not adversely impact the population being protected.

**Modifications:**  The authorized officer may modify the size and shape of the area or the criteria if an environmental record of review finds that a portion of the area is non-habitat and disturbance there does not preclude effective sage-grouse use of adjacent habitats, or if it is identified through scientific research or monitoring that the existing criteria are inadequate or overly protective for maintaining the function or utility of the site for habitat, life-history, or behavioral needs of the GRSG, including (but not limited to) reproductive display, daytime loafing/staging activities, and nesting.

**Waiver:**  This stipulation may be waived over the entire lease if it is determined that the GRSG lek that would be disturbed by the noise has been classified as unoccupied (not active in the prior 10 years) as determined by the state wildlife agency.

**Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes.  (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.**

# ATTACHMENT E –
# DESIRED CONDITIONS AND
# HABITAT OBJECTIVES
# FOR NFS LANDS IN UTAH

# ATTACHMENT E – DESIRED CONDITIONS AND HABITAT OBJECTIVES

Attachment E is Appendix E in the FEIS.

**Table E-1. Utah - Seasonal habitat desired conditions for greater sage-grouse at the landscape scale.**

| ATTRIBUTE | INDICATORS | DESIRED CONDITION |
|---|---|---|
| **Breeding and Nesting[1,2,3,4,5] (March 1 to June 15)  Apply 3 miles from active leks[14]** | | |
| Lek Security | Proximity to conifers | Conifers are absent or uncommon on shrub/grassland ecological sites within 1.8 miles (approx. 3 kilometers) of occupied leks. [6,7,8] |
| | Proximity of sagebrush to leks | Adjacent protective sagebrush cover within 328 feet of a lek.[6] |
| Cover | % of seasonal habitat meeting desired conditions[·8] | >80% of the mapped breeding and nesting habitat meets the recommended vegetation characteristics. |
| | Sagebrush canopy cover[6,8,9] | High elevation: ≥ 17%<br>Low elevation: ≥ 7%<br>Parker: ≥ 18% |
| | Total shrub cover[6,7,8,9] | High Elevation: ≥ 19%<br>Low elevation: ≥ 17%<br>Parker: ≥ 22% |
| | Sagebrush Composition[9] | High elevation: ≥ 83%<br>Low elevation: ≥ 36%<br>Parker: ≥ 71% |
| | Shrub height[6,8,9] | High elevation: ≥ 23 cm<br>Low elevation: ≥ 30 cm<br>Parker: ≥ 15 cm |
| | Predominant sagebrush shape[6] | >50% in spreading[11] |
| | Perennial grass canopy cover[6,8,9,10] | High elevation: ≥ 8%<br>Low elevation: ≥ 5%<br>Parker: ≥ 4% |
| | Perennial grass heigth[6,7,8,] | Provide overhead and lateral concealment from predators[8,13] Defer to local data whenever possible to help determine proper height. |
| | Perennial forb canopy cover[6,8,9,12] | High elevation: ≥ 4%<br>Low elevation: ≥ 2%<br>Parker: ≥ 1% |
| **Brood-Rearing/Summer (June 16 to October 31)[1]** | | |
| Cover | % of Seasonal habitat meeting desired condition | >40% of the mapped brood-rearing/summer habitat meets recommended habitat characteristics where appropriate. (Relative to site potential, etc.).[8] |
| | Sagebrush canopy cover[6,8,9] | High elevation: ≥ 17%<br>Low elevation: ≥ 4%<br>Parker: ≥ 16% |
| | Total shrub cover[6,8,9] | High elevation: ≥ 17%<br>Low elevation: ≥ 10%<br>Parker: ≥ 19% |

| | Sagebrush Composition[9] | High elevation: ≥ 77%<br>Low elevation: ≥ 28%<br>Parker: ≥ 77% |
| | Shrub height[6,8,9] | High elevation: ≥ 20 cm<br>Low elevation: ≥ 26 cm<br>Parker: ≥ 11 cm |
| | Perennial grass cover[9] | High elevation: ≥ 8%<br>Low elevation: ≥ 5%<br>Parker: ≥ 6% |
| | Perennial forb cover[9] | High elevation: ≥ 6%<br>Low elevation: ≥ 2%<br>Parker: ≥ 2% |
| | Riparian areas/mesic meadows | Proper Functioning Condition[12, 15] |
| | Upland and riparian perennial forb availability | Preferred forbs are common with several preferred species present[6, 12] |
| **Winter (November 1 to February 28)[1]** | | |
| Cover and Food | % of seasonal habitat meeting desired conditions | >80% of the mapped wintering habitat meets winter habitat characteristics where appropriate (relative to site potential, etc.).[6,8,9] |
| | Sagebrush canopy cover above snow[6,8,14] | >10% |
| | Sagebrush height above snow[6, 7,8,13] | High elevation: ≥ 23 cm<br>Low elevation: ≥ 14 cm<br>Parker:  NA |

**Table E-1. Footnotes**

[1]Seasonal dates can be adjusted; that is, start and end dates may be shifted either earlier or later, but the local unit cannot lengthen or shorten the number of days.

[2]Utah Greater Sage-Grouse Working Group 2013

[3]Doherty 2008

[4]Doherty et al. 2010

[5]Holloran and Anderson. 2005

[6]Stiver et al. 2015

[7]Baruch-Mordo et al. 2013.

[8]Connelly et al. 2000

[9]Dahlgren et al. (In Press)

[10]Smith et al. 2018

[11]Stiver et al. 2015

[12]Preferred forbs are listed in Stiver et al. 2015 (Table B-1). Overall total forb cover may be greater than that of preferred forb cover since not all forb species are listed as preferred.

[13]The height of sagebrush remaining above the snow depends upon snow depth in a particular year. Intent is to manage for tall, healthy sagebrush stand.

[14] Manier et al. 2014

[15]Prichard et al. 2003, Dickard et al. 2015

**Table E-2. Utah - Treatment acres per decade.[1]**

| FOREST | MECHANICAL[2] | ACRES PRESCRIBED FIRE[3] | GRASS RESTORATION[4] |
|---|---|---|---|
| Ashley | 10,000 | 0 | 2,000 |
| Dixie | 13,000 | 1,000 | 7,000 |
| Fishlake | 7,000 | 0 | 1,000 |
| Manti-La Sal | 3,000 | 0 | 4,000 |
| Uinta-Wasatch-Cache | 9,000 | 0 | 0 |

[1]These are estimates of treatments required to achieve and/or maintain desired habitat conditions over a period of 10 years. There are many dynamic and highly variable disturbances that may happen over that period of time that could have a significant effect on the amount, type, and timing of treatment needed. Those disturbances are factored into the 10-year simulation using stochastic, not deterministic, techniques. Probabilities of events such as large wildfires are used in the model to make the simulation as realistic as possible, given empirical data about such events in the past, but the results of the simulation cannot be used to predict the future occurrence of such events, including their timing, size, or location, which are essentially random.

[2]Removal of conifers that have invaded sagebrush including phase 1 juniper that is 10% or less and reducing sagebrush cover in areas over 30% canopy cover

[3]Acres are those that are greater than 30% sagebrush canopy cover and/or invaded by 10% or greater conifer.

[4]Acres presently dominated by annual grasses that could be improved by herbicide application and seeding of perennial vegetation

# ATTACHMENT F – MONITORING FRAMEWORK MANAGEMENT APPROACH FOR NFS LANDS IN UTAH

## ATTACHMENT F - UTAH MONITORING FRAMEWORK MANAGEMENT APPROACH

Actions and authorizations and progress toward completing and implementing activity-level plans, ought to be monitored consistently across all planning units and will be reported to Forest Service headquarters annually, with a summary report every 5 years, for the planning area.

The report ought to be based on current databases and information available at the time of writing, and some figures may be revised in later years as more complete information is compiled.  Because some information is collected by the BLM and some by the state, a collaborative approach with other agencies may be useful for reporting.

**Major items for monitoring during the implementation of the Amendment**

A. Implementation (Decision) Monitoring.

Measure:  Number of authorizations (NEPA decisions) and associated conditions or restrictions (e.g., efforts to avoid, minimize, or compensatory mitigation) in PHMA and GHMA.

B. Habitat Monitoring.

- Measure 1: Sagebrush Availability (percent of sagebrush per unit area)
- Measure 2: Habitat Degradation (percent of human activity per unit area)
- Measure 3: Energy and Mining Density (facilities and locations per unit area)

C. Population (Demographics) Monitoring.

D. Effectiveness Monitoring

Effectiveness Monitoring identifies various land agency contributions to habitat loss and calculates the trend of the above metrics over time by posing a series of additional questions:

1. Sagebrush Availability and Condition:

   a.  Measure:  Amount of sagebrush availability (existing vegetation) and the change in the amount and condition of sagebrush

   b.  Measure: Existing amount of sagebrush on the landscape and the change in the amount relative to the pre-EuroAmerican historical, and potential, distribution of sagebrush (Biophysical potential).

   c.  Measure:  Trend and condition of the indicators describing sagebrush characteristics important to sage-grouse

2. Habitat Degradation and Intensity of Activities:

   a. Measure:  Amount of habitat degradation and the change in that amount

   b. Measure:  The intensity of activities and the change in the intensity

   c. Measure:  the amount of reclaimed energy-related degradation and the change in the amount

3. Measure:  the population estimation of sage-grouse and the change in the population estimation?

4. Measure:  Forest Service contributions to changes in the amount of sagebrush

5. Measure:  Forest Service contributions to habitat disturbance

6. Is the Amendment effective?

    a. Measure:  movement toward, away, or neutral to sage-grouse desired conditions

    b. Measure:  Disturbances within sage-grouse areas relative to objectives (e.g., caps)

    c. Measure:  Are sage-grouse populations within the plan boundary increasing, stable, or declining?

To satisfy these monitoring requirements, Region 4, in collaboration with Regions 2 and 1, ought to collect required information from various sources, with particularly close cooperation with the BLM and state wildlife agencies.

# ATTACHMENT G – MITIGATION STRATEGY MANAGEMENT APPROACH FOR NFS LANDS IN UTAH

## ATTACHMENT G - UTAH MITIGATION STRATEGY MANAGEMENT APPROACH

## General

The Forest Service may require mitigation that provides no net loss to the greater sage-grouse, in alignment with state-based compensatory mitigation efforts, when undertaking Forest Service management actions authorizing third party actions that result in GRSG habitat loss and degradation, consistent with valid existing rights and applicable law.

The Forest Service will incorporate elements of The Planning Rule at 36 CFR 219.7(e)(1), which discusses required plan components, including:  the intent of (iii) Standards "…to avoid or mitigate undesirable effects…" and (iv) Guidelines to "…to avoid or mitigate undesirable effects…"  The greater sage-grouse is also a potential species of conservation concern, so the Forest Service will also follow the Forest Service Handbook FSH 1099.12, 23.13 (c) 5 (c) (2) and work "…towards an all-lands approach to species conservation with other land managers across the range of the species, including efforts to mitigate threats or stressors and to provide ecological conditions that would support the species.  Mitigation will follow the mitigation hierarchy from the White House Council on Environmental Quality's (CEQ's) NEPA regulations at 40 CFR 1508.20 which explain that mitigation first involves avoiding environmental impacts when possible, then minimizing impacts, and then compensating for residual impacts by applying beneficial mitigation actions.

If Forest Service management actions and authorized third party actions result in habitat loss and degradation that would otherwise not be allowed, even after applying avoidance and minimization measures (i.e., residual impacts), then compensatory mitigation may be used to provide no net habitat loss to the greater sage-grouse. Mitigation actions ought to account for any uncertainty associated with the effectiveness of such mitigation, be durable, timely and additional to the residual impacts.

## Process and Coordination

Before authorizing third-party actions that result in habitat loss and degradation in accordance with applicable standards and guidelines, the deciding official may consider the following steps:

1) Notify the appropriate State of Utah agency to determine if the State of Utah requires or recommends any additional mitigation – including compensatory mitigation – under State regulations, policies, or programs related to the conservation of GRSG;

2) Recommend to the project proponent that it coordinate with the appropriate State of Utah agency to ensure it considers and complies with all applicable State requirements or recommendations relating to its proposal;

3) Consider the State's recommendations and incorporate that mitigation into the NEPA and decisionmaking process;

4) Ensure mitigation outcomes are consistent with the State of Utah's mitigation strategy and principles outlined in the State's Conservation Plan for Greater Sage-Grouse, including, but not limited to:

a) Create, restoring and/or protecting functional habitat or habitat corridors to offset the impacts of unavoidable disturbance to GRSG habitat (i.e., incorporating the concept of additivity in mitigation),

b) In most cases, compensatory mitigation projects ought to be completed before the project triggering mitigation occurs,

c) Compensatory mitigation projects may account for the risk that the mitigation may fail or not persist for the full duration of the project it is intended to offset,

d) Compensatory mitigation projects ought to provide habitat that is in place for at least the duration of the project it is intended to offset.

Project-specific analysis will be necessary to determine how a compensatory mitigation proposal addresses impacts from a proposed action. The FS may cooperate with the State to determine appropriate project design and alignment with State policies and requirements, including those regarding compensatory mitigation.

# ATTACHMENT H –
# ADAPTIVE MANAGEMENT STRATEGY AND DISTURBANCE CAP GUIDANCE MANAGEMENT APPROACHES FOR NFS LANDS IN UTAH

## ATTACHMENT H - UTAH ADAPTIVE MANAGEMENT STRATEGY AND DISTURBANCE CAP GUIDANCE MANAGEMENT APPROACHES

Adaptive management is a decision process that promotes flexible resource management decisionmaking that can be adjusted in the face of uncertainties as outcomes from management actions and other events become better understood. Careful monitoring of these outcomes both advances scientific understanding and helps with adjusting resource management directions as part of an iterative management process. Adaptive management also recognizes the importance of natural variability in contributing to ecological resilience and productivity. It is not a "trial and error" process, but rather emphasizes learning while doing. Adaptive management does not represent an end in itself, but rather a means to more effective decisions and enhanced benefits.

In relation to the Bureau of Land Management (BLM) and US Forest Service (Forest Service) National Greater Sage-Grouse Planning Strategy, adaptive management provides additional certainty for effectiveness of conservation when implemented in concert with the greater sage-grouse conservation measures presented in the plan amendments. This adaptive management strategy is incorporated along with the conservation measures in the plan to ameliorate threats to greater sage-grouse, thereby increasing the likelihood that the combined conservation measures are effective in reducing threats to that species.

Because the greater sage-grouse remains a state-managed species, biological information that informs adaptive management is collected and analyzed by the state of Utah.  Responses by the state, BLM, and Forest Service are dependent up on state-based monitoring information and interagency cooperation.

## SPATIAL SCALE

Greater sage-grouse biologists within a multi-agency adaptive management working group (e.g., from the BLM, FS, and the state), will assess population and habitat adaptive management triggers at project and Biologically Significant Unit (BSU) scales. A BSU is a geographical/spatial area that contains the relevant habitats that are used by greater sage-grouse. In Utah, the FS is applying adaptive management monitoring and management to the total PHMA area associated with a greater sage-grouse population are but FS decisions, per FS authority, only apply on FS system lands and not BLM or state lands. These areas generally align with habitat areas within the State of Utah's Sage-Grouse Management Areas (SGMAs). The following areas will be monitored and evaluated for population and habitat adaptive management triggers: Box Elder, Rich, Uinta, Strawberry, Carbon, Emery, Parker, Panguitch, Bald Hills, Hamlin, Sheeprocks, and Ibapah. These areas generally represent population use areas within the sub-region.

## ADAPTIVE MANAGEMENT TRIGGERS

This overarching adaptive management strategy includes the identification of a two-tiered system of triggers (soft and hard) for both populations and habitat. These triggers are not specific to any particular project, but identify population and habitat thresholds which, if exceeded/tripped, would result in a change in how the FS addresses management of greater sage-grouse in that area. Triggers have been based on the two key metrics that are regularly monitored: population declines and habitat loss.

Soft triggers represent an intermediate threshold indicating that management changes are needed to address habitat or population losses before they become severe. Hard triggers represent a threshold indicating that more direct and refined actions are quickly needed to stop a severe deviation from Greater

sage-grouse conservation objectives.

## Population Triggers

When evaluating population-based adaptive management triggers, this adaptive management strategy includes consideration of two aspects of population data to ensure that one set of data, if in error for any reason, would not unnecessarily trigger management changes. Population declines will be evaluated using the following two metrics:

- Population trends based on "trend leks," and
- Population growth as indicated by Lambda (λ) (as described below) from one year to the next for monitoring associated with all leks within a priority habitat management area (PHMA).

Trend leks are either leks that have been surveyed consistently in the last 20 years or leks that provide spatial representation within PHMA. Twenty years was chosen as the appropriate time period to identify trend leks with consideration of the cyclic nature of greater sage-grouse populations, and to capture monitoring results during the period of time when lek counts were conducted more consistently, and when lek count protocol was more standardized. The Utah Greater Sage-Grouse lek counts appear to have been in a low oscillation in the mid-1990s and again in the last few years (2011). During this same time period, standard lek count protocol use was increasing. Criteria for the trend leks are below:

- Starting with 1996, a lek that had > 1 male counted within one of 5 years between 1994-1998'
- Lek counts have occurred on 80 percent of the years since 1994 (16 years), AND
- Lek counts on 50 percent of the years are > 1 (8 of 16), OR
- A lek provides spatial representation (in the case of small populations, all leks may be included).

Lambda (λ) is the population change from a given Year 1 to the following Year 2 by dividing the total PHMA males counted in Year 2 by the total males counted in Year 1. If the result equals one (1), there was no change in the population level. A lambda that exceeds one (> 1) means the population is growing. A lambda that is less than one (< 1) indicates a declining population. To generate a consistent and comparable number, lambda can only be calculated on leks that are counted in consecutive years. This is to ensure that the increase in number of leks does not skew population data. This way, lambda can only be calculated for a lek if it is counted in 2 consecutive years. Some examples of calculating lambda are as follows:

- Males in Year 2/males counted in Year 1 = Lambda (λ)

Example A – No Change in Population: Assuming in 2000, the total males counted on leks in PHMA is 350 and in 2001, on the same leks counted in 2000, the total males counted are 350.

- 350/350 = 1; since lambda is 1, the population is unchanged.

Example B: Increasing Population: Assuming in 2000, the total males counted on leks in PHMA is 350 males and in 2001, on the same leks counted in 2000, the total males counted are 430.

- 430/350 = 1.23; since lambda is > 1, the population is increasing.

Example C: Decreasing Population: Assuming in 2000, the total males counted on leks in PHMA is 350 males and in 2001, on the same leks counted in 2000, the total males counted are 280.

- 280/350 = 0.8; since lambda is < 1, the population is decreasing.

Multiple population triggers were established to account for different potential population trends for

which management and monitoring should respond. This includes triggers to address rapid short-term declines in a population, as well as persistent long-term decreases of both trend leks or all monitored leks (using lambda - λ).

**Population Soft Triggers**

A population soft trigger would be met in PHMA if any one of 1a, 1b, 1c, or 1d are met, AND number 2 is also met:

> 1a) 4 consecutive years of 10 percent or greater annual decline in average males per lek in each year, based on "trend leks"; OR
>
> 1b) 6 consecutive years of declining average males per lek in each year, based on "trend leks"; OR
>
> 1c) 40 percent or greater decline in average males per lek in any single year, based on "trend leks"; OR
>
> 1d) 50 percent or greater decline in average males per lek in a 4 consecutive year period, based on "trend leks"; AND
>
> 2) Lambda of less than 1 in 4 consecutive years, based on all leks in the PHMA. Using criteria 1c, the 40 percent decline in a single year may occur at any point of the four year lambda monitoring window (year one, two, three or four).

**Population Hard Triggers**

A population hard trigger would be met in PHMA if any one of the following criteria (a-d) is identified through monitoring:

Short-term Decline

> a) 4 consecutive years of 20 percent or greater annual decline in average males per lek in each year, based on "trend leks"; OR
>
> b) average males per lek, based on trend leks, drops 75 percent below the 10-year rolling average males per lek in any single year (not a 75 percent decrease, but a decline under 75 percent of the 10-year rolling average); OR

Long-term Decline

> c) Lambda of less than 1 in 6 consecutive years, based on all leks within the PHMA; OR
>
> d) Lambda of less than 1 in 8 years of a 10-year window, based on all leks within the PHMA.

The management to be applied if the hard trigger criteria are met is identified below under the Management Response header. Any change in management would only apply to the PHMA where the trigger is tripped.

## Habitat Triggers

The adaptive management approach also includes triggers based on greater sage-grouse habitat. Habitat quality is addressed by adherence to the objectives contained in the plan amendment. The adaptive management triggers for habitat is based on the availability of habitat within PHMA, measured using a percent of habitat loss from a baseline of available greater sage-grouse habitat at the signing of the final plan amendments.

Available habitat ought to be mapped within each PHMA using available information such as vegetation data from satellite imagery (e.g., reGAP, LANDFIRE), local monitoring, soils data, etc. As additional

information is made available in the future it can be used to refine the baseline habitat areas that existed at the point the plan amendments are finalized (e.g., removing areas of high juniper density, cliffs, salt-desert scrublands). However, any such changes should reflect habitat as it occurred at the signing of the plan amendments and not reflect changes to habitat from that time. Changes from the baseline acreage could occur through either the addition of habitat (e.g., juniper reduction projects) or reduction of habitat (e.g., wildfire). In either case, the percentages identified in the triggers are generated by comparing the availability of habitat at a point in time to the acres of habitat available at the signing of the plan amendments.

For both soft and hard triggers, nesting areas will be delineated using lek buffers based on published peer-reviewed data, unless local nesting areas have been specifically mapped by federal or state biologists using telemetry or other methods with appropriate sampling across the population. Wintering areas may be identified using UDWR mapping, in coordination with BLM and Forest Service biologists.

**Habitat Soft Triggers**
A habitat soft trigger would be met in PHMA if one of the following criteria is identified through monitoring:
> a) 10 percent loss of total greater sage-grouse habitat in PHMA; OR
> b) 10 percent loss of habitat within nesting areas in PHMA; OR
> c) 5 percent loss of habitat within UDWR mapped wintering areas in PHMA; OR
> d) any one fire that burns 5 percent of total greater sage-grouse habitat in PHMA.

The management to be applied if the soft trigger criteria are met is identified below under the Management Response header. The intent of the population soft trigger is to identify decreases in the availability of greater sage-grouse habitat and adjust management before a hard trigger is met.

**Habitat Hard Triggers**
> a) 20 percent loss of total greater sage-grouse habitat in PHMA; OR
> b) 20 percent loss of habitat within nesting areas in PHMA; OR
> c) 20 percent loss of habitat within UDWR mapped wintering areas in PHMA.

The management to be applied if the hard trigger criteria are met is identified below under the Management Response header. Any change in management would only apply to the PHMA where the trigger is tripped.

## MANAGEMENT RESPONSE
To be successful, an adaptive management strategy couples a change in management direction to an identified change in resource condition (e.g., meeting an identified trigger). The type of management response would vary whether a soft trigger is met versus a hard trigger. The larger deviation from natural variation associated with a hard trigger would necessarily correspond with a greater change in management. The adaptive change in management will be targeted to respond/resolve the cause of the observed change in resource condition, to the extent it can be determined. A causal factor may be associated with one of the threats the USFWS identified in its 2010 listing determination, though additional monitoring information and research may also identify other causes that could result in reaching population or habitat triggers. It is also important to note that while one or more factors may be associated with a habitat or population decline, directly attributing a change to a specific cause or causes may not be possible. If direct cause or causes cannot be identified, the change in management

may need to address multiple threats that were identified in the area where the trigger was been met in order to alter a negative trend. Absence of a clear cause may not be justification to not take some action to reverse a trend.

**Management Response to Meeting Soft Triggers**
Upon an annual review of monitoring data, if it is apparent that soft trigger criteria have been met, the FS, in collaboration with the state and BLM, would determine if there is a specific cause or causes that are contributing to the decline.

If it is determined that the decline is related to a natural population variation, no specific management actions would be recommended. However, if FS management actions are determined to cause or contribute to the decline, the FS intends to work with the appropriate State of Utah agency and public land users to identify and apply management to slow down or stop the population decline.

Responses to soft triggers may require the adjustment of future project level/plan implementation activities in the short or long term, as consistent with the individual site-specific NEPA analyses. Soft trigger responses can come in the form of terms, conditions, BMPs, or site-specific mitigation measures. Examples of soft trigger responses could include, but are not limited to:

- Extending seasonal restrictions for seasonal surface disturbing activities (in accordance with existing rights and sage-grouse plan content);
- Temporary area closures related to travel management;
- Applying additional restrictions on discretionary activities or reject the authorization if mitigation criteria cannot be met;

**Management Response to Meeting Hard Triggers**
Hard triggers represent a threshold indicating that more direct and refined actions are quickly needed to stop a severe deviation from greater sage-grouse conservation objectives.  Upon documenting that a hard trigger has been met the FS intends to review available and pertinent data, in coordination with greater sage-grouse biologists from multiple agencies including BLM, UDWR, USFWS, and/or NRCS, to determine the causal factor(s) for the declines for the area where the trigger has been met.

**Adaptive Management Responses**
- If a hard trigger is tripped, areas within and adjacent to PHMA within a Population Area (BSU) would be the top priority for regional mitigation habitat restoration and fuels reduction treatments.
- If a soft trigger is tripped within PHMA within a Population Area (also referred to as a biologically significant unit (BSU)), the top priority for habitat improvement and restoration projects and for fuels reduction treatments.


## DISTURBANCE CAP GUIDANCE MANAGEMENT APPROACH

**DISTURBANCE CAP**
This land use plan has incorporated a 3 percent disturbance cap, applicable only within GRSG priority habitat management areas (PHMA). The disturbance cap applies to PHMA within 1) PHMA associated

with a GRSG population area (referred to as biologically significant units {BSU} when coordinating across state lines), and 2) the project authorization scale.

For the Utah Sub-region, a "BSU" is the total PHMA acreage associated with a GRSG population area. At this scale, the total PHMA acreage in a population area is the denominator portion of the percentage calculation.

At the project scale, the denominator is determined by identifying PHMA that is nearby or affected by the proposed project that is also located in PHMA. The project scale denominator should include the portions of PHMA used by the local population of GRSG, including all seasonal habitats and transition zones, associated with where the project is proposed. If sufficient monitoring information is not available to identify the portions of the PHMA used by a local population of GRSG, project level boundaries should be identified as described in steps 2-4 below. Steps 1and 5-9 are applicable to either approach of identifying the project scale denominator.

The denominator in the disturbance calculation formula consists of all acres of lands classified as PHMA within the analysis area (BSU or project scale). Areas that are not GRSG seasonal habitats, or are not currently supporting sagebrush cover (e.g., due to wildfire), are not excluded from the acres of PHMA in the denominator of the formula. Information regarding GRSG seasonal habitats, sagebrush availability, and areas with the potential to support GRSG populations will be considered along with other local conditions that may affect GRSG during the analysis of the proposed project area.

The numerator portion of the percentage calculation is limited to specific activities associated with specific GRSG threats. At both the BSU and project scale, this includes the items identified in the "Degradation Type" column of Table H-1. At the project scale, seven additional site scale features are included in the cap, identified and defined in Table H-2. No other activities, actions, or threats are included in the numerator when calculating the cap.

At both the BSU and project scale, the best available information should be used to map existing disturbance. At the BSU scale, the west-wide habitat degradation (disturbance) data layers and associated areas of direct influence identified in Table E-3, Anthropogenic Disturbance Types for Disturbance Calculations, will be used, at a minimum, to calculate the amount of disturbance and to determine if the disturbance cap has been exceeded as the land use plans are being implemented. Locally collected disturbance data will be used to determine if the disturbance cap has been exceeded for project authorizations, and, as available, may also be used to calculate the amount of disturbance in the BSUs. Locally collected disturbance data should identify the actual areas of disturbance to the extent possible and are not required to rely on the "Direct Area of Influence" estimates in Table E-3.

Although locatable mine sites are included in the degradation calculation, mining activities under the Mining Law of 1872, as amended, may not be subject to the 3 percent disturbance cap. Details about locatable mining activities will be fully disclosed and analyzed in the NEPA process to assess impacts to GRSG and their habitat as well as to goals and objectives, and other agency programs and activities.

**DISTURBANCE FORMULAS**

Formulas for calculations of the amount of disturbance in PHMA in a Population Area (BSU) and in a proposed project area are as follows:

- For PHMA within a Population Area (BSUs):

% Degradation Disturbance = (combined acres of the degradation threats) ÷ (acres of all lands within PHMA in a Population Area {BSU}) x 100.

- For the Project Analysis Area:

% Degradation Disturbance = (combined acres of the degradation threats plus the 7 site scale threats and acres of habitat loss3) ÷ (acres of all lands within PHMA in the project analysis area) x 100.

## DENSITY CAP

This land use plan has also incorporated a cap on the density of energy and mining facilities at an average of 1 facility per 640 acres in PHMA in a project authorization area. If the disturbance density from energy or mining facilities in PHMA in a proposed project area is on average less than 1 facility per 640 acres, the analysis will proceed through the NEPA process incorporating mitigation measures into an alternative. If the disturbance density from energy or mining facilities is greater than an average of 1 facility per 640 acres, the proposed project will either be deferred (1) until the density of energy and mining facilities is less than the cap, or (2) the energy or mining facility is co-located into existing disturbed area (subject to applicable laws and regulations, such as the Mining Law of 1872, as amended, valid existing rights, etc.). However, the density cap may be exceeded if a project is located in non-habitat or otherwise excepted according to applicable standards and guidelines.

**Table H-1.  Facilities used in the disturbance calculation**

| Degradation Type | Specific Activity | | Feature Buffer Radius |
|---|---|---|---|
| Oil and Gas | | | |
| | Wells | | 263 feet (5.0 ac buffer) |
| | Power Plants | | 263 feet  (5.0 ac buffer) |
| Coal | | | |
| | Mines | | Digitized Polygon Area |
| | Power Plants | | Digitized Polygon Area |
| | Coal Bed Methane Ponds | | Digitized Polygon Area |
| Wind | | | |
| | Wind Turbines | | 204 feet (3.0 ac buffer) |
| | Power plants | | 204 feet (3.0 ac buffer) |
| Solar | | | |
| | Fields/Power Plants | | 316 (7.2 ac buffer) |
| Geothermal | | | |
| | Wells | | 204 feet (3.0 ac buffer) |
| | Power plants | | Digitized Polygon Area |
| Mining | | | |
| | Locatable Developments | | Digitized Polygon Area |
| Roads | | | |
| | Surface Streets* | | 40.7 ft |
| | Major Roads | | 84.0 ft |
| | Interstate Highways | | 240.2 ft |
| Railroads | | | |
| | Active Lines | | 30.8 ft |

| Degradation Type | Specific Activity | | Feature Buffer Radius |
|---|---|---|---|
| Powerlines | | | |
| | 1-199 kV | | 100 ft |
| | 200-399 kV | | 150 ft |
| | 400-699 kV | | 200 ft |
| | 700+ kV | | 250 ft |
| Communication | | | |
| | Towers | | 186 feet (2.5 ac buffer) |
| | Meteorological towers | | 186 feet (2.5 ac buffer) |
| Facilities | | | |
| | Nuclear Energy Facilities | | Digitized Polygon Area |
| | Airport Facilities | | Digitized Polygon Area |
| | Military Range Facilities | | Digitized Polygon Area |
| | Hydroelectric Plants | | Digitized Polygon Area |
| | Recreation Areas and Facilities (>0.25 acres) | | Digitized Polygon Area |

*Includes graded gravel roads and those more improved, not dirt and two-track roads or trails

**Table H-2 The Seven Site Scale Features Considered Threats to Sage-Grouse Included in the Disturbance Calculation for Project Authorizations**

1. Coalbed Methane Ponds
2. Meteorological Towers
3. Nuclear Energy Facilities
4. Airport Facilities and Infrastructure
5. Military Range Facilities & Infrastructure
6. Hydroelectric Plants
7. Recreation Areas Facilities and Infrastructure

Definitions:
1. Coalbed Methane and other Energy-related Retention Ponds – The footprint boundary will follow the fenceline and includes the area within the fenceline surrounding the impoundment. If the pond is not fenced, the impoundment itself is the footprint. Other infrastructure associated with the containment ponds (roads, well pads, etc.) will be captured in other disturbance categories.
2. Meteorological Towers – This feature includes long-term weather monitoring and temporary meteorological towers associated with short-term wind testing. The footprint boundary includes the area underneath the guy wires.
3. Nuclear Energy Facilities – The footprint boundary includes visible facilities (fence, road, etc.) and undisturbed areas within the facility's perimeter.
4. Airport Facilities and Infrastructure (public and private) – The footprint boundary will follow the boundary of the airport or heliport and includes mowed areas, parking lots, hangers, taxiways, driveways, terminals, maintenance facilities, beacons and related features. Indicators of the boundary, such as distinct land cover changes, fences and perimeter roads, will be used to encompass the entire airport or heliport.
5. Military Range Facilities & Infrastructure – The footprint boundary will follow the outer edge of the disturbed areas around buildings and includes undisturbed areas within the facility's perimeter.
6. Hydroelectric Plants – The footprint boundary includes visible facilities (fence, road, etc.) and undisturbed areas within the facility's perimeter.

7. Recreation Areas & Facilities – This feature includes all sites/facilities larger than 0.25 acres in size. The footprint boundary will include any undisturbed areas within the site/facility.

## PROJECT ANALYSIS AREA METHOD FOR PERMITTING SURFACE DISTURBANCE ACTIVITIES

1. Identify the portions of the proposed area of physical disturbance within PHMA. In other words, in GIS, "clip" the proposed project to PHMA.

2. Determine potentially affected occupied leks by placing a biologically appropriate buffer distance, given the disturbance type (i.e., using table E3 and/or other scientific information), around the proposed area of physical disturbance related to the project. All occupied leks located within the boundary and within PHMA will be considered affected by the project.

3. Next, place a biologically appropriate buffer distance, based on the disturbance type, around each of the affected occupied leks.

4. PHMA within the project buffer and lek buffer creates the project analysis area for each individual project. If there are no occupied leks within the project buffer, the project analysis area will be that portion of the project buffer within PHMA.

5. Map disturbances or use locally available data. Use of NAIP imagery is recommended.

6. Calculate percent existing disturbance using the formula above. If existing disturbance is less than 3 percent, proceed to next step. If existing disturbance is greater than 3 percent, consider if the proposal can incorporate avoidance, minimizing, and compensatory mitigation that reduces the project level disturbance below 3 percent.

7. Add proposed project disturbance footprint area and recalculate the percent disturbance. If disturbance is less than 3 percent, proceed to next step. If resulting disturbance is greater than 3 percent, consider if the proposal can incorporate avoidance, minimizing, and compensatory mitigation that reduces the project level disturbance below 3 percent.

8. For disturbance from proposed energy or mining facilities, calculate the disturbance density (listed below under *Density Cap*). If the disturbance density is less than 1 facility per 640 acres, averaged across the project analysis area, proceed to the NEPA analysis incorporating mitigation measures into an alternative. If the disturbance density is greater than 1 facility per 640 acres, averaged across the project analysis area, either defer the proposed energy or mining project or co-locate it into existing disturbed area. Discrete disturbances should be consolidated and localized as much as possible; this could result in small areas where density exceeds 1 facility per 640 acres, but average density in the project analysis area remains beneath the cap.

9. If a project that would exceed the degradation cap or density cap (for energy or mining facilities) cannot be deferred due to valid existing rights or other existing laws and regulations, fully disclose the local and regional impacts of the proposed action in the associated NEPA.